NIELSEN MERKSAMER
    PARRINELLO GROSS & LEONI LLP
JAMES R. PARRINELLO, ESQ. (S.B. NO. 63415)
CHRISTOPHER E. SKINNELL, ESQ. (S.B. NO. 227093)
2350 Kerner Boulevard, Suite 250
San Rafael, California 94901
Telephone:  (415) 389-6800
Facsimile:   (415) 388-6874

NIELSEN MERKSAMER
    PARRINELLO GROSS & LEONI LLP
CATHY A. CHRISTIAN, ESQ. (S.B. NO. 83196)
1415 L Street, Suite 1200
Sacramento, California 95814
Telephone:  (916) 446-6752
Facsimile:   (916) 446-6106

*Attorneys for Plaintiff*
COUNTY OF AMADOR, CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COUNTY OF AMADOR, CALIFORNIA,<br><br>    *Plaintiff,*<br><br>vs.<br><br>THE UNITED STATES DEPARTMENT OF THE INTERIOR; S.M.R. JEWELL, Secretary of the United States Department of Interior; KEVIN WASHBURN, Assistant Secretary of Indian Affairs, United States Department of Interior,<br><br>    *Defendants.*<br><br>THE IONE BAND OF MIWOK INDIANS,<br><br>    *Intervenor Defendant* | Case No. 2:12-cv-01710-TLN-CKD<br><br>**AMADOR COUNTY'S COMBINED REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO FEDERAL DEFENDANTS' AND INTERVENER-DEFENDANT IONE BAND'S CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>DATE: November 6, 2014<br>TIME:  2:00 p.m.<br>JUDGE: Hon. Troy L. Nunley<br>     (Courtroom No. 2) |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     INTRODUCTION ....................................................................................................1

II.    THE COUNTY IS NOT PRECLUDED FROM CHALLENGING THE DEPARTMENT'S RELIANCE ON THE *ULTRA VIRES* BRUCE AND DEER LETTERS AS THE BASIS FOR THE ROD.................................................3

III.   THE DEPARTMENT ACTED ARBITRARILY & CAPRICIOUSLY IN "GRANDFATHERING IN" THE 2006 INDIAN LANDS OPINION, CONTRARY TO CONGRESSIONAL INTENT ....................................................6

    A.    The Grandfather Clause Is Not Entitled To *Chevron* Deference..............................7

    B.    The Federal Defendants' And Ione Band's Efforts To Explain Away The Secretary's Explicit Recognition That Congress Intended To Limit The "Restored Lands" Exception Only To Tribes That Were Recognized Through The Part 83 Recognition Regulations, Are Without Merit ...................................................9

    C.    The *NRDC* Factors <u>Do</u> Apply To This Case ..........................................10

    D.    The Grandfather Rule Contained In 25 C.F.R. § 292.26(B) Cannot Survive Application Of The *NRDC* Factors Under The Facts Of This Case .............................................................13

    E.    The Solicitor's 2009 Withdrawal Of The 2006 Indian Lands Opinion Renders The Grandfather Clause Inapplicable Anyway ...........................15

    F.    The County's Challenge To The Unlawful "Grandfathering" Of The 2006 ILO Is Not Time-Barred Or Otherwise Procedurally Deficient ..................................................17

IV.    THE GOVERNMENT IS JUDICIALLY ESTOPPED, AND THE IONE BAND IS COLLATERALLY ESTOPPED, FROM ARGUING THAT THE BAND WAS RECOGNIZED PRIOR TO 1991 .........................................19

    A.    The Federal Government Is Judicially Estopped.....................................19

    B.    The Band Is Collaterally Estopped.........................................................23

V.     UNDER *CARCIERI V. SALAZAR*, THE IONE BAND IS NOT ELIGIBLE TO HAVE LANDS TAKEN INTO TRUST UNDER THE INDIAN REORGANIZATION ACT, BECAUSE IT WAS NOT A "RECOGNIZED TRIBE" THAT WAS "UNDER FEDERAL JURISDICTION" IN 1934 .................................................28

A.    The Record Shows The Band Was Not A "Tribe" In 1934 .....................................28

    1.    The ROD's finding that the Ione Band was a "tribe" in 1934 is not supported by substantial evidence .............................................29

    2.    The *Muwekma* court's acceptance of the federal government's uncontested claims that the Ione Band was properly recognized as a "tribe" by Ada Deer, in a case to which Amador County was not even a party, does not resolve the issue ..................................................................................34

B.    Even If It Was A "Tribe," The Ione Band Was Not "Under Federal Jurisdiction" In 1934 ...................................................36

    1.    The failure of the Federal Government to actually acquire land on behalf of the "Ione Band" means it was not "under federal jurisdiction" in 1934, and the Secretary's contrary "interpretation" is not entitled to deference because it is contrary to the clear legislative history .....................................36

    2.    There is no other substantial evidence that the Band was "under federal jurisdiction" in 1934 either ...................................45

VI.   THE ROD'S DETERMINATION THAT THE IONE BAND IS A "RESTORED" TRIBE CONSTITUTES AN ABUSE OF DISCRETION AND IS ARBITRARY, CAPRICIOUS AND CONTRARY TO LAW, BECAUSE EVEN IF THE IONE BAND WAS RECOGNIZED IN 1934, (1) IT WAS NEVER TERMINATED, AND (2) IT WAS NEVER LAWFULLY "RESTORED" WITHIN THE MEANING OF IGRA .................................47

VII.   CONCLUSION...................................................................50

# TABLE OF AUTHORITIES

Page(s)

CASES

*Alaska v. Babbitt,*
    72 F.3d 698 (9th Cir. 1995) ........................................................................................44

*Amador County v. Dep't of Interior,*
    Case No. 2:07-cv-00527-LKK-GGH (E.D. Cal.) ......................................................14

*Ariz. Grocery Co. v. Atchison, T. & S.F.R. Co.,*
    284 U.S. 370, 52 S. Ct. 183, 76 L. Ed. 348 (1932).....................................................5

*Artichoke Joe's Cal. Grand Casino v. Norton,*
    278 F. Supp. 2d 1174 (E.D. Cal. 2003), *aff'd*, 353 F.3d 712 (9th Cir. 2003),
    *cert. denied*, 543 U.S. 815 (2004).........................................................................5, 6

*Bowen v. Georgetown Univ. Hosp.,*
    488 U.S. 204, 109 S. Ct. 468, 102 L. Ed. 2d 493 (1988)....................................11, 12

*Carcieri v. Salazar,*
    555 U.S. 379, 129 S. Ct. 1058, 172 L. Ed. 2d 791 (2009)...................................*passim*

*Carter Prods., Inc. v. Federal Trade Comm'n,*
    268 F.2d 461 (9th Cir), *cert. denied*, 361 U.S. 884 (1959) ..................................30, 32

*Cent. Bank, N.A. v. First Interstate Bank, N.A.,*
    511 U.S. 164, 114 S. Ct. 1439, 128 L. Ed. 2d 119 (1994).........................................41

*Cherokee Nation of Okla. v. Norton,*
    389 F.3d 1074 (D.C. Cir. 2004), *cert. denied*, 546 U.S. 812 (2005) ........................36

*Cherokee Nation v. Babbitt,*
    117 F.3d 1489 (D.C. Cir. 1997)..................................................................................36

*Chevron, USA, Inc. v. Natural Res. Def. Council, Inc.,*
    467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)..............................2, 7, 8, 44

*Citizens Against Casino Gambling v. Kempthorne,*
    471 F. Supp. 2d 295 (W.D.N.Y. 2007)........................................................................29

*Comm. of the Russian Fed'n on Precious Metals & Gems v. United States,*
    987 F. Supp. 1181 (N.D. Cal. 1997)...........................................................................21

*Conners v. United States,*
    180 U.S. 271, 21 S. Ct. 362, 45 L. Ed. 525 (1901).....................................................34

*County of Amador v. United States DOI*,
2007 U.S. Dist. LEXIS 95715 (E.D. Cal. Dec. 13, 2007) ..................................5, 6, 17

*D&F Afonso Realty Trust v. Garvey*,
216 F.3d 1191 (D.C. Cir. 2000)..................................................................................4

*DiSalvo v. DiSalvo (In re DiSalvo)*,
219 F.3d 1035 (9th Cir. 2000) ..................................................................................23

*Dongbu Steel Co. v. United States*,
635 F.3d 1363 (Fed. Cir. 2011) ..................................................................................8

*Estate of Prasad v. County of Sutter*,
958 F. Supp. 2d 1101 (E.D. Cal. 2013) (Nunley, J.) .................................................18

*Federated Mut. Ins. Co. v. Anderson*,
991 P.2d 915 (Mont. 1999).......................................................................................24

*Fernandez-Vargas v. Gonzales*,
548 U.S. 30, 126 S. Ct. 2422, 165 L. Ed. 2d 323 (2006) ..........................................11

*Fiorello v. Heckler*,
725 F.2d 174 (2d Cir. 1983) ......................................................................................30

*Fort Hall Landowners Alliance, Inc. v. BIA*,
407 F. Supp. 2d 1220 (D. Idaho 2006) ......................................................................21

*Frank v. United Airlines, Inc.*,
216 F.3d 845 (9th Cir. 2000) .....................................................................................24

*Friends of Yosemite Valley v. Norton*,
348 F.3d 789 (9th Cir. 2003) .......................................................................................9

*Garner v. Heckler*,
745 F.2d 383 (6th Cir. 1984) .....................................................................................29

*Georgetown University Hospital v. Bowen*,
261 U.S. App. D.C. 262, 821 F.2d 750 (D.C. Cir. 1987) ..........................................11

*Goodyear Atomic Corp. v. Miller*,
486 U.S. 174, 108 S. Ct. 1704, 100 L. Ed. 2d 158 (1988)..........................................10

*Grand Traverse Band of Ottawa & Chippewa Indians v. Office of the U.S. Atty*,
198 F. Supp. 2d 920 (W.D. Mich. 2002) ..............................................................47, 48

*Grand Traverse Band of Ottawa & Chippewa Indians v. Office of the U.S. Atty.*,
369 F.3d 960 (6th Cir. 2004) ........................................................42, 48, 49, 50

*Hartmann v. Cal. Dep't of Corr. & Rehab.*,
  707 F.3d 1114 (9th Cir. 2013) ..................................................................18

*In re Lockard*,
  884 F.2d 1171 (9th Cir. 1989) ..............................................................24, 25

*Jones v. Heckler*,
  760 F.2d 993 (9th Cir. 1984) ....................................................................30

*Kahawaiolaa v. Norton*,
  222 F. Supp. 2d 1213 (D. Haw. 2002), *aff'd*, 386 F.3d 1271 (9th Cir. 2004) ............39

*Kern v. United States Bureau of Land Mgmt.*,
  284 F.3d 1062 (9th Cir. 2002) ..................................................................21

*Lahr v. NTSB*,
  569 F.3d 964 (9th Cir. 2009), *cert. denied*, 561 U.S. 1007 (2010) ..........................16

*Landgraf v. USI Film Prods.*,
  511 U.S. 244, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994)........................................11

*Lawlor v. National Screen Service Corp.*,
  349 U.S. 322, 75 S. Ct. 865, 99 L. Ed. 1122 (1955)..............................................24

*Mashpee Tribe v. Secretary of Interior*,
  820 F.2d 480 (1st Cir. 1987)......................................................................42

*Morton v. Mancari*,
  417 U.S. 535, 94 S. Ct. 2474, 41 L. Ed. 2d 290 (1974)........................................40

*Morton v. Ruiz*,
  415 U.S. 199, 94 S. Ct. 1055, 39 L. Ed. 2d 270 (1974)..........................................4

*Mpoyo v. Litton Electro-Optical Sys.*,
  430 F.3d 985 (9th Cir. 2005) ....................................................................25

*Muwekma Ohlone Tribe v. Kempthorne*,
  452 F. Supp. 2d 105 (D.D.C. 2006).....................................................5, 34, 35, 36

*Muwekma Ohlone Tribe v. Salazar*,
  813 F. Supp. 2d 170 (D.D.C. 2011), *aff'd*, 708 F.3d 209 (D.C. Cir. 2013)...............34

*N. County Cmty. Alliance, Inc. v. Salazar*,
  573 F.3d 738 (9th Cir. 2009), *cert. denied*, 559 U.S. 1068 (2010) ..........................6

*Natural Res. Defense Council, Inc. v. Thomas*,
  838 F.2d 1224 (D.C. Cir.), *cert. denied sub nom.*, *Alabama Power Co. v.*
  *Thomas*, 488 U.S. 901 (1988) .............................................................*passim*

*New York ex rel. Kennedy v. Becker*,
    241 U.S. 556, 36 S. Ct. 705, 60 L. Ed. 1166 (1916)...................................................40

*Northcoast Envtl. Ctr. v. Glickman*,
    136 F.3d 660 (9th Cir. 1998) ................................................................................21

*Northern Alaska Environmental Center v. Lujan*,
    961 F.2d 886 (9th Cir. 1992) ................................................................................21

*Parklane Hosiery Co. v. Shore*,
    439 U.S. 322, 99 S. Ct. 645, 58 L. Ed. 2d 552 (1979)...........................................24, 34

*Port of Seattle v. FERC*,
    499 F.3d 1016 (9th Cir. 2007) ..............................................................................8, 30

*Potawatamie Indians v. United States*,
    27 Ct. Cl. 403 (1892) ...........................................................................................48

*Pub. Citizen v. DOT*,
    316 F.3d 1002 (9th Cir. 2003) ..............................................................................9

*Quinaielt Tribe of Indians v. United States*,
    102 Ct. Cl. 822 (1945) .........................................................................................43

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
    442 F.3d 741 (9th Cir. 2006) ................................................................................24

*Richardson v. Perales*,
    402 U.S. 389, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)..........................................29

*Romeiro De Silva v. Smith*,
    773 F.2d 1021 (9th Cir. 1985) ..............................................................................5, 10

*Salmon River Concerned Citizens v. Robertson*,
    32 F.3d 1346 (9th Cir. 1994) ................................................................................21

*San Luis & Delta-Mendota Water Auth. v. United States Dept. of Interior*,
    236 F.R.D. 491 (E.D. Cal. 2006) ..........................................................................18

*Santa Rosa Band of Indians v. Kings County*,
    532 F.2d 655 (9th Cir. 1975), *cert. denied*, 429 U.S. 1038 (1977) .........................41

*Sault Ste. Marie Tribe of Lake Superior Chippewa Indians v. United States*,
    78 F. Supp. 2d 699 (W.D. Mich. 1999), *vac'd & rem'd*, 288 F.3d 910 (6th Cir.
    2002) ................................................................................................................48, 49

*Securities and Exchange Comm'n v. Chenery Corp.*,
    318 U.S. 80, 63 S. Ct. 454, 87 L. Ed. 626 (1943)...............................................13, 18

*Shrestha v. Holder,*
    590 F.3d 1034 (9th Cir. 2010) ....................................................................30

*Sierra Club v. EPA,*
    719 F.2d 436 (D.C. Cir. 1983), *cert. denied sub nom., Ala. Power Co. v. Sierra
    Club,* 468 U.S. 1204 (1984).................................................................12, 13

*Singh v. Holder,*
    406 Fed. Appx. 166 (9th Cir. 2010).........................................................30

*Stand Up for California! v. United States DOI,*
    919 F. Supp. 2d 51 (D.D.C. 2013)...........................................................42

*Taylor v. Sturgell,*
    553 U.S. 880, 128 S. Ct. 2161, 171 L. Ed. 2d 155 (2008)........................23

*Tim v. Colvin,*
    2014 U.S. Dist. LEXIS 28198 (N.D.N.Y. Jan. 31, 2014).........................30

*TOMAC v. Norton,*
    433 F.3d 852 (D.C. Cir. 2006).................................................41, 48, 49, 50

*Troutt v. Colo. W. Ins. Co.,*
    246 F.3d 1150 (9th Cir. 2001) .................................................................24

*Turcios v. INS,*
    821 F.2d 1396 (9th Cir. 1987) .................................................................29

*United States Dep't of the Treas. IRS Office of Chief Counsel Wash., D.C. v. Fed.
    Lab. Rel. Auth.,*
    739 F.3d 13 (D.C. Cir. Jan. 3, 2014) ..........................................................8

*United States ex rel. Marks v. Brooks,*
    32 F. Supp. 422 (N.D. Ind. 1940) ............................................................40

*United States v. Liquidators of European Fed. Credit Bank,*
    630 F.3d 1139 (9th Cir. 2011) .................................................................20

*United States v. Owens,*
    54 F.3d 271 (6th Cir. 1995) .....................................................................21

*United States v. Wash.,*
    157 F.3d 630 (9th Cir. 1998) ...................................................................21

*Universal Camera Corp. v. Nat'l Labor Relations Bd.,*
    340 U.S. 474, 71 S. Ct. 456, 95 L. Ed. 456 (1951).................................29

*Vallejo General Hospital v. Bowen*,
   851 F.2d 229 (9th Cir. 1988) ...............................................................29

*W. Shoshone Bus. Council v. Babbitt*,
   1 F.3d 1052 (10th Cir. 1993) ...............................................................42

*Ward v. Race Horse*,
   163 U.S. 504, 16 S. Ct. 1076, 41 L. Ed. 244 (1896) ...................................40

*Williams Natural Gas Co. v. FERC*,
   943 F.2d 1320 (D.C. Cir. 1991) ...........................................................13

*Williams v. Lee*,
   358 U.S. 217, 79 S. Ct. 269, 3 L. Ed. 2d 251 (1959) ...................................40

*Wind River Mining Corp. v. United States*,
   946 F.2d 710 (9th Cir. 1991) ...........................................................5, 6, 19

*WRT Energy Corp. v. FERC*,
   107 F.3d 314 (5th Cir. 1997) ...............................................................15

STATUTES

Administrative Procedure Act, 5 U.S.C.A. 1001 et seq. ...........................................29

*Federally Recognized Indian Tribe List Act of 1994* ................................................8

Indian Reorganization Act, 25 U.S.C. § 461 *et seq.* ("IRA")....................................passim

Little Traverse Bay Bands of Odawa Indians and Little River Band of Ottawa Indians
   Act, 25 U.S.C. § 1300k *et seq.*...........................................................49

Pokagon Restoration Act, 25 U.S.C. § 1300j *et seq.*................................................49

Stats. ch. 576, § 16, 48 Stat. 987 (June 18, 1934) ...............................................43

Stats. ch. 576, § 17, 48 Stat. 987 (June 18, 1934) ...............................................44

7 Stat. 51, art. IV, ¶ 3, cl. 7 .................................................................48

5 U.S.C. § 553(b)(2), (c) .......................................................................19

25 U.S.C. § 465 (IRA § 5) ...................................................................passim

25 U.S.C. § 476 (IRA § 16) ..................................................................41, 43

25 U.S.C. § 477 (IRA § 17) ................................................................................43

25 U.S.C. § 478 (IRA § 18) ................................................................................43

25 U.S.C. § 479 (IRA § 19) ..................................................................28, 37, 41

25 U.S.C. § 1300j(1) ....................................................................................41, 48

25 U.S.C. § 1300j(2) ....................................................................................41, 48

25 U.S.C. § 1300j-5 ............................................................................................49

25 U.S.C. § 1300k(2)-(4) ...................................................................................49

25 U.S.C. § 1300k-4 ...........................................................................................49

25 U.S.C. § 1300k(5) ..........................................................................................49

25 U.S.C. § 2719 .........................................................................................12, 16

25 U.S.C. § 2719(a) ..............................................................................................1

25 U.S.C. § 2719(b)(1)(A) ...................................................................................1

28 U.S.C. § 2401(a) .......................................................................................5, 26

OTHER AUTHORITIES

25 C.F.R. ...........................................................................................................18

25 C.F.R. § 1.2 .............................................................................................36, 37

25 C.F.R. Part 83 .........................................................................................passim

25 C.F.R. §§ 83.1-83.11 .....................................................................................20

25 C.F.R. Part 292 .......................................................................................passim

25 C.F.R. § 292.10 .......................................................................................passim

25 C.F.R. § 292.26 ......................................................................................12, 18

25 C.F.R. § 292.26(b) ..................................................................................passim

71 Fed. Reg. 58769 (Oct. 5, 2006) ....................................................................14

72 Fed. Reg. 1954 (Jan. 17, 2007) .....................................................................14

73 Fed. Reg. 29354 (May 20, 2008) ...................................................................8, 10, 13, 17, 50

*County of Amador v. Assoc. Deputy Sec'y of the Interior & Assoc. Solicitor, Div.*
  *of Indian Affairs,*
  44 IBIA 4, 2006 I.D. LEXIS 80, Docket No. IBIA 07-24-A (Oct. 19, 2006) .....................35

F. Cohen, *Handbook of Federal Indian Law* (1942), *available online at*
  http://hdl.handle.net/2027/uiug.30112074260008 (last visited Sept. 3, 2014)....................43

F. Cohen, *Handbook of Federal Indian Law* (1982) ................................................................41

Fed. R. Civ. Proc. 8...................................................................................................................18

*Hearings on S.2755 and S.3645: A Bill to Grant to Indians Living Under Federal*
  *Tutelage the Freedom To Organize for Purposes of Local Self-Government and*
  *Economic Enterprise, Before the S. Comm. on Indian Affairs*, 73d Cong., 2d Sess.
  (1934), available online at http://hdl.handle.net/2027/uc1.b5157913 (last visited
  Sept. 3, 2014) ...................................................................................................................38, 39

Merriam Webster Dictionary, definition of "jurisdiction" ........................................................44

Restatement (Second) of Judgments (1982) § 13 .....................................................................25

Tr. of BIA Carcieri Tribal Consultation: Arlington, Va., Wed., July 8, 2009, *online at*
  http://www.bia.gov/cs/groups/public/documents/text/idc-001871.pdf (last visited
  Sept. 4, 2014)..................................................................................................................2, 3

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, p. 1936 (G. & C.
  Merriam Co. 1976) ...........................................................................................................47

# I.      __INTRODUCTION.__

Amador County's concern over the Band's proposed casino should not come as a surprise. Such casinos risk producing significant negative impacts on a small, rural locality like Amador County—which already has one large-scale casino in the County (the Jackson Rancheria), and another in the works (the Buena Vista Rancheria).

In enacting the Indian Gaming Regulatory Act, Congress gave local governments like Amador County a place at the table when it comes to such proposed projects.  That Act generally requires that the Ione Band's proposed off-reservation gaming should take place only if the Secretary and the Governor of California both conclude that gaming would be "in the best interest of the Indian tribe and its members" __and__ would "not be detrimental" to the surrounding community.  25 U.S.C. § 2719(a) and (b)(1)(A) (emphasis added).  By adopting the "two-part" Secretary/Governor approval process, IGRA seeks to protect local interests like those of Amador County, which will be drastically and adversely affected by additional large-scale authorized gambling operations, by requiring the Secretary to "consult with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes."   25 U.S.C. § 2719(b)(1)(A).  This "two-part test" is the exception that must be satisfied before the Plymouth Parcels may be used for Indian gaming operations.   It is the Band's attempt to bypass these congressionally-crafted requirements, and the Department's results-oriented willingness to let it do so (as it previously purported to let the Band bypass the process for federal recognition) that are at issue in this case.  Those actions are unlawful.

First, the Secretary of Interior is precluded, by the Supreme Court's decision in *Carcieri v. Salazar*, 555 U.S. 379, 129 S. Ct. 1058, 172 L. Ed. 2d 791 (2009) ( *"Carcieri"*), from taking land into trust on behalf of the Ione Band because it was not (1) a recognized "tribe" that was (2) "under federal jurisdiction" in June 1934.  As to the first point, though the ROD takes the position that the Band was a "tribe" on that date, that determination is not supported by substantial evidence in the administrative record.  Furthermore, the Department has itself repeatedly taken a diametrically opposite position concerning the Ione Band, including asserting in the *Ione Band litigation* before this Court that the Ione Band was __not and never had been__ federally recognized, and could only

become federally recognized by proceeding through the Part 83 process. (*See* AR000691-767, SAR20814-929.)[1]  The Federal Defendants are judicially estopped, and the Ione Band collaterally estopped, from contending otherwise now. Their arguments to the contrary are meritless.

Moreover, the ROD's purported "interpretation" of the phrase "under federal jurisdiction" is contrary to congressional intent.  Not surprisingly, the Federal Defendants' first line of defense is to seek refuge in *Chevron, USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984) ("*Chevron*"), which requires judicial deference to an agency's "reasonable interpretation" of a statute in cases where Congress has not "directly spoken to the precise question at issue." *Id*. at 842-44.  But the legislative history of the Indian Reorganization Act, 25 U.S.C. § 461 *et seq*. ("IRA"), clearly shows that—at least absent an existing treaty—the phrase "under federal jurisdiction" was meant to limit the provisions of that Act to "tribes" on whose behalf the federal government owned land (*e.g.,* a reservation).  Where the legislative history clearly establishes Congress's intent, there is no room for agency interpretation.

In fact, the Department's open-ended "interpretation" of "under federal jurisdiction" is nothing more than a blatant end-run around the Supreme Court's decision in *Carcieri*—a transparent effort to render that phrase superfluous by stripping it of all meaningful content.  The Department's hostility to the *Carcieri* decision is no secret.  Almost immediately following its issuance, the Department began consulting with tribes about proposed "fixes" for the "Carcieri issue," to "make sure that all recognized—federally recognized Indian tribes have the same opportunity to acquire land into trust and to make sure that the Carcieri decision of this past February is not an impediment, cannot be—is not impediment for such a goal."[2]  Department officials frankly admitted at those consultations that "We are not separately consulting with states or communities, and we don't intend to. . . . It's not that we are going to be look [sic] at what states

---

[1] Though the Federal Defendants have numbered the pages of the supplemental record by continuing the "AR" format from the original record, for the convenience of the Court, Plaintiff's citations to the supplemental record will preface page numbers with "SAR."

[2] Tr. of BIA Carcieri Tribal Consultation: Arlington, Va., Wed., July 8, 2009, p. 17:6-11 (Comments of Acting Principal Assistant Secretary for Indian Affairs George Skibine), *online at* http://www.bia.gov/cs/groups/public/documents/text/idc-001871.pdf (last visited Sept. 4, 2014).

want. Our clients are you guys, and that's where it's going to be."[3]

Furthermore, the ROD's determination that the Plymouth Parcels qualify as Indian lands eligible for gaming, under IGRA's "restored lands for a restored tribe" exception, is likewise unsupported by the record or applicable case law.  First of all, the Secretary has *expressly* recognized, in adopting regulations in 2008 to govern the process of taking land into trust for gaming purposes, that Congress *did not intend* for tribes to be able to take advantage of the "restored lands" exception when those "tribes" were informally recognized outside the formal Part 83 acknowledgement regulations. The ROD's opportunistic and arbitrary attempt to grandfather in a non-final 2006 opinion that the Ione Band may nevertheless take advantage of that exception, in defiance of Congress's intent, is arbitrary and capricious, and the arguments of the Federal Defendants and Ione Band to the contrary are wholly without merit.  Second, even if the Ione Band was under federal jurisdiction in 1934 (and it was not), the Band still does not qualify for the "restored lands of a restored tribe" exception because (1) it was never terminated, and (2) it was never lawfully restored.  And again, the ROD's position is diametrically opposed to the positions taken by the Department on numerous occasions in the past, and the County is not precluded from challenging the unlawful past acts upon which the Department's current unlawful ROD relies.

Simply put, the recent history of the Ione Band's recognition and drive to conduct casino gaming in Amador County has been a case of unprincipled, results-driven decision-making by the Department, without regard to clear congressional intent, previous decisions of this Court, or the facts reflected in the administrative record.  The ROD is unlawful, and should be vacated.

## II.   THE COUNTY IS NOT PRECLUDED FROM CHALLENGING THE DEPARTMENT'S RELIANCE ON THE *ULTRA VIRES* BRUCE AND DEER LETTERS AS THE BASIS FOR THE ROD.

The bedrock foundation of the arbitrary, capricious and unlawful acts in the ROD are two prior arbitrary, capricious and unlawful actions by the Department: the defective (and immediately disavowed) Louis Bruce letter from 1972, and the equally defective Ada Deer letter from 1994.  It

---

[3] *Id*. at p. 125:8-10 & 16-18 (Mr. Skibine).

is black-letter law that an administrative agency's "abandonment of its own established procedure and its lack of reasoned analysis on the record constitute arbitrary and capricious agency action in violation of the law."  *D&F Afonso Realty Trust v. Garvey*, 216 F.3d 1191, 1197 (D.C. Cir. 2000). That description perfectly fits both letters.

As discussed in the County's moving papers, in the case of Louis Bruce, he had the assessment processed through Real Estate Services rather than Tribal Services, and he failed to consider the "Cohen criteria," which were the criteria that the Bureau applied to requests for tribal recognition from the time the IRA was enacted until the Part 83 regulations were adopted in 1978. (*See, e.g.,* AR000678, AR000784.)   The record shows that the decision was regarded as an "administrative anomaly" when it was made; that it was widely disputed within the Bureau; and that it was never put into effect as a result.  By bypassing established Department procedures for recognizing tribes, he committed an *ultra vires* and void act.[4]  Moreover, as the federal government pointed out in its pleadings in the *Ione Band Litigation*, the fact that Louis Bruce stated that "Federal recognition was evidently extended to the Ione Band of Indians at the time that the Ione land purchase was contemplated" (emphasis added) indicates that Mr. Bruce himself "was not entirely convinced that the Ione Band was federally recognized[.]"  (AR000697.)[5]

With regard to Ada Deer, the record plainly shows that she was subjected to raw political pressure from Members of Congress—and her reaffirmation explicitly states that it was issued in response to meetings with congressional representatives.  (AR001056.)  She ignored the Part 83 regulatory process that the Bureau had previously contended—and this Court had previously held—were the only mechanism by which a tribe could gain federal recognition.  Her failure to comply with those regulations, standing alone, was an abuse of discretion, because "An agency is

---

[4] The Supreme Court has held, in *Morton v. Ruiz*, 415 U.S. 199, 94 S. Ct. 1055, 39 L. Ed. 2d 270 (1974), that administrative agencies—in that case, the Bureau of Indian Affairs—are not only bound by their formal regulations, but by internal procedures as well.

[5] The Federal Defendants and Ione Band try to put these words in the County's mouth, instead of the Government's.  But far from representing a "singular focus" of the County on these words "as indicia of equivocation" (Def's Memo., p. 37:20-21), it was the federal government itself that adopted that focus and propounded it to this Court in the 1990s litigation.  (AR000697.)

1   bound by its regulations so long as they remain operative…" *Romeiro De Silva v. Smith*, 773 F.2d

2   1021, 1025 (9th Cir. 1985); *see also Ariz. Grocery Co. v. Atchison, T. & S.F.R. Co.*, 284 U.S. 370,

3   389, 52 S. Ct. 183, 186, 76 L. Ed. 348, 356 (1932).  Moreover, Ms. Deer changed the agency's

4   position without any explanation for her abrupt about-face; and, like Louis Bruce before her, she

5   followed an "administrative[ly] anomol[ous]" round of decision-making—in her case, bypassing

6   the customary system of "program review and surname," and failing to distribute copies for review

7   in advance.  (AR001057.)  Tellingly, the Federal Defendants never make any real effort to deny

8   these facts, though they were discussed at some length in the County's moving papers.

9        The Federal Defendants and Ione Band argue, however, that the six-year statute of

10   limitations in the Administrative Procedures Act bars any challenge to the legality of these *ultra*

11   *vires* acts, and that—by extension—the County is precluded from challenging the Department's

12   reliance on them in the ROD.  That is simply not the law.

13        Civil actions against federal agencies must be "filed within six years after the right of

14   action first accrues," 28 U.S.C. § 2401(a); a substantive challenge to an agency decision as beyond

15   its authority accrues when the disputed decision is first "appli[ed] . . . to the challenger," *Wind*

16   *River Mining Corp. v. United States,* 946 F.2d 710, 715-16 (9th Cir. 1991).  In this case, the

17   County's cause of action to challenge the Band's recognition accrued with the issuance of the

18   ROD.

19        For a third party to have standing to challenge the federal recognition of an Indian tribe,

20   that recognition must have a direct impact on the third party's interest.  *See Muwekma Ohlone*

21   *Tribe v. Kempthorne*, 452 F. Supp. 2d 105, 113 (D.D.C. 2006) (other tribe lacked standing to

22   challenge Ione Band's failure to proceed through Part 83 process—citing the federal government's

23   briefs); *Artichoke Joe's Cal. Grand Casino v. Norton*, 278 F. Supp. 2d 1174, 1183 (E.D. Cal.

24   2003), *aff'd*, 353 F.3d 712 (9th Cir. 2003), *cert. denied*, 543 U.S. 815 (2004) ("*Artichoke Joe's*").

25   Until the ROD determined to take land into trust, thereby depriving Amador County of taxing and

26   regulatory jurisdiction over land within its boundaries, any such direct impact upon the County's

27   interests was too "speculative" to let it challenge the Band's recognition; that was the very holding

28   of this Court, which dismissed as premature the County's 2007 effort to challenge the 2006 Indian

Lands Opinion ("ILO"). *County of Amador v. United States DOI*, 2007 U.S. Dist. LEXIS 95715, *10 (E.D. Cal. Dec. 13, 2007) ("The core question is whether the agency has completed its decision-making process, *and whether the result directly affects the parties*.") (emphasis added); *id*. at *19 ("Without deciding to take the Plymouth Parcels into trust, the Artman/Cason opinion has merely rearranged the parties' rights in a hypothetical world that may never come to fruition").

Highly instructive on this point is the Ninth Circuit's decision in *N. County Cmty. Alliance, Inc. v. Salazar*, 573 F.3d 738 (9th Cir. 2009), *cert. denied*, 559 U.S. 1068 (2010). In that case, relying on its earlier decision in *Wind River*, the Court of Appeals held that the statute of limitations did not bar a local group's challenge to the NIGC's allegedly unlawful approval of a tribal gaming ordinance 14 years before the case was filed, because it was not applied to those plaintiffs until the tribe began construction of a casino a year before the suit was filed.

*N. County Cmty. Alliance,* in turn, relied on and cited with approval, *Artichoke Joe's*, which is also highly instructive. In that case, several local (non-tribal) card rooms were allowed to challenge a tribe's recognition by the Secretary more than six years after it was granted, because they lacked standing to raise such a challenge at the time of recognition, but they challenged the decision within six years of its application to them. 278 F. Supp. 2d at 1183-84.

These cases stand for the clear proposition—applicable here—that a federal agency may not avoid review of its unlawful decisions simply because no party had standing to challenge that decision at the time it was taken. Only when that unlawful decision first is "applied to" a third party, thereby creating standing, does the cause of action accrue and the six-year statute of limitations begin to run. In this case, the *ultra vires* acts of Louis Bruce and Ada Deer were not "applied to" the County of Amador in any final agency action subject to challenge until 2012, when the ROD issued. This suit was brought well within six years from that date.

## III.   THE DEPARTMENT ACTED ARBITRARILY & CAPRICIOUSLY IN "GRANDFATHERING IN" THE 2006 INDIAN LANDS OPINION, CONTRARY TO CONGRESSIONAL INTENT.

25 C.F.R. § 292.10 provides that a tribe is "restored to federal recognition" within the meaning of IGRA if it is (1) congressionally-recognized, (2) re-recognized through a court

judgment or settlement to which the United States is a party; or (3) recognized "through the administrative Federal Acknowledgment Process under § 83.8 of this chapter [Part 83]."  It is undisputed that the Band does not fit within any of the foregoing provisions, a fact the ROD implicitly acknowledges; instead the ROD asserts the Band was *informally* "recognized" by Ada Deer in 1994 *outside* of the "Federal Acknowledgement Process under § 83.8." (AR007156, AR010100-02.)  Neither the Federal Defendants nor the Ione Band claim otherwise in their briefs.

Despite this fact, the Secretary's ROD went ahead and found that the Band is a restored tribe and concluded that gaming on the Plymouth Parcels is permissible under the "restored tribe" exception.  The ROD's conclusion relied exclusively on 25 C.F.R. § 292.26(b), which arbitrarily purports to "grandfather in" tribes who had received a (purely advisory, non-binding, non-final) Indian Lands Opinion in their favor prior to the enactment of the regulations.  Relying on the 2006 ILO, the ROD purports to relieve the Ione Band of the need to comply with Congress's intentions in adopting IGRA, reflected in 25 C.F.R. § 292.10's requirement that an administratively recognized tribe be one that proceeded through the Part 83 regulatory process.  The ROD's reliance on the grandfather clause was arbitrary and capricious and contrary to law.

## A.     The Grandfather Clause Is Not Entitled To *Chevron* Deference.

*Chevron* requires judicial deference to an agency's "reasonable interpretation" of a statute it is tasked with administering, in cases where Congress has not "directly spoken to the precise question at issue." 467 U.S. at 842-44. The problem for the government in this case, is that the grandfather clause was not a "reasonable interpretation" of Congress's intent in enacting IGRA; at least as applied in this case, its purpose is to create a subclass of tribes that will be permitted to undertake gaming under the "restored lands" exception where—by the Secretary's own explicit admission—*Congress did not intend that result*.

In adopting the Part 292 regulations, which govern secretarial determinations of whether to take land into trust for gaming purposes, the Secretary explicitly acknowledged and rejected proposals that it amend those regulations to permit a tribe to qualify as a "restored tribe" within the meaning of IGRA based on administrative recognition outside the Part 83 regulations, stating, **"We believe Congress intended restored tribes to be those tribes restored to Federal recognition by**

Congress or through the part 83 regulations. We do not believe that Congress intended restored tribes to include tribes that arguably may have been administratively restored prior to the part 83 regulations." 73 Fed. Reg. 29354, 29363 (May 20, 2008) (emphasis added).  The Secretary further elaborated thus:

> In 1988, Congress clearly understood the part 83 process because it created an exception for tribes acknowledged through the part 83 process. The part 83 regulations were adopted in 1978. These regulations govern the determination of which groups of Indian descendants were entitled to be acknowledged as continuing to exist as Indian tribes. *The regulations were adopted because prior to their adoption the Department had made* <u>*ad hoc*</u> *determinations of tribal status and it needed to have a uniform process for making such determinations in the future. We believe that in 1988 Congress did not intend to include within the restored tribe exception these pre-1979* <u>*ad hoc*</u> *determination.* [sic] *Moreover, Congress in enacting the Federally Recognized Indian Tribe List Act of 1994 identified only the part 83 procedures as the process for administrative recognition.*

*Id*. (emphasis added).  25 C.F.R. § 292.10 represents the Secretary's "reasonable interpretation" of Congress's intent in enacting the "restored lands of a restored tribe" exception in IGRA.  Its application would preclude the Ione Band from taking advantage of that exception.  The grandfather clause in 25 C.F.R. § 292.26(b) merely serves to frustrate and evade Congress's purpose.  When agencies contemporaneously "set forth two inconsistent interpretations of the very same statutory term," as the Department is doing here, they act arbitrarily and capriciously.  *United States Dep't of the Treas. IRS Office of Chief Counsel Wash., D.C. v. Fed. Lab. Rel. Auth.*, 739 F.3d 13, 21 (D.C. Cir. Jan. 3, 2014).  In such circumstances, the agency's interpretation is not "reasonable," and *Chevron* deference is therefore not warranted. *Dongbu Steel Co. v. United States*, 635 F.3d 1363, 1372-73 (Fed. Cir. 2011) (Dept. of Commerce not entitled to deference where it adopted one interpretation of a statute for purposes of investigations, and another interpretation of the same statute for administrative reviews).  *See also Port of Seattle v. FERC*, 499 F.3d 1016, 1034 (9th Cir. 2007) (FERC not entitled to *Chevron* deference where it adopted conflicting interpretations of two similar complaints for refund).[6]

> *Chevron* deference is not a warrant for courts to "rubber-stamp . . . administrative decisions

---

[6] The fact that the NIGC purported to apply 25 C.F.R. § 292.26(b) to the Karuk Tribe (*see* Band's Memo., p. 16:25 – 17:7) says nothing about whether that application was *legal*.

that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute . . . ." *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 793 (9th Cir. 2003) (quoting *Pub. Citizen v. DOT*, 316 F.3d 1002, 1020 (9th Cir. 2003)) (ellipses in original).

**B.     The Federal Defendants' And Ione Band's Efforts To Explain Away The Secretary's Explicit Recognition That Congress Intended To Limit The "Restored Lands" Exception Only To Tribes That Were Recognized Through The Part 83 Recognition Regulations, Are Without Merit.**

Faced with the Secretary's damning statements in the *Federal Register*, which recognize that treating groups like the Ione Band, which were informally recognized outside the Part 83 regulations, as "restored tribes" was contrary to what in "Congress intended" in enacting IGRA, both the Federal Defendants and the Ione Band latch onto the references in those statements to "pre-1979 ad hoc determinations."   Based on those references, they argue that the Secretary's statements were not meant to apply to the Ione Band because it was informally recognized by Ada Deer after 1979.  This argument strains credulity.

First of all, this is inconsistent with the government's basic position that Ada Deer's actions were "only a reaffirmation"[7] of the 1972 (*i.e.,* pre-1979) actions of Louis Bruce.  (Bruce's actions were even more *ad hoc* than most, having been processed through Real Estate Services rather than Tribal Services, and without consideration of the "Cohen criteria," which were the criteria that the Bureau applied to requests for tribal recognition from the time the IRA was enacted until the Part 83 regulations were adopted in 1978.  Not surprisingly, they were considered an "administrative anomaly" even at the time.)[8]

Second, the Secretary's references to "pre-1979" *ad hoc* determinations have to be read in light of the fact that—as the federal government argued to this very Court (*see* AR000691-000731, AR000738-000767), and as this very Court held in the *Ione Band Litigation*, more than two decades ago (AR007779)—the adoption of the Part 83 regulations made them the exclusive administrative means of being recognized after that date, and was in fact meant to end such *ad hoc*

---

[7] *See* Defs' Memo, p. 39:11.
[8] *See, e.g.,* AR000678, AR000784.

inquiries.  The position of the Federal Defendants and the Ione Band requires this Court to assume that Congress intended—and that the Secretary's statements revealed a belief that Congress intended—to preclude *pre*-1979 *ad hoc* determinations from being treated as permissible "restorations" under IGRA, but that Congress meant to allow *post*-1979 *ad hoc* determinations to be so treated.  But as the Secretary expressly recognized, "In 1988, Congress clearly understood the part 83 process because it created an exception for tribes acknowledged through the part 83 process." *See* 73 Fed. Reg. 29354, 29363 (May 20, 2008).  Given that fact, and given Congress's presumed familiarity[9] with the black-letter rule of administrative law that "[a]n agency is bound by its regulations so long as they remain operative…,"[10] this position is nothing short of bizarre.

In enacting IGRA in 1988, Congress intended to permit tribes that were "restored" administratively through the Part 83 regulations to take advantage of the "restored lands of a restored tribe" exception contained in that statute; Congress did <u>not</u> intend for tribes that were administratively recognized outside of that process to do so, *as the Secretary expressly recognized in adopting the Part 292 regulations*. The application of the grandfather clause in 25 C.F.R. § 292.26(b) to nevertheless thwart Congress's recognized intent is therefore arbitrary, capricious, and contrary to law, and must be overturned.

## C.   The *NRDC* Factors <u>Do</u> Apply To This Case.

The courts have articulated a four-part test for determining whether a new administrative rule should be applied to pending agency actions, which is applicable here:

[C]onsiderations governing an agency's duty to apply a rule retroactively [a]re

> (1) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (2) the extent to which the party against whom the new rule is applied relied on the formed [sic] rule, (3) the degree of the burden which a retroactive order imposes on a party, and (4) the statutory interest in applying a new rule despite the reliance of a party on the old standard.

[Citations]. Clearly the issue entails a balancing of the interest in prompt and complete

---

[9] *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184, 108 S. Ct. 1704, 100 L. Ed. 2d 158 (1988) ("We generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts.").

[10] *Romeiro De Silva*, 773 F.2d at 1025.

fulfillment of statutory goals against the inequity of enforcing a new rule against persons that justifiably made investment decisions in reliance on a past rule or practice.

*Natural Res. Defense Council, Inc. v. Thomas*, 838 F.2d 1224, 1244 (D.C. Cir.), *cert. denied sub nom., Alabama Power Co. v. Thomas*, 488 U.S. 901 (1988) (hereafter "*NRDC*").

Despite this clear authority, both the Federal Defendants and the Ione Band argue that *NRDC* is inapplicable to this case, citing *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 109 S. Ct. 468, 102 L. Ed. 2d 493 (1988), for the proposition that retroactive application of administrative rules is not required unless Congress affirmatively says so, and is in fact disfavored.  (Defs' Memo, p. 49; Band's Memo., pp. 21-22.)  Their reliance on *Bowen* is misplaced; it has no application here.

The reason for this is articulated in the *NRDC* decision itself, which expressly distinguished *Bowen* on grounds equally applicable to this case:

> Some general principles are applicable to all these issues. First, none of them is governed by the rule adopted in *Georgetown University Hospital v. Bowen*, 261 U.S. App. D.C. 262, 821 F.2d 750, 756-58, 760 (D.C. Cir. 1987),[11] generally invalidating retroactive rules. The rules there at issue would have limited reimbursements for *past transactions*. All that is at stake here are restrictions on plants' *future emissions*.

838 F.2d at 1244 (emphasis in original).  In other words, *Bowen* and NRDC deal with two different *kinds* of "retroactivity."  *Bowen* addresses the standard for deciding whether new agency rules are to be applied retroactively to acts that have already taken place; *NRDC*, by contrast, addresses the standard for deciding whether new administrative rules must be applied to agency actions that are not yet completed—are pending.  *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 126 S. Ct. 2422, 165 L. Ed. 2d 323 (2006)—quoted, ironically enough, by the Ione Band (Band's Memo, p. 21:8-11)—emphasizes this: "Statutes are disfavored as retroactive when their application 'would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions *already completed*.'"  548 U.S. at 37 (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994) (emphasis added).[12]

---

[11] Though the *NRDC* court cited to its own appellate decision in the *Bowen* case, it is that decision that was unanimously affirmed by the Supreme Court in the decision relied upon by Federal Defendants and the Ione Band.

[12] *See also Bowen*, 488 U.S. at 219-20 (Scalia, J., concurring) ("The Treasury Department

25 C.F.R. § 292.26 itself reflects this very distinction. That regulation contains two subparts. Subsection (a), which the County has not challenged, grandfathers in "final agency decisions made pursuant to 25 U.S.C. 2719 before the date of enactment of these regulations." Subsection (b), by contrast, purports to exempt agency actions "taken <u>after</u> the effective date of these regulations" when the Department has merely taken a preliminary, non-binding step toward agency action, which—by the express terms of the regulation itself—is subject to withdrawal at any time (as, in fact, took place here). With respect to subsection (a), *Bowen* applies; with respect to actions that fall into subsection (b)—like the ROD challenged herein—*NRDC* applies.

The Ione Band's land-to-trust application was merely pending in 2008, when the Part 292 regulations were adopted. There was no final agency action on that application—as the County learned the hard way when it tried to challenge the 2006 ILO in this very Court. Thus, the Secretary had a duty to apply the definition of "restored tribe" adopted in those regulations to "future actions" of the agency, including the 2012 decision to take land into trust for gaming on behalf of the Ione Band.

Finally, the Ione Band seeks to distinguish *NRDC* and *Sierra Club v. EPA*, 719 F.2d 436, 467 (D.C. Cir. 1983), *cert. denied sub nom., Ala. Power Co. v. Sierra Club*, 468 U.S. 1204 (1984) ("*Sierra Club*"), on the ground that the agency in those cases had a statutory "duty" to apply its regulations retroactively. (Band's Memo., p. 22:2-12.) And, of course they did. Agencies *always* have a duty to adhere to congressionally-approved statutes (at least unless the four-factor test set forth in the NRDC decision warrants a limited exception), and this case is no exception. But to the extent that the Ione Band seeks to imply that there was some unique statutory provision that compelled the result in *NRDC* or *Sierra Club*, distinguishing it from this case, it is simply wrong.

---

might prescribe, for example, that for purposes of assessing future income tax liability, income from certain trusts that has previously been considered nontaxable will be taxable—whether those trusts were established before or after the effective date of the regulation. That is not retroactivity in the sense at issue here, *i.e.*, in the sense of altering the *past* legal consequences of past actions. Rather, it is what has been characterized as 'secondary' retroactivity, [citation]. A rule with exclusively future effect (taxation of future trust income) can unquestionably *affect* past transactions (rendering the previously established trusts less desirable in the future), but it does not for that reason cease to be a rule under the APA.")

---

**D.      The Grandfather Rule Contained In 25 C.F.R. § 292.26(B) Cannot Survive Application Of The *NRDC* Factors Under The Facts Of This Case.**

The four-factor *NRDC* test does not allow an exception for the Ione Band here.

Of four *NRDC* factors, the Secretary addressed only one in adopting the grandfathering rule in 25 C.F.R. § 292.26(b): reliance.[13]  She has therefore conceded that the other three factors do not support its decision, because a court may not affirm the action of an administrative agency on grounds upon which the agency itself did not expressly articulate.  *Securities and Exchange Comm'n v. Chenery Corp.*, 318 U.S. 80, 87, 63 S. Ct. 454, 87 L. Ed. 626 (1943).

Moreover, 25 C.F.R. § 292.26(b), adopts a blanket exemption on the premise that a "tribe and perhaps other parties <u>may have</u> relied on the" Indian Lands Opinion, in violation of the rule that when an agency seeks to grandfather prior actions that are contrary to congressional purpose— as is the case here—the grandfathering rule must require a showing of "actual"[14] and "justifiable"[15] reliance by the affected party.

Tellingly, the Federal Defendants make no real effort to apply the *NRDC* factors to justify 25 C.F.R. § 292.26(b), simply resting on their mistaken contention that those factors do not apply.

The Ione Band's defense on this point is limited only to pointing out that it has incurred costs in applying to the Department for the Indian Lands Opinion itself, and to have the Plymouth Parcels taken into account.  (Band's Memo., p. 24.)  This defense is wholly unavailing for several reasons.

First, 25 C.F.R. § 292.26(b), and the Secretary's discussion thereof, are based on presumed reliance on the Indian Lands Opinion *itself*.  Thus, costs incurred between 2003 and 2005—a period which appears to encompass <u>all</u> of the costs that the Band points to in its brief—are irrelevant, because the ILO was not issued until late-September 2006.

Second, reliance on the 2006 ILO was not justified either, because the initial proposal to

---

[13] 73 Fed. Reg. 29354, 29372 ("It is expected that in those cases, the tribe and perhaps other parties <u>may have</u> relied on the legal opinion to make investments into the subject property or taken some other actions that were based on their understanding that the land was eligible for gaming.").

[14] *Sierra Club*, 719 F.2d at 467; *see also NRDC*, 838 F.2d at 1248.

[15] *Williams Natural Gas Co. v. FERC*, 943 F.2d 1320, 1343 (D.C. Cir. 1991).

adopt the Part 292 regulations was issued just days after that memorandum was issued, and that proposal (1) already included the provision limiting administrative restoration to those actions taking place under the Part 83 regulations, and (2) contained no proposal for a grandfather provision. *See* 71 Fed. Reg. 58769, 58774 (Oct. 5, 2006). The Band's response—that the Department expressed an intention to modify those regulations a few months later—does not withstand scrutiny, for several reasons.

In the first place, the *Federal Register* notice cited by the Band was nothing more than a brief, very general notice re-opening public comment on the draft regulations. It states generically that comments were received "that may result in modification of the proposed rule," but it gives no indication that the "restored tribe" provisions of those regulations were the provision that might be amended (of the 24 sections initially proposed), or that amendment was anything but a mere possibility. 72 Fed. Reg. 1954 (Jan. 17, 2007).

Moreover, the Band conveniently glosses over the other contemporaneous events discussed in the County's moving papers that would have made reliance on the 2006 ILO unjustified by January 2007, including the fact that by that time Amador County had challenged that decision as unlawful and expressed their intention to renew the challenge when a "final agency" action was taken in reliance thereon.

Also, any claim of reliance by the Band also conflicts with the Band's own characterizations of the ILO in the earlier litigation: "as a *preliminary* assessment intended to assist the Secretary in making a final determination with regard to the [Band]'s pending fee-to-trust application"[16]; as an "interim," "interlocutory," and merely "advisory" opinion[17]; and as a document that "standing alone has no legal force or practical legal implications" unless the fee-to-trust application was approved.[18]

_____

[16] *See* Ione Band's Memo. In Support of Motion To Dismiss (Dkt. #33), *Amador County v. Dep't of Interior*, Case No. 2:07-cv-00527-LKK-GGH at 11:5-7 (emphasis added) (Dkt. #66-8).

[17] *See, e.g., id.* at 3:1, 10:16 & 28; Ione Band's Reply In Support of Motion To Dismiss (Dkt. #42), *Amador County v. Dep't of Interior*, Case No. 2:07-cv-00527-LKK-GGH at 1:2 (Dkt. #66-9).

[18] Ione Band's Reply, *supra*, note 17, at 1:19-20.

And finally, the Ione Band makes no effort whatsoever to explain how incurring the costs of these applications distinguishes it from the applicant in *WRT Energy Corp. v. FERC*, 107 F.3d 314 (5th Cir. 1997), discussed in the County's opening brief.  Indeed, both the Federal Defendants and the Ione Band alike *completely ignore* that case, failing to even cite it, much less distinguish it. In that case, the Louisiana Office of Conservation—which had initial decision-making power, subject to review by FERC, issued a determination that a natural gas well qualified as producing high-cost natural gas.  In apparent "reliance" on the LOC determination, and while the issue was pending with FERC, WRT installed the same technology on the other four wells.   FERC subsequently reversed the LOC's determination.   In rejecting WRT's challenge to the FERC determination, the Fifth Circuit stated, "we note that WRT apparently relied, perhaps imprudently, on the affirmative LOC determination as to the first well when it subsequently installed the new technology on its other four wells, prior to receiving a final determination from the FERC as to that first well."  *Id.* at 321.  In the process, the Court rejected a claim by WRT that the FERC's ruling was impermissibly retroactive in light of its reliance.  *Id.*

**E.      The Solicitor's 2009 Withdrawal Of The 2006 Indian Lands Opinion Renders The Grandfather Clause Inapplicable Anyway.**

Even if one were to assume, *arguendo*, that a pre-2008 non-final Indian Lands Opinion could legitimately grandfather-in a "restored" tribe under 25 C.F.R. § 292.26(b), that is not the case here, because the 2006 ILO *was withdrawn by the Solicitor's office in 2009*—an option expressly preserved by the terms of 25 C.F.R. § 292.26(b) itself.  *Id.* ("the Department or the NIGC retains full discretion to qualify, withdraw or modify such opinions").   That decision became effective immediately, and for the period from January 2009 until Solicitor Hilary Tompkins re-adopted the reasoning of the 2006 ILO in 2011, there was no ILO in effect for the Ione Band.  Moreover, since Solicitor Tompkins' opinion was issued <u>after</u> the Part 292 regulations took effect, whereas the grandfather clause in 25 C.F.R. § 292.26(b) only purports to grandfather-in decisions made "before the effective date of th[o]se regulations," the regulations were fully applicable and the ROD abused its discretion in relying on the earlier, withdrawn opinion that is contrary to 25 C.F.R. § 292.10's requirement that administratively-recognized tribes proceed through the Part 83 acknowledgement

1  process.

2        The Federal Defendants and Ione Band urge that Solicitor Bernhardt's 2009 withdrawal had

3  no effect on the 2006 ILO—that it survived the withdrawal by Solicitor Bernhardt—that because

4  the NIGC and Assistant Secretary Skibine did not agree with it, it never became final. They are

5  wrong. They are confusing two separate things: the withdrawal of the old opinion, which the

6  Solicitor could and did accomplish unilaterally, and the issuance of a new opinion, which required

7  the concurrence of the NIGC.[19]

8        Under the terms of the Memoranda of Understanding that govern the preparation of such

9  opinions, "the Solicitor must concur in any opinion that provides legal advice relating to ... the

10  exceptions in 25 U.S.C. § 2719…" (AR007088-89 [2009 MOU]; *see also* AR005044 [2006 MOU

11  requiring concurrence between Solicitor and NIGC].) By his 2009 memorandum, Solicitor

12  Bernhardt withdrew his concurrence with the 2006 ILO. Conversely, those MOUs contain no

13  provision for, or requirement of, concurrence by the Assistant Secretary. Under the express terms

14  of the MOUs, "whether a tribe meets one of the exceptions in 25 U.S.C. § 2719 (i.e., settlement of

15  a land claim, restored lands for a restored tribe, or an initial reservation of a tribe acknowledged

16  through the Part 83 process) is a decision made by the Secretary [or the Assistant Secretary acting

17  on the Secretary's behalf] *when he or she decides to take land into trust for gaming*." (AR005043

18  [2006 MOU] [emphasis added], AR007088 [2009 MOU].) Thus, the Assistant Secretary's

19  concurrence became relevant in 2012, when he issued the ROD, and not before.

20        Moreover, their position is based on the view expressed in the Tompkins memorandum that

21  "an incomplete administrative action cannot negate prior official acts." (AR008824.) But the idea

22

23        [19] This distinction is amply supported by the fact that the Department has never asserted the
"deliberative process privilege" with respect to the withdrawal letter, and in fact made it public
24  immediately, while it has asserted that privilege with respect to the draft opinion enclosed with that
letter and withheld it from public disclosure until the protective order was entered in this case.
25  (*Compare* AR007292 [BIA lawyer Scott Keep forwarding withdrawal memo to California
Attorney General] with AR007286 [DOI Attorney refusing to produce copy of draft substitute
26  opinion under FOIA Exemption 5 for deliberative process].) *See also Lahr v. NTSB,* 569 F.3d 964,
979 (9th Cir. 2009), *cert. denied*, 561 U.S. 1007, 130 S. Ct. 3493, 177 L. Ed. 2d 1057 (2010)
27  (FOIA Exemption 5 for deliberative process applies to documents that are both deliberative and
"predecisional.").
28

that the 2006 ILO was a "prior official act" is inconsistent with the nature of ILOs, which is that "the legal opinions are advisory in nature and thus do not legally bind the persons vested with the authority to make final agency decisions." 73 Fed. Reg. 29354, 29372 (May 20, 2008) (explanation for adoption of Part 292 regulations). *See also County of Amador v. United States DOI*, 2007 U.S. Dist. LEXIS 95715 (E.D. Cal. Dec. 13, 2007) (Indian lands opinions not final agency action).

The fact that the NIGC did not concur with Solicitor Bernhardt's decision to issue a new opinion means, of course, that under the terms of the MOU his draft opinion never was effective either, but that fact does not mean that the 2006 ILO remained in effect; from the time of the Bernhardt withdrawal until the issuance of the Tompkins memorandum, there simply was no operative ILO with regard to the Ione Band at all, just as was the case prior to 2006.

**F.      The County's Challenge To The Unlawful "Grandfathering" Of The 2006 ILO Is Not Time-Barred Or Otherwise Procedurally Deficient.**

Obviously concerned with how this Court would view its opportunistic disregard for Congress's intention in enacting IGRA, both the Federal Defendants and the Ione Band seek to avoid a decision on that issue by arguing that the six-year statute of limitations contained in the APA bars the County's challenge on this score.  That mistaken contention goes as follow: (1) the County has brought a facial challenge to 25 C.F.R. § 292.26(b); (2) though the County filed its complaint in this action within four years of the effective date of the regulations (August 25, 2008), the complaint failed to adequately allege a challenge to the grandfathering of the 2006 ILO; and (3) it is now more than six years since the effective date of the regulations, so the statute of limitations precludes the County from amending its complaint to cure the alleged pleading defect.  All three prongs of this analysis are flat wrong.

First, the County has not brought a facial challenge to 25 C.F.R. § 292.26(b)—it has brought a challenge as applied to the 2012 decision in this case to grandfather in a "restored tribe" opinion that the Secretary has expressly recognized to be contrary to Congress's intent in enacting that particular exception.  The Part 292 regulations cover a host of other actions by the Secretary, and there may be other respects in which the regulations are appropriately grandfathered.

Second, the Complaint expressly alleged that "the ROD's conclusion that the 2006 Artman

determination is 'grandfathered,' and is not subject to the regulations adopted in 2008 (*see* 25 C.F.R., Part 292), is arbitrary, capricious, and contrary to law." *See* Complaint (Dkt. #1), ¶ 25 n.2. That allegation alone is sufficient to satisfy the pleading requirements of Rule 8.[20]   But this allegation also has to be read in the context of the Record of Decision itself, which this allegation expressly refers to and which was attached as Exhibit 1 to the Complaint and incorporated therein by reference. *See id.,* ¶ 3 & Exhibit 1 (Dkt. ##1-2 to 1-5).   "[E]xhibits to the complaint are part of the complaint for all purposes…"   *Estate of Prasad v. County of Sutter*, 958 F. Supp. 2d 1101, 1111 (E.D. Cal. 2013) (Nunley, J.) (citing *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1124 (9th Cir. 2013)).   That ROD relies exclusively on 25 C.F.R. § 292.26(b), and contains a detailed discussion thereof.   Thus, it would have been abundantly clear that the County challenged the Department's use of that regulatory provision to exempt the Ione Band from the application of 25 C.F.R. § 292.10, which provides that only administratively-recognized tribes that proceeded through the Part 83 regulations could take advantage of the "restored lands" exception.   Certainly, the Federal Defendants and Ione Band have not been prevented from responding in full to the County's challenge—they have each devoted multiple pages of their briefs to responding.[21]

---

[20] *See San Luis & Delta-Mendota Water Auth. v. United States Dept. of Interior*, 236 F.R.D. 491, 500 (E.D. Cal. 2006) ("the proposed complaint does not formally state any 'cause of action.' But, it does assert that Interior's accounting for 2004 is 'arbitrary and capricious, an abuse of discretion, and not in accordance with law, within the meaning of 5 U.S.C. § 706(2) (A), and is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, within the meaning of 5 U.S.C. section 706(2) (C).' (Doc. 623-1 at P 10.) This language arguably states a claim under the Administrative Procedure Act sufficient to satisfy the liberal requirements of Federal Rule of Civil Procedure 8.").

[21] The Ione Band's claim that there is an insufficient administrative record for resolving the County's challenge (Band's Memo., p. 23), is without merit. As the Supreme Court has repeatedly held, the validity of an agency's determination must be judged on the basis of the agency's stated reasons for making that determination. *SEC v. Chenery Corp., supra*, 448 U.S. at 95. The Secretary articulated his reasons for adopting the grandfather clause in 26 C.F.R. § 292.26—as he was required to do by the APA—in the *Federal Register* notice adopting the final Part 292 regulations. *See* 5 U.S.C. § 553(b)(2), (c) (agency must public notice of rule-making in Federal Register, including "reference to the legal authority under which the rule is proposed" and "a concise general statement of the[ rule's] basis and purpose."). The reasons articulated by the Secretary—that parties "may have" relied upon prior ILO's—do not justify the blanket exemption from the application of 25 C.F.R. § 292.10 under the *NRDC* factors.

---

And finally, the statute of limitations has not run in any event.  As discussed above, a substantive challenge to an agency decision as beyond its authority accrues when the disputed decision is first "appli[ed] . . . to the challenger," *Wind River Mining Corp,* 946 F.2d at 715-16.  In this case, the grandfather clause in question was not "applied" to Amador County until the issuance of the ROD in 2012.

Were this Court to adopt the Federal Defendants' and Ione Band's position, it would put the County in a completely untenable position.  Under the reasoning of this Court's 2007 decision, Amador County would been precluded from challenging the grandfather clause, because doing so would have required that it challenge the 2006 ILO, which was never a final agency action, and which—under the express terms of the regulation—was subject to withdrawal or modification at any time.  Until the Department issued the ROD, it would have been purely speculative that the grandfather clause would have any impact on Amador County, calling into question the County's standing to even try to challenge the regulation.  Moreover, once Solicitor Bernhardt withdrew the 2006 ILO, less than six months after the effective date of the Part 292 regulations, the possibility that the grandfather clause would be applied to the County became even more speculative.  Nor did Solicitor Tompkins's purported "reinstatement" of the 2006 ILO in 2011 put the County on notice that it was likely to be affected; the County did not learn of that decision until reading about it in the ROD itself, and it would not have a copy of Solicitor Tompkins's decision even now, were it not for the fact that it was included in the administrative record in this case pursuant to a protective order negotiated between the parties.  (*See* Dkt. #39, ¶ 3(4).)

## IV.  THE GOVERNMENT IS JUDICIALLY ESTOPPED, AND THE IONE BAND IS COLLATERALLY ESTOPPED, FROM ARGUING THAT THE BAND WAS RECOGNIZED PRIOR TO 1991.

### A.  The Federal Government Is Judicially Estopped.

In the *Ione Band Litigation* before Judge Karlton in the early 1990s, the federal government vigorously argued that (1) the Ione Band had never been recognized as a "tribe" within the meaning of the IRA; (2) that the Bruce letter did not alter that fact; and (3) that the only lawful way for the Ione Band to gain federal "recognition" was to proceed through the Part 83 federal

acknowledgement regulations adopted by the Secretary in 1978 (25 C.F.R. §§ 83.1-83.11).  (*See* AR000691-000731, AR000738-000767.)  Judge Karlton adopted these contentions as his own, in dismissing the federal complaint against the federal government, holding:

> Plaintiffs' argument appears to be that these non-regulatory mechanisms for tribal recognition demonstrate that "the Secretary may acknowledge tribal entities outside the regulatory process," . . . and that the court, therefore, should accept jurisdiction over plaintiffs' claims compelling such recognition. I cannot agree. **Because plaintiffs cannot demonstrate that they are entitled to federal recognition by any of the above mechanisms [congressional recognition, status as a "treaty tribe," recognition of "Alaska native entities," and settlement of litigation], and because they have failed to exhaust administrative remedies by applying for recognition through the BIA's acknowledgment process, the United States' motion for summary judgment on these claims must be GRANTED.**

(AR007779 [emphasis added].).

Having previously taken that position in the *Ione Band Litigation*, the government is judicially estopped from taking a diametrically opposite position now.  The Federal Defendants' arguments to the contrary are without merit.

They state that "the U.S. Supreme Court has never held that judicial estoppel is available against the United States." (Def's Memo., p. 41:7-8.)  But this passive phrasing is telling: it implicitly admits that no Supreme Court case also has ever held that the doctrine does not apply against the United States either.  Moreover, Ninth Circuit case law, which is binding on this Court in the absence of such Supreme Court decision, makes clear that judicial estoppel *may* be applied against the federal government.  *See, e.g., United States v. Liquidators of European Fed. Credit Bank*, 630 F.3d 1139, 1148 (9th Cir. 2011) (applying doctrine to federal government); *Kern v. United States Bureau of Land Mgmt.*, 284 F.3d 1062, 1069 (9th Cir. 2002) (same); *Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d 660, 670 (9th Cir. 1998) (same); *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1357-58 (9th Cir. 1994) (same); *Northern Alaska Environmental Center v. Lujan*, 961 F.2d 886, 891 (9th Cir. 1992) (same).

As a fallback position, the Federal Defendants suggest that, whatever the general rule is regarding that doctrine's application to the United States government, it cannot be applied in this case, because it deals with Indian land claims.  This, too, is wrong.  Each of the cases cited by the

1    Federal Defendants for that proposition deals with some form of *equitable* estoppel—in fact, most

2    dealt with claims of laches, and mentioned "estoppel" only in dicta.  The holding of those cases is

3    that "defenses based on *delay in bringing claims* such as laches and estoppel are inapplicable to

4    claims to enforce Indian rights."  *United States v. Wash.*, 157 F.3d 630, 649 (9th Cir. 1998).

5         Not one of those cases deals with, or even refers to, the doctrine of *judicial* estoppel,

6    however.  The courts have widely recognized that equitable estoppel and judicial estoppel are

7    separate doctrines, and have held that while the former may be inapplicable to the federal

8    government, *judicial* estoppel does apply.  *See Comm. of the Russian Fed'n on Precious Metals &*

9    *Gems v. United States*, 987 F. Supp. 1181, 1184 (N.D. Cal. 1997) (making this very distinction and

10   noting that the Ninth Circuit has applied judicial estoppel against the government); *United States v.*

11   *Owens*, 54 F.3d 271, 275 (6th Cir. 1995) ("judicial estoppel may apply against the government

12   when equitable estoppel would not.").

13        No case that the Federal Defendants have cited—or that Amador County has found—holds

14   that the federal government is exempt from the doctrine of judicial estoppel (as opposed to

15   equitable estoppel) in Indian lands cases; indeed, at least one district court in this Circuit has

16   applied the doctrine of judicial estoppel against the government in connection with such a claim.

17   *See Fort Hall Landowners Alliance, Inc. v. BIA*, 407 F. Supp. 2d 1220, 1224-25 (D. Idaho 2006)

18   (judicial estoppel against Bureau of Indian Affairs).

19        Nor is there any merit to the contention that the Department's filing of an amicus brief in

20   the *Ione Band Litigation* in 1995 negates the application of judicial estoppel here.  Filing the

21   amicus brief did not did not cure the unfair advantage that the government's prior position gives it.

22        The amicus brief was filed three years after Judge Karlton dismissed the federal

23   government as a party to the original action, based on its prior position.  By extracting itself from

24   that prior suit, based on the position it now disavows, and then changing its position, the

25   government ensured that its flip-flop could not be contemporaneously challenged in that action,

26   and no party would have had standing at the time to challenge it in a separate action.  The Ione

27   Band—having received the recognition it sought (despite the fact that it was unlawfully

28   recognized)—had nothing more to complain about.  And the County could not have then

---

challenged the recognition of the Band, because judgment was granted in its favor on other grounds, permitting the County to continue exercising taxing and regulatory jurisdiction over the land owned by the Band.  As discussed above, until the ROD determined to take land into trust, depriving the County of such jurisdiction, there was no direct impact upon its interests sufficient to let it challenge the Band's recognition.  Now, however, both the Federal Defendants and the Ione Band argue that the County is precluded from challenging Ada Deer's actions by the statute of limitations.  (Defs' Memo., p. 40; Band's Memo., p. 36.)  It is exactly this kind of have-your-cake-and-eat-it-too gamesmanship that the doctrine of judicial estoppel is designed to prevent.

The Federal Defendants further argue that judicial estoppel should not be invoked to prevent it from correcting a "mistake" or changing "policy."  That is too cute by half.  Nowhere in their brief, tellingly, do the Federal Defendants ever try to deny the obvious facts contained in the record and discussed in the County's moving papers: that Ms. Deer's actions were attributable to raw political pressure from Members of Congress, not a change of policy; that she changed the agency's position without any explanation for her abrupt about-face; and, like Louis Bruce before her, she followed an "administrative[ly] anomol[ous} round of decision-making—in her case, bypassing the customary system of "program review and surname," and failing to distribute copies for review in advance; and that her actions violated the Part 83 regulations.  (AR001057.)

And finally, the Federal Defendants urge, merely in passing, that "The County's contention that this Court should apply judicial estoppel to bar the ROD's conclusion that the Ione Band was recognized prior to the Assistant Secretary's reaffirmation is without merit. First, the County took the exact opposite position in submissions to the NIGC opposing the Band's request for a Restored Exception opinion." (Defs' Memo., pp. 40:24 – 41:2.)  In support of this contention, it merely cites "AR004851" and moves on without further comment.

This approach is representative of the Federal Defendants' approach to this whole case—make a broad, very general, misleading statement, cite a single page in a 20,000 page administrative record, and then hope the sheer volume of paper will discourage close examination of the cited materials.  In fact, however, the federal government's statement is not remotely supported by the document it cites.  The cited document is a brief, three-page letter that the County

1   sent to the NIGC in 2006 which—contrary to the Federal Defendants' characterization—did not

2   take the "opposite" position: that the federal government was not estopped by the *Burris* litigation.

3   In fact, that letter contained the County's alternative arguments on the merits that the federal

4   government's opinion that the Ione Band is a "restored" tribe constitutes an abuse of discretion and

5   is arbitrary, capricious and contrary to law, because (1) it was never a recognized tribe, but (2)

6   even if the Ione Band was recognized in 1934, it was never terminated, and (3) it was never

7   lawfully restored.  (AR004851-53.)  Far from being the "opposite" of the County's position, it is

8   exactly the same as the argument contained in Section IV.D of the County's moving papers in this

9   case.

10          **B.      The Band Is Collaterally Estopped.**

11          The Ione Band claims to be "confused" by the County's use of the term "res judicata" in its

12   moving papers, because that blanket term encompasses both "issue preclusion" and "claim

13   preclusion."  *DiSalvo v. DiSalvo (In re DiSalvo)*, 219 F.3d 1035, 1038 (9th Cir. 2000); *see also*

14   *Taylor v. Sturgell*, 553 U.S. 880, 892, 128 S. Ct. 2161, 171 L. Ed. 2d 155 (2008) ("The preclusive

15   effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively

16   referred to as 'res judicata.'").  This purported confusion about which prong of the res judicata

17   doctrine the County was referring to is obviously contrived; after all, the County specifically stated

18   that "the Ione Band itself is bound by the doctrine of *collateral* estoppel (or *res judicata*), because

19   it litigated that issue and lost."  (County's Mot. for Summ. Judg. [Dkt. #65], p. 39:24.)  As the

20   Band itself acknowledges (*see* Band's Memo., p. 42:4-5) "collateral estoppel" is another name for

21   "issue preclusion," a fact further reinforced by the County's reference to the fact that the Band

22   previously litigated an "issue" and lost.  (County's Mot. for Summ. Judg. [Dkt. #65], p. 40:1.)  And

23   whether the doctrine is called collateral estoppel, issue preclusion, or res judicata, the County

24   accurately stated the elements of the doctrine that precludes the Band from re-litigating the issues

25   of whether it was federally-recognized as a "tribe" at any time prior to 1978, and whether it was

26   required to proceed through the Part 83 process to obtain administrative recognition: that the same

27   issues were decided in the prior proceeding, that a final judgment on the merits issued, and that the

28   party against whom collateral estoppel is asserted was a party or in privity with a party at the first

1    proceeding.  *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 (9th Cir. 2006).

2        However, it turns out there is a method to the Band's madness; it opportunistically seeks to

3    use its purported "confusion" to focus its briefing on the doctrine of "claim preclusion" instead of

4    issue preclusion.  In most respects, this distinction is irrelevant.  The two types of preclusion are

5    closely related, have largely identical elements,[22] and serve the same fundamental "dual purpose of

6    protecting litigants from the burden of relitigating an identical issue with the same party or his

7    privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co.*

8    *v. Shore*, 439 U.S. 322, 326, 99 S. Ct. 645, 58 L. Ed. 2d 552 (1979).

9        There are, however, two respects in which these doctrines differ.   First, and most

10   fundamentally, "'The doctrines differ in that res judicata bars the same parties from relitigating the

11   same cause of action, while collateral estoppel bars the party against whom the claim is asserted, or

12   a party in privity with the earlier party, from relitigating issues which have been decided with

13   respect to a different cause of action.'"  *Troutt v. Colo. W. Ins. Co.*, 246 F.3d 1150, 1156 (9th Cir.

14   2001) (quoting *Federated Mut. Ins. Co. v. Anderson*, 991 P.2d 915, 926 (Mont. 1999)); *see also*

15   *Lawlor v. National Screen Service Corp.*, 349 U.S. 322, 326, 75 S. Ct. 865, 99 L. Ed. 1122 (1955).

16   Also, "the 'final judgment' requirement is somewhat more relaxed for purposes of 'issue

17   preclusion' than it is for purposes of 'claim preclusion[.]'"  *In re Lockard*, 884 F.2d 1171, 1175

18   (9th Cir. 1989).  "'For purposes of issue preclusion (as distinguished from merger and bar), "final

19   judgment" includes any prior adjudication of an issue in another action that is determined to be

20   *sufficiently firm to be accorded conclusive effect*.'"   *Id.* (quoting Restatement (Second) of

21   Judgments (1982) § 13) (emphasis in original).

22       It is the first of these distinctions that is crucial here: the Band claims that the County failed

23   to address all of the required criteria for demonstrating the identity of the issues between the two

24   cases. (Band's Memo., p. 42:19-20.)   However, the criteria it cites relate to the question under

25   *claim* preclusion of "[w]hether the two suits involve the same claim or cause of action" (*Mpoyo v.*

26   *Litton Electro-Optical Sys.*, 430 F.3d 985, 987 (9th Cir. 2005))—not whether they present the same

27

28   _____
         [22] *See Frank v. United Airlines, Inc.*, 216 F.3d 845, 853 (9th Cir. 2000).

1  factual and/or legal issue, which is the question to be resolved in connection with *issue* preclusion.

2  　　　All three elements of issue preclusion are present here.  Unquestionably the Ione Band was

3  a party to the *Ione Band Litigation* (or at least in privity with parties therein).  Indeed, the Band

4  makes no effort to deny it.  Nor does it deny (as it could not) that the case was resolved by a series

5  of final judgments against it, the first dismissing the United States as a party (AR007763-88), and

6  then a subsequent final judgment in favor of Amador County.  (AR001159-68.)

7  　　　And as for the identity of issues, though the Band seeks to deny it, that prong is met here as

8  well.  In the prior litigation, the Band's Complaint expressly sought "entry of an order declaring

9  that the Ione Band of Miwok Indians has and continues to be a sovereign Indian Tribe having

10  government-to-government relations with the United States."  (Amador County's Request for

11  Judicial Notice, filed May 1, 2014 [hereafter "RJN"], Ex. 1 [Dkt. #66-1] [Complaint in *Ione Band*

12  *Litigation*], p. 2:1-3.)  Its first cause of action was for a writ of mandamus, forcing the government

13  to recognize the Band as an Indian tribe, based on its allegation that "The decision of

14  Commissioner Bruce in his October 18, 1972 letter mandates that the United States recognize the

15  Ione Band of Miwok Indians as a sovereign Indian Tribe having government-to-government

16  relations with the United States…"  (*Id.*, p.14:16-19.)  Its second, third and fifth causes of action

17  likewise challenged the federal government's purportedly unlawful refusal to recognize the Band

18  as a tribe, "after previously recognizing such status…" (*Id.*, p. 16:7; *see also generally id.*, pp. 14-

19  18.)  And each of the first six causes of action sought to challenge as unlawful the government's

20  insistence that the Band must proceed through the Part 83 recognition process. (*Id.*)

21  　　　The federal government expressly disputed these contentions.

22  　　　As to the first claim—that the Band "has and continues to be a sovereign Indian Tribe

23  having government-to-government relations with the United States," the federal government

24  expressly denied this contention in its Answer, stating, "Defendant affirmatively avers that the Ione

25  Band of Miwok Indians is not and has not been federally recognized by the United States."  (RJN,

26  Ex 2 [Dkt. #66-2], p. 7:6-8 & 18-20.)  It submitted a sworn declaration from Michael Lawson,

27

28

Ph.D., an historian in the Bureau of Indian Affairs' Branch of Acknowledgement and Research,[23] which stated that "[a]ccording to BAR records, the United States has <u>never</u> extended federal recognition to the Ione Band of Miwok Indians as an Indian tribe."  (SAR020824 [emphasis added].)[24]  In its Status Report, filed January 17, 1991, it stated, "The [United States] government denies that the Ione Band of Miwok Indians has ever been a federally-recognized tribe." (RJN, Ex. 5 [Dkt. #66-5].)  In its motion for summary judgment, the government further stated that "[t]o the extent that plaintiffs viewed this decision [not to include the Ione Band on a list of federally-recognized tribes published in the *Federal Register* in 1979] as a change from recognition status to nonrecognition status, *which change the government disputes*, plaintiffs were bound to bring suit no later than 1985 pursuant to the statute of limitations set forth at 28 U.S.C. 2401(a)." (AR000703.)  And finally, in its reply brief supporting summary judgment, the government stated:

> [T]he [Bruce] letter was written in response to a request to take title to the 40-acre parcel in trust.  The Commissioner agreed to do so under the terms of the [Indian Reorganization Act], pursuant to which **the Commissioner did not make a determination or findings that the Ione Band was a tribe within the meaning of the IRA**.  In stating that "federal recognition was evidently extended to the Ione Band of Indians at the time that the Ione land purchase was contemplated", without more, **it is further evident that none of the traditional factors for tribal recognition were given consideration, even apart from the IRA.  Given the express context of the sentence, it is clear that the Commissioner**

---

[23] The Bureau of Indian Affairs' Branch of Acknowledgement and Research ("BAR") is the administrative department responsible for researching the historical bases for claims of federal tribal recognition.  (SAR020824.)

[24] The Federal Defendants seek now to disavow this declaration, by claiming that Dr. Lawson's 1991 declaration was undermined by his subsequent review of additional documents in early-February 1992.  (*see* Defs' Memo., p. 28:9-20.)  But Dr. Lawson did not say that those documents changed his opinion, and the federal government did not withdraw the Lawson declaration before Judge Karlton issued his opinion holding that the Band was not a recognized tribe several months later.  Nor is there any evidence to suggest that Dr. Lawson changed his view based on those documents, and the position of the Department remained unchanged.  Shortly thereafter, the Department staff sent a "Briefing Paper" to the President, stating, "It is the Department's position that this group has never attained Federal tribal status and is not, therefore, eligible for restoration."  (AR000794.)  And on August 26, 1992 Assistant Secretary – Indian Affairs Eddie Brown sent a letter to Senator Inouye—with copies to Dr. Lawson and the Solicitor's office—stating that "[t]he Department has never viewed the absence of the Ione Band from the Federal Register list of federally recognized tribes as a simple clerical error.  This group has never attained Federal tribal status and is not, therefore, eligible for restoration of that status." (AR000814.) Many other post-February-1992 examples abound. (*See, e.g.,* AR000808-13.)

---

*articulated an assumption, not borne out by any caselaw, treatise or statute, that the identification of a group of Indians and the initiation of efforts to purchase land for said group without more constitutes "federal recognition".* Indeed, because a group of Indians collectively identified as the Ione Band were targetted [sic] as beneficiaries of a land purchase that unfortunately never materialized, *the Ione Band was known to exist in 1916 by the government and in that sense were "recognized" to exist by the "federal" government. . . . There are a number of such tribes who are known to the federal government to exist in some form, but with which there is no federal relationship. . . . The government submits that there are undoubtedly tribal groups indigenous to California. . . . that have never come under the government's supervision within the context of "federal recognition."*

(AR000759-62 [emphasis added].)

As for the second contention, the federal government argued strenuously that the Part 83 recognition regulations were the exclusive administrative means by which the Ione Band could be recognized by the federal government. (*See* RJN, Ex. 2 [Dkt. 66-2] [USA's Answer], p. 6:9-11 ["the Ione Band of Miwok Indians have been advised that to obtain federal recognition, the procedures set forth at 25 C.F.R. Part 83 must be followed."]; AR000691-000731, AR000738-000767.)  The government took the same position in various other instances as well, including in subsequent IBIA proceedings (*see* AR000813), and in refusing to review a "tribal" contract (*see* AR000807 ["the only administrative option for the group to achieve Federal status was through the acknowledgement process set forth in Part 83 …"]).

Judge Karlton <u>explicitly</u> adopted the government's positions in his April 23, 1992 order dismissing the complaint against the government:

> Plaintiffs' argument appears to be that these non-regulatory mechanisms for tribal recognition demonstrate that "the Secretary may acknowledge tribal entities outside the regulatory process," . . . and that the court, therefore, should accept jurisdiction over plaintiffs' claims compelling such recognition. I cannot agree. **Because plaintiffs cannot demonstrate that they are entitled to federal recognition by any of the above mechanisms [congressional recognition, status as a "treaty tribe," recognition of "Alaska native entities," and settlement of litigation], and because they have failed to exhaust administrative remedies by applying for recognition through the BIA's acknowledgment process, the United States' motion for summary judgment on these claims must be GRANTED.**

(AR007779 [emphasis added]).  As he further noted in a subsequent order seeking to dismiss other claims against non-federal defendants, "In my order filed April 23, 1992, I determined that the Ione

Band of Miwok Indians is not an Indian tribe which has been "duly recognized by the Secretary of the Interior" because plaintiffs have not applied for recognition through the Bureau of Indian Affairs' ("BIA") acknowledgment process and have not shown that they are otherwise entitled to such recognition."  (AR000822:9-15.)

Simply put, the Ione Band previously argued to this Court that it (1) was a previously-recognized "tribe" and (2) that it need not proceed through the Part 83 regulations to obtain administrative recognition.  The government fiercely disputed these contentions, and they were expressly rejected by this Court in the process of entering judgment against them and in favor of the government on those claims.  These are precisely the type of facts on which collateral estoppel is appropriate against the Band, and judicial estoppel is appropriate against the government.

**V.   UNDER *CARCIERI V. SALAZAR*, THE IONE BAND IS NOT ELIGIBLE TO HAVE LANDS TAKEN INTO TRUST UNDER THE INDIAN REORGANIZATION ACT, BECAUSE IT WAS NOT A "RECOGNIZED TRIBE" THAT WAS "UNDER FEDERAL JURISDICTION" IN 1934.**

The Secretary's authority to take land into trust on behalf of Indian tribes and Indians is found in the IRA, specifically Section 19, 25 U.S.C. § 465. Section 19 of the IRA defines the terms "Indian" and "tribe."  In *Carcieri v. Salazar*, 555 U.S. 379, 129 S. Ct. 1058, 172 L. Ed. 2d 791 (2009), the U.S. Supreme Court held that Section 19 of the IRA, 25 U.S.C. "§ 479 limits the Secretary's authority to taking land into trust for the purpose of providing land to members of a tribe *that was under federal jurisdiction when the IRA was enacted in June 1934*."  555 U.S. at 382, 129 S. Ct. at 1061, 172 L. Ed. 2d at 796 (emphasis added).  Thus the Secretary may not take land into trust on behalf of Indians who were *not* members of a tribe that was under federal jurisdiction in June 1934; to the extent the Secretary proposes to do so, *Carcieri* holds she exceeds her delegated authority, and usurps power that may properly only be exercised by Congress.

**A.   The Record Shows The Band Was Not A "Tribe" In 1934.**

The fact that the Department of Interior repeatedly urged the Ione Band to seek recognition through the Part 83 regulatory process, but that the Band repeatedly refused to do so, is strong evidence that it *knew* it could not meet the criteria set forth in those regulations.   And the administrative record in this case bears that out.

1. **The ROD's finding that the Ione Band was a "tribe" in 1934 is not supported by substantial evidence.**

Substantiality of the evidence must be based upon "the record taken as a whole." *Vallejo General Hospital v. Bowen*, 851 F.2d 229, 231 (9th Cir. 1988); *see also Citizens Against Casino Gambling v. Kempthorne*, 471 F. Supp. 2d 295, 324 (W.D.N.Y. 2007) ("This Court has reviewed the NIGC's administrative *record as a whole*, and concludes that it does not support a finding of reasonableness as to the Chairman's actions [in approving a gaming ordinance under IGRA]." (emphasis added)). "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)." *Turcios v. INS*, 821 F.2d 1396, 1398 (9th Cir. 1987). *See also Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (""Substantial evidence is not simply some evidence, or even a great deal of evidence."). "The reviewing court must consider evidence contravening the agency's determination." Turcios, 821 F.2d at 1398. In the "landmark decision" of *Universal Camera Corp. v. Nat'l Labor Relations Bd.*, 340 U.S. 474, 488, 71 S. Ct. 456, 95 L. Ed. 456 (1951), "the Supreme Court spelled out with care the general rules that should govern [courts] in their work of reviewing orders and/or decisions of administrative agencies":

> The Court held, inter alia, (in conformance with a requirement of the Administrative Procedure Act, 5 U.S.C.A. 1001 et seq.) that such decisions must be supported by substantial evidence "on the record considered as a whole." If after canvassing and fairly assessing the entire record a reviewing court cannot conscientiously find that the evidence supporting an agency decision is substantial, "good conscience" dictates that the agency decision be reversed. ***In so appraising the whole record the reviewing court must take into account whatever in the record fairly detracts from the weight of the evidence which underlies the agency order and is "opposed to the agency's view."***

*Carter Prods., Inc. v. Federal Trade Comm'n*, 268 F.2d 461, 493 (9th Cir) (emphasis added), *cert. denied*, 361 U.S. 884 (1959). *See also Port of Seattle*, 499 F.3d at 1035 ("an agency must account for evidence in the record that may dispute the agency's findings"). A court "may not affirm [agency action] simply by isolating a specific quantum of supporting evidence." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1984) (overturning ALJ's findings for lack of substantial evidence).

Or, put more succinctly, "Reliance on cherry-picked evidence does not satisfy a substantial evidence standard."[25]  "Cherry-picking" aptly describes the Federal Defendants' and Ione Band's approach to the administrative record here.

For instance, in its effort to rehabilitate the inadequacy of the Louis Bruce letter, and to attempt to refute the fact that the BIA never treated that letter as conclusive of final, the Ione Band states that "approximately two years later, then-Commissioner of Indian Affairs Morris Thompson reiterated the formal acknowledgement of Ione's previously recognized tribal status in a memorandum to the BIA Sacramento Area Director…"  (Band's Memo., p. 6:19-21.)  In support of this claim they cite AR674—a 1990 letter from Reid Peyton Chambers (who was an Associate Solicitor in the Department of Interior during the 1970s) to Senator Daniel Inouye—and AR873— an undated, unsigned letter, purportedly from Mr. Thompson to the Sacramento Area Director, stating his concurrence with the Bruce letter.  In fact, the record—far from supporting the Ione Band's claim—directly refutes it.

The 1990s letter from Reid Peyton Chambers expressly states that the Commissioner's staff felt that for them to formally issue the Thompson memorandum, "would require approval of the Solicitor's office," and that Chambers could not give that approval due to the conclusion of Solicitor Kent Frizzell that "the Secretary lacked authority to recognize tribes."  (AR000674.)  Moreover, the administrative record itself places the date of the purported Thompson memorandum as April 2, 1975.  (AR000565.)  And the record contains a memorandum dated that exact same day from Mr. Chambers to the Commissioner, stating, "The Solicitor's Office is currently reviewing the Department's criteria for recognizing Indian tribes.   The surname approval of your memorandum to the Area Director, Sacramento, is being held in abeyance pending completion."

---

[25] *Tim v. Colvin*, 2014 U.S. Dist. LEXIS 28198, *24 (N.D.N.Y. Jan. 31, 2014) (citing *Fiorello v. Heckler*, 725 F.2d 174 (2d Cir. 1983), and overruling ALJ's adverse decision on plaintiff's applications for disability-based benefits under the Social Security Act based on selective citation of certain reports while disregarding evidence to the contrary); *Singh v. Holder*, 406 Fed. Appx. 166, 169 (9th Cir. 2010) (rejecting immigration judge's adverse credibility decision as "cherry-picking" and citing *Shrestha v. Holder,* 590 F.3d 1034, 1040 (9th Cir. 2010), for the proposition that selective consideration of the record is not substantial evidence).

(AR000569.)  In other words, the "Thompson memorandum" was a *draft* that never received the requisite approvals from the Solicitor's office—because the Solicitor disagreed with its contents—and which was never finalized or sent.  Yet the Band relies upon it without mentioning these facts.

Moreover, as detailed in the County's moving papers, the clear evidence in the administrative record shows that the so-called "Ione Band" was not a separate and distinct entity from the Buena Vista and Jackson Rancheria, both of which organized under the IRA:

- Early BIA documents and correspondence refer to the Buena Vista, Jackson Rancheria, and Ione Band groups interchangeably.  (*See, e.g.,* AR000107, AR000132, AR000137, AR000145, AR000862-66, AR000944, AR000959.)

- The Terrell Census lists members of all three groups in its "Census of Ione and vicinity Indians," including John Oliver, Casus Oliver, and Lucy & Joseph Oliver, from whom the Buena Vista Rancheria claim descent.  (AR000919, AR000878, AR004093-94, AR003966.)

- Much of the correspondence that Agent Terrell had with actual Indians regarding the attempted land purchase on which the ROD relies (at least insofar as that correspondence is contained in the administrative record) is with the Olivers (*see* AR000132, 000137, 000180, 000186).

- A tribal history prepared by Glen Villa, Sr., *and submitted by the Band itself* expressly acknowledged, "Buena Vista Rancheria, a 70 acre parcel of land 4 miles south of Ione, was purchased for the Ione Band.  Some of the people identified on the 1915 census already lived at this site which was an old Indian village called Upusuni." (AR003972.)

- That Villa history further stated that that it was common for the population of Miwok tribes to be "divided between several settlements consisting of a few households more or less connected by blood..."  (AR003974.)

- Charlie Maximo, whom the Terrell Census identified as the "chief" of the band, "[m]oved to Jackson Valley Rancheria" in 1895 (AR003976).

- Maximo's rival to be elected "chief" (or "spokesman") was John Powell

1   (AR003972), whom the 1905 Kelsey census and the 1915 Terrell census both

2   identified as living at Buena Vista/Richey.  (AR000073, AR003775.)

3   •   And an analysis of the Terrell Census, submitted by the Band, shows that "Chief"

4   Charlie Maximo was buried at the Buena Vista Rancheria. (AR004082.)

5   •   The ethnohistorical report prepared on behalf of the Ione Band and submitted by the

6   Band expressly states, "Terrell was impressed with the needs of the Ione group, and

7   with the assistance of Captain Charlie Maximo, assembled a list of 101 individuals

8   of the Ione Band in May 1915 (Figure 4).  Terrell's Census enumerated 29 people in

9   or near Richey (Buena Vista), and ten people with ties to the Ione area at Jackson

10   and 63 living near [the City of] Ione. … Terrell notes that these people are of the

11   same band…"  (AR003547.)

12   The Federal Defendants' response to this evidence is telling—they simply ignore it, both in

13   the ROD and in their brief!  In other words, even now the government refuses to "take into account

14   whatever in the record fairly detracts from the weight of the evidence which underlies the agency

15   order and is 'opposed to the agency's view.'"  *Carter Products, Inc.*, 268 F.2d at 493.

16   The Band's response is to deny that "Ione Band" was used interchangeably with "Buena

17   Vista," "Richey" and "Jackson" to refer to a single tribe with multiple land bases.  For example,

18   the County cited seven documents in its opening papers for the premise that "Early BIA documents

19   and correspondence refer to the Buena Vista, Jackson Rancheria, and Ione Band groups

20   interchangeably. (*See, e.g.,* AR000107, AR000132, AR000137, AR000145, AR000862-66,

21   AR000944, AR000959.)"  Citing only some of these, the Band responds, "Most of these

22   documents have the headings "Ione Indians" and "Buena Vista Rancheria," but only discuss the

23   proposed Ione Band land purchase. AR107, 132, 137, 145,862-863." (Band's Memo., p. 32:19-20.)

24   It is difficult to imagine how the Ione Band believes that it *helps* its case that the documents

25   have the headings "Ione Indians" and "Buena Vista Rancheria" but "only discuss the proposed

26   Ione Band land purchase."  If anything, references to the Buena Vista Rancheria on a letter dealing

27   solely with the proposed Ione Band land purchases reinforce the proposition that the Department

28   regarded the Buena Vista and the Ione-based group as part of the same group of Indians.

But also, the Band's omission of pages AR000864-65, AR000944, and AR000959 was apparently not an accident. Here again, the Band's penchant for cherry-picking becomes obvious. The first two of these contain a letter identified as being from between 1916 and 1920 (the date is obscured on the copy) from Indian Agent John Terrell to Commissioner of Indian Affairs Cato Sells, which specifically refers to the "Ione and Richey Band of Indians," further confirming their overlap. (*See* AR000865.) Most damning, however: this document is identified in the administrative record—by the federal government itself—as "Correspondence from circa 1916-1920 using Ione and Buena Vista interchangeably."

Moreover, the version of that letter contained at AR000864 is annotated with hand-written notes, stating, "This is one tribe" and "[these groups are] one tribe" and "Buena Vista is other name." (AR000864-65.) The author is not identified, but that version was—according to the AR's index—submitted by Gerald Glazer, who was the attorney for the tribe in the mid-1990s. (AR001018.) Similar annotations can be found on the other document submitted by Mr. Glazer—a 1916 letter from Mr. Terrell to Lena Oliver (the Buena Vista Rancheria claims descent from the Olivers), which likewise discusses the "Ione Indians" and "Buena Vista Rancheria," and which discusses the membership of the Olivers, who lived at Buena Vista, in the Ione Band.

The Ione Band also claims that "the 1915 Terrell Census did not group all of the tribes together (PMP&A 30:18-19); the Census's language clearly shows that members of the Ione Band who were then living at Buena Vista or Jackson *maintained their identity with their own Band at Ione* despite living on other Rancherias." This reading of the Terrell Census is nothing short of bizarre. That document was titled, "Census of Ione and vicinity Indians." (AR003490.) Given that Buena Vista and Jackson Rancheria were obviously regarded as being in the "vicinity" of Ione, it is inexplicable that Mr. Terrell would have only enumerated those Indians at Buena Vista and Jackson who were members of the Ione Band, ignoring other Indians in those places who were not. The only sensible understanding of those documents is that all of the Indians at Jackson and Buena Vista were members of the Ione Band. And that, in turn, leads to the inescapable conclusion that there was but a single band with multiple land bases. The record contains no contrary evidence, and again, it is telling that the Federal Defendants have made no effort to dispute this point.

Finally, the Federal Defendants and Ione Band also point to isolated references in the administrative record to the "Ione Band" during the period of the land negotiations.  But that, too, is not evidence of a "tribe."  Indeed, just a few years before the Supreme Court had expressly distinguished between "bands" and "tribes" of Indians, holding that the former term—unlike the latter—did not necessarily connote a "separate political entity, recognized as such, inhabiting a particular territory, and whom treaties had been or might be made."  *Conners v. United States*, 180 U.S. 271, 275, 21 S. Ct. 362, 45 L. Ed. 525 (1901).  The Court continued, "*The word 'band' implies an inferior and less permanent organization*, though it must be of sufficient strength to be capable of initiating hostile proceedings."  *Id.* (emphasis added).

> **2.   The *Muwekma* court's acceptance of the federal government's uncontested claims that the Ione Band was properly recognized as a "tribe" by Ada Deer, in a case to which Amador County was not even a party, does not resolve the issue.**

It is the height of irony that, while they strive mightily to deny being bound by their prior actions in the *Ione Band Litigation*—to which they *were* parties—the Federal Defendants and Ione Band) seek to have this Court treat factual findings from a separate case—*Muwekma Ohlone Tribe v. Salazar*, 813 F. Supp. 2d 170 (D.D.C. 2011), *aff'd*, 708 F.3d 209 (D.C. Cir. 2013)—to which the County of Amador was <u>not</u> a party, as nevertheless binding on the County.  (*See, e.g.,* Defs' Memo., pp. 22:16-27, 26:17-19, 27:15-28, 37:23 – 38:2; Band's Memo., pp. 27:27 – 28:2, 38:23-25.)  Doing so would contradict basic principles of due process and established law. *See Parkland Hosiery Co.*, 439 U.S. at 327 n.7 ("It is a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefore has never had an opportunity to be heard.").

Moreover, the factual posture of the *Muwekma* case made it a particularly inappropriate vehicle for resolving the legality of the Ione Band's status, and both the Federal Defendants and the Ione Band therefore misrepresent the significance of that holding.  In *Muwekma*, no party had any incentive to question the legality of the Ione Band.  The Muwekma Ohlone tribe challenged the federal government's refusal to recognize it outside of the Part 83 regulations, just as the Ione Band had done a decade earlier.  The Muwekma argued that "the Department violated the Equal Protection Clause and the APA by requiring it to undergo the Part 83 acknowledgment procedures

---

while allowing similarly situated tribal petitioners," specifically the Ione Band and another tribe, the Lower Lake Rancheria, "to bypass these procedures altogether."  *Muwekma Ohlone Tribe v. Kempthorne*, 452 F. Supp. 2d 105, 113 (D.D.C. 2006).  In 2006, the district court held that the Department had not provided a sufficient record for it to evaluate the Department's claims that the Muwekma Ohlone were not similarly-situated to the Ione Band or Lower Lack Rancheria.  *Id.*

In late 2006, after Amador County had already filed a challenge to the Ione Band's Indian Lands Opinion with the Interior Board of Indian Appeals,[26] the Department filed a supplemental record with the *Muwekma* district court, containing many of the same documents present in the administrative record of this case.

It is hardly surprising that the Department would seek to defend Ada Deer's 1994 actions, especially knowing that they were being contested by Amador County elsewhere, and that it therefore presented the Ione Band documents to the *Muwekma* court in the manner most favorable to the Ione Band, while distinguishing it from the case of the Muwekma.  It is also not surprising that the Muwekma Ohlone would accept the legitimacy of the Ione Band's informal "recognition" outside the Part 83 process—that is exactly what they sought to obtain as well.  And since no party had any incentive to question the legitimacy of Ada Deer's actions, it is hardly surprising that courts would accept them without question as well.

The Federal Defendants' reliance on the *Muwekma* litigation is particularly misleading insofar as it states that "the Band's under federal jurisdiction status as a tribal entity throughout the Twentieth Century was confirmed in recent litigation in the United States Court of Appeals for the District of Columbia Circuit."  (Defs' Memo., p. 22:16-18.)  Nothing *whatsoever* in the district court or Court of Appeals opinions in that case discusses the meaning of the term "under federal jurisdiction" in the IRA, or the Supreme Court's decision in *Carcieri*.  The Federal Defendants' efforts to suggest otherwise flatly misrepresents that decision.

The Federal Defendants' citations to the district court's decisions in *Muwekma* for the proposition that Part 83, however, is not the only way in which an Indian tribe can be recognized"

---

[26] *See County of Amador v. Assoc. Deputy Sec'y of the Interior & Assoc. Solicitor, Div. of Indian Affairs*, 44 IBIA 4, 2006 I.D. LEXIS 80, Docket No. IBIA 07-24-A (Oct. 19, 2006)

is also highly misleading.  (*Id.*, p. 36 n.20.)  The pages of the district court opinion they cite merely note that—as a factual matter—tribes, like the Ione Band, have been recognized outside the Part 83 process.  It expresses no judgment as to whether those recognitions were appropriate.

The Federal Defendants' citations to the D.C. Circuit's opinion for the same proposition are also misleading, insofar as they are meant to imply that the appeals court conclusively decided that Ada Deer's actions were legal, because that issue was not presented by that appeal.  Thus, any implication to that effect is the purest dicta.  It is true that the D.C. Circuit noted that under 25 C.F.R. § 1.2, Interior could waive the Part 83 process if it found that such a waiver is "'in the best interest of the Indians.'"  *Muwekma*, 708 F.3d at 212.  But that does not mean that the Secretary is free to "simply elect[] not to follow the Part 83 procedures for recognizing an Indian tribe" at will; she must follow the proper procedures and adopt the necessary findings on the record.  *Cherokee Nation of Okla. v. Norton*, 389 F.3d 1074, 1087 (D.C. Cir. 2004), *cert. denied*, 546 U.S. 812 (2005); *Cherokee Nation v. Babbitt*, 117 F.3d 1489, 1499 (D.C. Cir. 1997).  The Secretary, like all administrative officers, is bound by her own regulations, and her failure to waive them in the proper manner will result in actions taken in disregard of those regulations being voided. Thus, in *Cherokee Nation of Oklahoma*, the D.C. Circuit—the same Court that decided *Muwekma*—overturned the Secretary's "re-recognition" of the Delaware Tribe of Indians outside the Part 83 recognition process where the Secretary "did not even properly waive application of those procedures."  389 F.3d at 1087.  Here, as in the *Cherokee* case, "[n]othing in the record reveals a finding by [Ada Deer] pursuant to 25 C.F.R. § 1.2 (1996), whereby the regulations were waived 'in the best interest of the Indians.'" 117 F.3d at 1499.  And, tellingly, neither the Federal Defendants nor the Ione Band *even cite* 25 C.F.R. § 1.2.

**B.    Even If It Was A "Tribe," The Ione Band Was Not "Under Federal Jurisdiction" In 1934.**

**1.    The failure of the Federal Government to actually acquire land on behalf of the "Ione Band" means it was not "under federal jurisdiction" in 1934, and the Secretary's contrary "interpretation" is not entitled to deference because it is contrary to the clear legislative history.**

The ROD itself flatly acknowledges that "[t]he actions of the Department in furtherance of

its efforts to acquire land for the Indians at Ione are not conclusive as to the Tribe's recognized tribal status." (AR010102.)  Likewise, the 2006 Indian Lands Opinion properly recognized that the "*actions of the Department in furtherance of its efforts to acquire land for the Indians at Ione are not conclusive as to the Band's recognized tribal status*. Throughout California in the early part of the Twentieth Century, the Department attempted to purchase land wherever it could for landless California Indians without regard to the possible tribal affiliation of the members of the group" (AR005072 [emphasis added].)  If such proposed purchases were not conclusive as to the "recognized" tribal status of the Band, they certainly cannot be regarded as establishing that said Band was "under federal jurisdiction."  To the contrary, the government's failure to acquire land for the Ione Band is conclusive evidence that the Band—regardless of its tribal status—was <u>not</u> then "under federal jurisdiction," because at that time land and jurisdiction went hand-in-hand, at least where there was no valid treaty in effect.

The legislative history of the Indian Reorganization Act specifically reflects the fact that addition of the phrase "under federal jurisdiction" was suggested by then-Commissioner of Indian Affairs John Collier and incorporated in Section 19 of that Act (25 U.S.C. § 479) in response to several Senators' concerns that there were already a number of self-identified Indian "tribes" on whose behalf the federal government owned land, but who really should not have been under federal jurisdiction, and who were not really the intended beneficiaries of the Act.  Though the bill's chief co-sponsor in the Senate, Senator Wheeler, advised that the purpose of the Act was not to deal with the problem of those "tribes" already but improperly under federal jurisdiction; as he put it, "Of course this bill is being passed, as a matter of fact, to take care of the Indians that are taken care of at the present time."[27]  Nevertheless, he and other Senators were nevertheless

---

[27] *Hearings on S.2755 and S.3645: A Bill to Grant to Indians Living Under Federal Tutelage the Freedom To Organize for Purposes of Local Self-Government and Economic Enterprise, Before the S. Comm. on Indian Affairs*, 73d Cong., 2d Sess., pt. 2, p. 263 (1934) (hereafter "*Hearings on S.2755 and S.3645*") (copies of cited pages of this hearing are attached hereto;  the  entire  manuscript  is  available  in  digital  form  online  at http://hdl.handle.net/2027/uc1.b5157913); *see also id*. at 264 ("The Chairman.  Well, that is true, but we have not done anything to eliminate them up to the present time.  I think something has got to be done sooner or later to eliminate those, but we have not done anything about it at the present

concerned that the definitions of "Indian" and "tribe" in Section 19 were so broad that they threatened to create more such "tribes" who would be able to take advantage of the provisions of the Act.[28]    Commissioner Collier proposed the addition of the phrase "now under federal jurisdiction," to modify the term "recognized Indian tribe," specifically to address those concerns.

The legislative record contains a detailed discussion of the Catawba Indians in South Carolina, who did not then have a reservation, and many of the members of which were also not "half-blood Indians."   The question arose whether the Catawbas would be "Indians" within the meaning of the IRA.   Senator Mahoney believed that they should be, because "the Catawbas certainly are an Indian tribe[,]" and he saw no reason "Why, if they are living as Catawba Indians, why should they limit them any more than we limit *those who are on the reservation*[.]"[29] Chairman Wheeler, however, disagreed:

> The Chairman. But the thing about it is this, Senator; I think you have to sooner or later eliminate those Indians who are at the present time—as I said the other day, you have a tribe of Indians here, for instance in northern California, several so-called "tribes" there. They are no more Indians than you or I, perhaps. I mean they are white people essentially. And yet they are under the supervision of the Government of the United States, and there is no reason for it at all, in my judgment. Their lands ought to be turned over to them in severalty and divided up and let them go ahead and operate their own property in their own way.

> Senator O'Mahoney. If I may suggest, that could be handled by some separate provision excluding from the benefits of the act certain types, but must have a general definition.

> Commissioner Collier. Would this not meet your thought, Senator: After the words "recognized Indian tribe" in line 1 insert "now under Federal jurisdiction"? That would limit the act to the Indians now under Federal jurisdiction, except that other Indians of more than one-half Indian blood would get help.[30]

Senator Wheeler's view was that members of the Catawba tribe *should* be more limited than "those who are on the reservation" to avoid cases where new "tribes" like those in northern California would be created; only Catawbas who could establish that there were "half-blood" Indians could take advantage of the Act, whereas "members of any recognized Indian tribe [then]

---

time, and I did not think we should try to include them in this particular bill…").
[28] *Hearings on S.2755 and S.3645, supra,* note 27 at 265-67.
[29] *Hearings on S.2755 and S.3645, supra,* note 27 at 266.
[30] *Id.* (emphasis added).

under Federal jurisdiction" (*i.e.,* on a reservation) or their descendants living on the reservation, need not show that they were "half-blood" Indians.[31]

It was to accomplish this very end—leaving existing reservation Indians unaffected, but limiting the ability of non-reservation Indians to bring themselves within the Act—that Commissioner Collier proposed the inclusion of the phrase "now under federal jurisdiction" in Section 19, to modify the phrase "recognized Indian tribe."[32]

Further supporting this conclusion is the fact that the legislative history of the IRA also reflects the understanding of the time that "Indians under Federal jurisdiction are not subject to State laws."[33]   It was well-established in 1934 that, absent a treaty to the contrary, Indians were fully subject to state laws when outside the boundaries of a reservation.  *See, e.g., Ward v. Race Horse*, 163 U.S. 504, 507-08, 16 S. Ct. 1076, 41 L. Ed. 244 (1896) (Indian who killed game outside the boundaries of a reservation in violation of Wyoming state laws could be prosecuted by the State); *New York ex rel. Kennedy v. Becker*, 241 U.S. 556, 36 S. Ct. 705, 707, 60 L. Ed. 1166 (1916) (state could prosecute Indina for illegal spear-fishing off the reservation).[34]

---

[31] *See also Hearings on S.2755 and S.3645, supra,* note 27 at 264 ("Senator Thomas of Oklahoma. If your suggestion should be approved then do you think that Indians of less than half blood should be covered with regard to their property in this act? [¶]   The Chairman. No; not unless they are enrolled at the present time.").

[32] In this same vein, the legislative history also reflects that "Representative Edgar Howard, who co-sponsored the IRA with Senator Burton Wheeler, made the following statements during the congressional debate regarding whom should be classed as an 'Indian:'

> "For purposes of this act, [the definitional section] defines the persons who shall be classed as Indian. *In essence, it recognizes the status quo of the present reservation Indians and further includes all other persons of one-fourth Indian blood.* The latter provision is intended to prevent persons of less than one-fourth Indian blood who are already enrolled members of a tribe or descendants of such members living on a reservation from claiming financial and other benefits of the act. Obviously the line must be drawn somewhere …"

*Kahawaiolaa v. Norton*, 222 F. Supp. 2d 1213, 1220 n.10 (D. Haw. 2002), *aff'd*, 386 F.3d 1271 (9th Cir. 2004) (quoting Congressional Debate on Wheeler-Howard Bill (1934) in THE AM. INDIAN AND THE UNITED STATES, Vol. III. (Random House 1973)) (emphasis in original).

[33] *Hearings on S.2755 and S.3645, supra,* note 27 at 214 (Comments of the Indians Rights Association on the Collier Land Self-Government Bill," May 4, 1934).

[34] *See also Williams v. Lee*, 358 U.S. 217, 220, 79 S. Ct. 269, 3 L. Ed. 2d 251 (1959) (citing congressional action dating back to 1834—including the passage of the IRA—for the proposition that "Congress has also acted consistently upon the assumption that the States have no power to

---

Contemporaneous administrative practice further supports the understanding that the IRA's provisions were meant to benefit tribes for whom the government held land.  As discussed in the County's moving papers, on August 15, 1934—only two months after passage of the IRA— then-Superintendent of the Sacramento Indian Agency, O.H. Lipps, sent a letter to Commissioner Collier, listing the various Indian communities under the "jurisdiction" of the Sacramento Agency (which then included Amador County). (SAR020754-58.)  The stated purpose of that letter was to respond to a request for information from the Commissioner about Indian communities within the Sacramento Agency's jurisdiction, for the very purpose of putting into effect the "Wheeler-Howard bill."  (SAR020755.)[35]  The Ione Band was not listed, though the Jackson Rancheria and Buena Vista Rancheria were; and the Band was not invited to organize under the Act.

Also, in 1935—just a year after the IRA was enacted—the Pokagon Band of Potawatomi Indians petitioned for reorganization under the IRA, but was denied reorganization because Commissioner Collier's BIA concluded that "'*that residence on trust lands held in common for the Band was required for reorganization* and the fact that appropriations to purchase such lands had run out." *TOMAC v. Norton*, 433 F.3d 852, 856 (D.C. Cir. 2006) ("*TOMAC*") (quoting H.R. Rept. No. 103-620 at 5).  This, too, is strong evidence that the IRA was understood by those who were responsible for its drafting and enactment to apply only to tribes with a reservation set aside on its behalf.  *See Carcieri*, 555 U.S. at 390 n.5 ("In addition to serving as Commissioner of Indian Affairs, John Collier was 'a principal author of the [IRA].' [Citation.] And, as both parties note, he appears to have been responsible for the insertion of the words "now under Federal jurisdiction"

---

regulate the affairs of Indians *on a reservation*." (emphasis added)); *United States ex rel. Marks v. Brooks*, 32 F. Supp. 422, 424 (N.D. Ind. 1940) (citing pre-1934 cases for the proposition that "in order to grant the relief asked for [enjoining a state court prosecution for violation of state law], it is necessary for this court to definitely decide that the plaintiff, being a Miami Indian, is subject only to the jurisdiction of the United States court. The court is thus obliged to decide in this injunction action the exact status of the Miami Indians residing in Indiana—are they citizens of the United States and subject to all the laws of the state of Indiana as such citizens, or are they wards of the United States government residing on a reservation? If they are wards of the government and residing on a reservation, as plaintiff alleges, the law is clear that the state of Indiana would have no power to interfere with the Indians through any state regulations.").

[35] The "Wheeler-Howard Act" was the IRA. *Morton v. Mancari*, 417 U.S. 535, 537 (1974).

---

into what is now 25 U.S.C. § 479 … Commissioner Collier's responsibilities related to implementing the IRA make him an unusually persuasive source as to the meaning of the relevant statutory language and the Tribe's status under it."); *id*. at 397 (Breyer, J., concurring) (rejecting deference to Department's interpretation of "now under federal jurisdiction" because Commissioner Collier favored a different interpretation when the IRA was enacted).[36]

Consistent with all of the foregoing, the Ninth Circuit recognized, in *Santa Rosa Band of Indians v. Kings County*, 532 F.2d 655 (9th Cir. 1975), *cert. denied*, 429 U.S. 1038 (1977), that "[p]rior to passage of P.L. 280 [in 1953], Congress had encouraged, under § 476 of the Indian Reorganization Act, the formation and exercise of tribal self-government *on reservation trust lands*." *Id*. at 662 (emphasis added). And Judge Karlton noted, in his 1992 order dismissing the federal government from the Ione Band Litigation, that prior to 1978, "*Recognition could be shown by Congress or the executive branch creating a reservation for the group* by a treaty, agreement, statute, executive order or valid administrative action *and* by the United States having had some continuing political relationship with the group, such as providing services through the Bureau of Indian Affairs." (AR007774 [citing F. Cohen, *Handbook of Federal Indian Law* at 6 (1982)].) A number of federal Courts of Appeal have adopted the test cited by Judge Karlton as well. *See, e.g., Mashpee Tribe v. Secretary of Interior*, 820 F.2d 480, 484 (1st Cir. 1987) ("Normally a group will be treated as a . . . 'recognized' tribe if *(a) Congress or the Executive has created a reservation for the group* by treaty, agreement, statute, executive order, or valid administrative action; <u>and</u> (b) the United States has had some continuing political relationship with the group." (emphasis added))

---

[36] The Federal Defendants and the Ione Band will surely point out that a 1994 House Report accompanying the legislation to restore the Pokagon Band characterizes the IRA's conclusion as a "misguided assumption," but at best that report represents *post hoc* legislative history on the issue, 60 years after the IRA was enacted, and therefore carries no weight with respect to the proper interpretation of that Act. *See Cent. Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164, 185-86, 114 S. Ct. 1439, 128 L. Ed. 2d 119 (1994) ("we have observed on more than one occasion that the interpretation given by one Congress (or a committee or Member thereof) to an earlier statute is of little assistance in discerning the meaning of that statute."). Moreover, the assumption may have been "misguided" *in that case* because the Pokagon Band— unlike the Ione Band—was a "treaty tribe," having been a party to eleven different treaties with the federal government in the 1800s. *See TOMAC*, 433 F.3d at 855; 25 U.S.C. § 1300j(1), (2).

---

1   (quoting Cohen, *supra*, at 6); *W. Shoshone Bus. Council v. Babbitt,* 1 F.3d 1052, 1056 (10th Cir.

2   1993); (same); *Grand Traverse Band of Ottawa & Chippewa Indians v. Office of the U.S. Atty.*,

3   369 F.3d 960, 968 (6th Cir. 2004) ("*Grand Traverse III*") (same).

4          In other words, the legislative history and subsequent case law—bolstered by

5   contemporaneous administrative practice—reflect an understanding that (at least absent a specific

6   treaty), a tribe was regarded as being "under federal jurisdiction" when the government had

7   established a reservation for the tribe on which state law was not applicable, by taking such land

8   into trust on behalf of that "tribe."[37]   That never happened with respect to the Ione Band, which

9   was subject to state law at all times prior to 1994 at least.   (AR000621, AR001148, AR001153,

10  AR001159-001169, AR001171-001174.)   Simply put, the Ione Band was never under federal

11  jurisdiction, because there was no treaty and the government failed to acquire land on its behalf.[38]

12

_____

13  [37] *See, e.g., Stand Up for California! v. United States DOI*, 919 F. Supp. 2d 51, 68 (D.D.C.

14  2013) ("This purchase of land is important, and likely dispositive in its own right, regarding
    whether the North Fork Tribe was 'under Federal jurisdiction' in 1934.");

15  [38] This interpretation does not render the definition of "tribe" redundant in Section 19, by
    virtue of its inclusion of "the Indians residing on one reservation" within that definition, because in

16  some cases multiple "recognized tribes" might reside on the same reservation, so for those cases
    this wording in the IRA permitted those tribes to organize on their own, or to consolidate as a

17  single "tribe" so long as they resided on the same reservation. As noted by Department of Interior
    Solicitor Felix Cohen—after whom the "Cohen criteria" are named—in his Handbook to Federal

18  Indian Law, published by the Department of Interior a few years after the IRA was enacted:

19
        The term 'tribe' is commonly used in two senses, an ethnological sense and a political
20      sense. It is important to distinguish between these two meanings of the term. Groups that
        consist of several ethnological tribes, sometimes speaking different languages, have been
21      recognized as single tribes for administrative and political purposes. Examples are the Fort
        Belknap Indian Community (Gros Ventre and Assiniboine), the Cheyenne and Arapahoe
22      Indians of Oklahoma, the Cherokee Nation (in which Delawares, Shawnees, and others
        were amalgamated), and the Confederated Salish and Kootenai Tribes of the Flathead
23      Reservation.

24
    F. Cohen, *Handbook of Federal Indian Law* at 268 (1942), *available online at*
25  http://hdl.handle.net/2027/uiug.30112074260008 (last visited Sept. 3, 2014); *see also Quinaielt*
    *Tribe of Indians v. United States*, 102 Ct. Cl. 822, 835 (1945) (in 1873, the President "set aside the
26  reservation not only for the Quinaielts and the Quillehutes, but also for the Hohs, Quits, and other
    tribes of fish-eating Indians on the Pacific Coast. And the Supreme Court held in *Halbert v. United*
27  *States*, 283 U.S. 753 [1931], that the Chehalis, Chinook, and Cowlitz tribes were entitled to equal
    rights in the reservation ….").
28

The Federal Defendants and Ione Band attempt to dismiss the fact that in 1934 the Secretary did not invite the "Ione Band" to organize as a "tribe" under the IRA—a fact easily explainable, in light of the legislative history, by the fact that the government did not acquire land on behalf of the Band. Both parties argue that the *mandatory* election requirement contained in the applicable section of the IRA—section 18 (25 U.S.C. § 478)—applied only to tribes on reservations, whereas section 16 of the Act (25 U.S.C. § 476) provided for *optional* organization under the Act by all other tribes. (Defs' Memo., pp. 24-25; Band's Memo., p. 28:13-21.) That is simply not true. As it was enacted in 1934, section 16 also applied only to "tribes" and "Indians" living *on reservations*. Until it was amended in 1988, that section read in relevant part:

> Any Indian tribe, or tribes, residing on the same reservation, shall have the right to organize for its common welfare, and may adopt an appropriate constitution and by-laws, which shall become effective when ratified by a majority vote of the adult members of the tribe, or of the adult Indians residing on such reservation, as the case may be, at a special election authorized and called by the Secretary of the Interior under such rules and regulations as he may prescribe. Such constitution and by-laws, when ratified as aforesaid and approved by the Secretary of the Interior, shall be revocable by an election open to the same voters and conducted in the same manner as hereinabove provided. Amendments to the constitution and by-laws may be ratified and approved by the Secretary in the same manner as the original constitution and by-laws."

Stats., ch. 576, § 16, 48 Stat. 987 (June 18, 1934) (underline added).[39]

Section 17 of the Act, providing authority for Indian tribes to adopt a charter of incorporation, was likewise limited to tribes on a reservation. As adopted, that section read:

> The Secretary of the Interior may, upon petition by at least one-third of the adult Indians, issue a charter of incorporation to such tribe: *Provided*, That such charter shall not become operative until ratified at a special election by a majority vote of the adult Indians living on the reservation. Such charter may convey to the incorporated tribe the power to purchase, take by gift, or bequest, or otherwise, own, hold, manage, operate, and dispose of property of every description, real and personal, including the power to purchase restricted Indian lands and to issue in exchange therefor interests in corporate property, and such further powers as may be incidental to the conduct of corporate business, not inconsistent with law, but no authority shall be granted to sell, mortgage, or lease for a period exceeding ten years any of the land included in the limits of the reservation. Any charter so issued shall not be revoked or surrendered except by Act of Congress.

---

[39] The definitions of "Indian" and "tribe" in Section 19 were not amended in 1988, or at any time since the Act's adoption in 1934.

1   Stats., ch. 576, § 17, 48 Stat. 987 (June 18, 1934) (underline added).

2          In view of the foregoing, the ROD's conclusion that the government's *failed* efforts acquire

3   land meant that the Ione Band was "under federal jurisdiction" in 1934 cannot stand.

4          Nor can *Chevron* deference save the ROD.  When "Congress 'has directly spoken to the

5   precise question at issue' either in the statute itself or in the legislative history[,]" there is no need

6   for "administrative interpretation" such as would warrant deference by this Court.  *Alaska v.*

7   *Babbitt,* 72 F.3d 698, 701 (9th Cir. 1995) (quoting *Chevron*, 467 U.S. at 842); *see also Carcieri*,

8   555 U.S. at 396-97 (Breyer, J., concurring) (agreeing with majority's interpretation of the word

9   "now" from the phrase "now under federal jurisdiction" because "the provision's legislative history

10  makes clear that Congress focused directly upon that language, believing it definitively resolved a

11  specific underlying difficulty," so the Department's "interpretation is not entitled to *Chevron*

12  deference, despite any linguistic ambiguity.").

13         Finally, the Ione Band cites several letters referencing the Band that also refer to "the

14  proposed Indian Colony for the homeless Indians near Ione in Amador County, this jurisidiction"

15  (Band's Memo., p. 30:21) and state that "as this Office is aware, this jurisdiction includes the

16  activities in forty-five counties of Northern and Central California."  (*Id*. at 31:1-2.)  This is

17  ridiculous—it purposely confuses two different meanings of the word "jurisdiction," one of which

18  refers to "the power or right to exercise govern or legislate," and the other of which refers to "the

19  limits or territory within which authority may be exercised."[40]  "Jurisdiction" as used in the IRA

20  clearly refers to the power of the federal government over Indian tribes.  "Jurisdiction" as used in

21  these letters, however, merely refers to the territorial reach of one Indian office of the Bureau of

22  Indian Affairs—for example, the Sacramento Agency, of which O.H. Lipps was superintendent—

23  as opposed to some neighboring agency.  The term "jurisdiction" as used in the cited letters is more

24  akin to "venue."  Those letters have no bearing on what the understanding of Congress was

25  regarding the power of the federal government over tribes and Indians.

26         The plain legislative intent of incorporating the phrase "now under federal jurisdiction" was

27

28

_____

[40] *See* Merriam Webster Dictionary, *online at m-w.com* (definition of "jurisdiction").

to limit the reach of the Act only to those "recognized Indian tribes" then residing on land held for the tribe's benefit by the federal government.  The Ione Band was not residing on land held for their benefit by the federal government in 1934.  Thus, they were not an "recognized Indian tribe under federal jurisdiction as of that date, and the Secretary cannot take land into trust for the Band.

> **2.    There is no other substantial evidence that the Band was "under federal jurisdiction" in 1934 either.**

In their briefing, the Federal Defendants also cite two other "facts" for the proposition that the Ione Band was "under federal jurisdiction" in 1934: (1) the fact that the members of the Band were purportedly successors in interest to "the signatories of Treaty J, one of 18 unratified treaties negotiated by the Federal Government with California Indians in the mid-1800s" (Defs' Memo., p. 19:18-23), and (2) the proposed use of Departmental appropriations to acquire the Arroyo Seco property.  (*See, e.g.,* Defs' Memo., p. 20:16-18, 21:9-11.)  Neither is sufficient to establish that the Band was "under federal jurisdiction" in 1934.

First, though the ROD noted these purported "facts" in passing, it did not rely on them in support of its ultimate conclusion, which was that "the continuous efforts of the United States beginning in 1915 to acquire land for the Ione Band as a permanent reservation demonstrates a consistent 'under federal jurisdiction' relationship between the Federal Government and the Ione." (AR010109.)  As noted above, agency action may only be upheld based on the rationale adopted by the agency in making the decision.  But even leaving that aside, these facts are still insufficient to support the ROD's conclusions.

By citing these two factors, the Federal Defendants and the Ione Band clearly seek to bring themselves within the relatively expansive interpretation of "under federal jurisdiction" advanced by Justice Breyer in his *Carcieri* concurrence, upon which they rely so heavily.   In that concurrence, Justice Breyer (writing for himself alone, and not for the Court) identified several examples of (what he regarded as) "a 1934 relationship between the Tribe and Federal Government that could be described as jurisdictional, for example, a treaty with the United States (in effect in 1934), a (pre-1934) congressional appropriation, or enrollment (as of 1934) with the Indian Office." 555 U.S. at 399 (Breyer, J., concurring) (emphasis added).

---

As to the failed treaty negotiations in the 1800s, even if one accepts as true that members of the Band are descendants or "successors in interest" to those Indians that negotiated Treaty J, that fact has little bearing on whether the Band was "under federal jurisdiction" in 1934. The "Ione Band" was indisputably <u>not</u> a party to any "treaty with the United States *(in effect in 1934)*." *Id.* (Breyer, J., concurring) (emphasis added). No party claims otherwise, and the record clearly would not support such a claim. Indeed, in the *Ione Band Litigation*, the tribe "concede[d] that they are not a 'treaty tribe.'" (AR007778.)

And as to the proposed use of Department funds to acquire the Arroyo Seco land for the Ione Band in the late 1910s and the early 1920s, the Federal Defendants and the Band conveniently ignore the fact that these were not "a (pre-1934) congressional appropriation" *for the Ione Band*. The appropriations under which the Arroyo Seco land was proposed to be purchased were simply generic statutes providing for the purchase of land for "landless" California Indians, rather than for the Ione Band as such. In the early part of the 20th Century, recognizing the plight of landless Indians in California, Congress established a land purchase program to enable the Bureau of Indian Affairs to purchase tracts of land throughout the State, upon which "landless Indians" could be settled. (AR000001-23, AR000499-500.) Hazel E. Elbert, Deputy Assistant Secretary of Interior – Indian Affairs (Tribal Services), explained this program to Senator Alan Cranston in 1990 thus:

> The California land purchase program was aimed at buying acreage for miscellaneous, landless Indians, whether or not they then existed as part of a tribal entity or had previously been federally recognized. The purchase of land for these Indians did not, in and of itself, prove or establish the existence of a government-to-government relationship between an Indian tribe and the United States.

(AR000645.) And again, the 2006 Indian Lands Opinion itself noted that "Throughout California in the early part of the Twentieth Century, the Department attempted to purchase land wherever it could for landless California Indians *without regard to the possible tribal affiliation of the members of the group*." (AR005072 [emphasis added].)

**VI.   THE ROD'S DETERMINATION THAT THE IONE BAND IS A "RESTORED" TRIBE CONSTITUTES AN ABUSE OF DISCRETION AND IS ARBITRARY, CAPRICIOUS AND CONTRARY TO LAW, BECAUSE EVEN IF THE IONE BAND WAS RECOGNIZED IN 1934, (1) IT WAS NEVER TERMINATED, AND (2) IT WAS NEVER LAWFULLY "RESTORED" WITHIN THE MEANING OF IGRA.**

The Department's refusal to implement the *ultra vires* Bruce letter, and its defense of that position in the Ione Band litigation, did not constitute termination of the Ione Band.  As the court recognized, in *Grand Traverse Band of Ottawa & Chippewa Indians v. Office of the U.S. Atty*, 198 F. Supp. 2d 920, 929 (W.D. Mich. 2002) ("*Grand Traverse II*"), inherent in the concept of "restoration" is the idea of "an act of restoring or the condition or fact of being restored: as a: bringing back to or putting back into a former position or condition: reinstatement, renewal, reestablishment…" *Id.* at 929 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, p. 1936 (G. & C. Merriam Co. 1976)).  It also involves a notion of "restitution." *Id.* Accordingly, the notion of "termination" has to be understood as marking a change from a pre-existing condition to which one can be "restored."

In this case, there was no such change.  Prior to the 1970s, the federal government did not own land on behalf of the Band.  It did not provide them services.  There was no treaty relationship.  The Band was not exempt from state or local taxation.  Their members were not enrolled with the federal government.  As reflected in the Declaration of Harold Burris—whom members of the Band elected "Chairman" in 1970, and who served in that position until the mid-1990s—while the Indians in the Ione area "supported the efforts of the United States to purchase land for [them]" during the 1920s, due to fears that they would lose their homes on land they did not own, "[t]here was never any expectation that any further relationship or further services would develop out of the government's efforts to buy the land for [them]."  (SAR020905.)  And indeed, during the 30 years preceding the Bruce letter, there is no record of <u>any</u> communication from the Band to the federal government or vice versa.  Thus, the Band's relationship with the government in 1992 was no different than it was in 1978, which was no different than it was in 1968—there was no relationship.  Thus, the *Ione Band Litigation* was not a "termination" of the Band.

This state of affairs stands in stark contrast to the three cases that the Federal Defendants

1  and Ione Band cite for the proposition that tribes can be "administratively terminated" for purposes

2  of the "restored lands" exception: the *Grand Traverse* line of cases; the *TOMAC* line of cases; and

3  *Sault Ste. Marie Tribe of Lake Superior Chippewa Indians v. United States*, 78 F. Supp. 2d 699

4  (W.D. Mich. 1999), *vac'd & rem'd*, 288 F.3d 910 (6th Cir. 2002) ("*Sault Ste. Marie*").  In each, the

5  purported "termination" was in fact a radical shift from the pre-existing state of affairs.

6        In the *Grand Traverse* cases, the tribe at issue had actually been a party to two treaties with

7  the federal government in the 1800s—actual, ratified treaties, not just proposed ones.  *Grand*

8  *Traverse III*, 369 F.3d at 961-62 & n.2.  "These treaties granted the Band reservation lands and

9  other compensation," *Grand Traverse II*, 198 F. Supp. 2d at 929, including a series of annuity

10 payments from the government.  *Grand Traverse III*, 369 F.3d at 961 n.2.  All of that ceased,

11 however, when the Commissioner mistakenly interpreted a provision of the Treaty of Detroit as

12 dissolving the tribe, when, in fact, that provision's purposes was merely to undo the artificial

13 combination of "the Ottawa and Chippewa nations into a joint political unit solely for purposes of

14 facilitating the negotiation of th[e 1836] treaty, and "to permit the United States to deal with the

15 Ottawas and the Chippewas as separate political entities" once again.  *Id.*

16       In the *TOMAC* cases, the Pokagon Band of Potawatomi Indians was a party to eleven (11)

17 different treaties with the federal government, including a supplemental treaty that exempted them

18 from removal to Kansas and entitled them to a series of annuity payments as well.  25 U.S.C. §

19 1300j(1), (2); 7 Stat. 51, art. IV, ¶ 3, cl. 7; *Potawatamie Indians v. United States*, 27 Ct. Cl. 403,

20 409 (1892).  As discussed above, in 1935, the tribe petitioned for reorganization under the IRA, but

21 was denied reorganization because the BIA concluded that "'*that residence on trust lands held in*

22 *common for the Band was required for reorganization* and the fact that appropriations to purchase

23 such lands had run out."  *TOMAC*, 433 F.3d at 856 (quoting H.R. Rept. No. 103-620 at 5).

24 Thereafter, the the Pokagon Band was ultimately "restored" by the enactment of Congressional

25 legislation, the Pokagon Restoration Act, 25 U.S.C. § 1300j *et seq*., which specifically directed the

26 Secretary to take land into trust for the Band to establish its reservation (meaning that such land

27 was not taken into trust pursuant to the IRA).  25 U.S.C. § 1300j-5.

28       And finally in *Sault Ste. Marie*, the tribes at issue were—like the Grand Traverse—parties

to the 1836 Treaty of Washington and the 1855 Treaty of Detroit, which established reservations for the tribes.  25 U.S.C. § 1300k(2)-(4); *Sault Ste. Marie*, 78 F. Supp. 2d at 705.  And like the Pokagon Band, they were denied the right to reorganize under the IRA.  *Id.*  But unlike the Pokagon Band, it was not because they were deemed ineligible—after all, they did have reservations.  *See* 25 U.S.C. § 1300k(5).  In fact, "Federal agents who visited the Bands, including Commissioner of Indian Affairs, John Collier, attested to the continued social and political existence of the Bands and concluded that the Bands were eligible for reorganization."  *Id.*  The denial of their right to recognize was merely "[d]ue to a lack of Federal appropriations to implement the provisions of such Act."  *Id.*  And finally, the tribes at issue in *Sault Ste. Marie*— like the Pokagon—were expressly restored by Congressional legislation, the Little Traverse Bay Bands of Odawa Indians and Little River Band of Ottawa Indians Act, 25 U.S.C. § 1300k *et seq.*, which  also directed the Secretary to create a reservation for the tribes.  25 U.S.C. § 1300k-4.

In summary, all the tribes in these cases were treaty tribes; all were entitled, pursuant to those treaties, to receive compensation from the government in exchange for ceding their claims to certain lands; all but one of the tribes had actual reservations (and the fact that it did not precluded it from reorganizing under the IRA), and all were deprived of these existing benefits and their land by the administrative actions of the Department.  In this case, by contrast, the Ione Band received the same exact benefits at all points—which is none.  Thus, the Michigan tribes addressed by *Grand Traverse*, *TOMAC* and *Sault Ste. Marie* can be said to have experienced a "termination" of their prior position that could be restored.  The Ione Band experienced no such thing.

Moreover, *even assuming arguendo* that the Band had been recognized and then terminated, Ada Deer's 1994 letter could not lawfully "restore" the Band to federal recognition.  As the government argued, and this Court held, in the *Ione Band Litigation*, the only lawful means for the Band to be federally-recognized was to go through the Acknowledgement Regulations, which it never did.  Having previously taken that position in the *Ione Band Litigation*, the government is judicially estopped from taking the opposite position in this litigation.  Moreover, Ms. Deer's informal decision—which proceeded outside the normal regulatory process, and which never considered the criteria applicable to a "recognition" decision, was itself *ultra vires*, arbitrary

and capricious and cannot provide a "reasoned" basis for the ROD's determination in this case.

Additionally, even if Ms. Deer's decision is sufficient to "re-recognize" the Band for certain purposes, it is still not sufficient to constitute "restoration" within the meaning of IGRA. As the Secretary recognized in adopting the Part 292 regulations, "Congress intended restored tribes to be those tribes restored to Federal recognition by Congress or through the part 83 regulations," and it did not intend to include tribes, like the Ione Band, that were informally recognized outside the Part 83 process.  73 Fed. Reg. 29354, 29363 (May 20, 2008).

Importantly, none of the cases that the Federal Defendants or Ione Band cite regarding administrative termination hold that a tribe can be "restored" within the meaning of IGRA in the informal manner that Ms. Deer purported to re-recognize the Ione Band.  In *Sault St. Marie* and *TOMAC*, as discussed above, the tribe challenged therein were deemed to have been "restored" pursuant to a formal acts of Congress, while the tribe at issue in *Grand Traverse III* the tribe was re-recognized by proceeding through the Part 83 regulations, which the Ione Band refused to do.

## VII.   CONCLUSION.

For the foregoing reasons, the ROD is arbitrary, capricious, an abuse of discretion, and contrary to law.  Enforcement of the ROD should, therefore, be enjoined.

Dated:  September 4, 2014

NIELSEN MERKSAMER
PARRINELLO GROSS & LEONI LLP
By: /s/ Christopher E. Skinnell
   James R. Parrinello
   Cathy A. Christian
   Christopher E. Skinnell
   *Attorneys for Plaintiff*
   AMADOR COUNTY, CALIFORNIA