1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11   COUNTY OF AMADOR, CALIFORNIA          Case No. 2:12-cv-01710-TLN-CKD

12                  Plaintiff,

13           v.                            **MEMORANDUM AND ORDER**

14   THE UNITED STATES DEPARTMENT
     OF THE INTERIOR; S.M.R. JEWELL,
15   Secretary of the United States Department
     of the Interior; KEVIN WASHBURN,
16   Assistant Secretary of Indian Affairs,
     United States Department of the Interior,
17
                    Federal Defendants,
18

19   and

20   IONE BAND OF MIWOK INDIANS

21                  Defendant Intervenors

22

23           The matter is before the Court on Cross Motions for Summary Judgment filed by Plaintiff

24   County of Amador ("Plaintiff"); Defendants the United States Department of the Interior (the

25   "Department"), S.M.R. Jewell, and Kevin Washburn; and the Ione Band of Miwok Indians

26   ("Defendant Intervenors").  (ECF Nos. 65, 82, and 84.)  The Court has carefully considered the

27   arguments raised in the parties filings, and has reviewed the attached exhibits and the relevant

28   portions of the administrative record.  For the reasons discussed below, Defendants' Motion for

                                             1

1  Summary Judgment and Defendant Intervenors' Motion for Summary Judgment are GRANTED.

2  Plaintiff's Motion for Summary Judgment is DENIED.

3  ## INTRODUCTION

4        This lawsuit presents a challenge to the Record of Decision ("ROD"), issued on May 24,

5  2012, by Donald Laverdure, Acting Assistant Secretary of Indian Affairs, Department of the

6  Interior,[1] concerning the acquisition of the Plymouth Parcels property in trust for the Ione Band of

7  Miwok Indians, in anticipation of the construction of a gaming-resort complex.  In summary,

8  Plaintiff challenges are as follows: the Department's determination to take the Plymouth Parcels

9  into trust; the determination that the Ione Band is a "recognized Indian tribe now under Federal

10  jurisdiction," 25 U.S.C. § 479; and the determination that the trust acquisition constitutes the

11  "restoration of lands for an Indian tribe that is restored to Federal recognition," 25 U.S.C. §

12  2719(b)(1)(B), such that the property is gaming-eligible.  Defendants and Defendant Intervenors

13  respond that the ROD is procedurally and substantively valid.[2]

14  ## PROCEDURAL HISTORY

15        The complaint in this matter was filed on June 27, 2012.  (ECF No. 1.)  The complaint

16  contains four causes of action.  Claims one and two seek declaratory and injunctive relief under

17  the Indian Reorganization Act that the Department's determination – that the Ione Band was

18  "under federal jurisdiction" in June 1934 – constitutes an abuse of discretion and is arbitrary,

19  capricious, and contrary to law.  Claims three and four seek declaratory and injunctive relief

20  under the Indian Gaming Regulatory Act that the Department's "Indians Lands" determination –

21  including that the "restored lands for a restored tribe provision" is met – constitutes an abuse of

22  discretion and is arbitrary, capricious, and contrary to law.

23

---

24  [1] The Court uses the umbrella term "Department" throughout this Order, with the understanding that the relevant
25  agency action in this case is largely undertaken by a sub-unit, the Bureau of Indian Affairs, or other agencies as
noted.

26  [2] This case is related to Case No. 12-cv-1748-TLN-1748-CMK.  A decision in that case, also considering the parties'
motions for summary judgment on issues largely analogous to those here, will be filed concurrently with this
27  decision.  The instant decision has undertaken greater written analysis than in Case No. 1748, with the exception of
the following issues: the *Carcieri* decision, collateral estoppel regarding the *Burris* litigation, and the pro hac vice
28  application of a tribal attorney.  The Court requests that the parties visit its decision in Case No. 1748 for additional
analysis on those issues.

1    Plaintiff's motion for summary judgment was filed on May 1, 2014.  (ECF No. 65.)

2    Defendant's motion for summary judgment was filed on July 10, 2014.  (ECF No. 84.)

3    Defendant Intervenors' motion for summary judgment was also filed on July 10, 2014.  (ECF No.

4    82.)  All parties submitted additional reply briefs, and Defendants submitted notices of

5    supplemental authorities.[3]  (ECF Nos. 85–87, 89, 93, 94.)

6                              **STANDARD OF REVIEW**

7           The Court's review is governed by the Administrative Procedures Act ("APA").

8    Ordinarily, summary judgment is appropriate when the pleadings and the record demonstrate that

9    "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

10   matter of law." Fed. R. Civ. P. 56(c).  However, in a case involving review of a final agency

11   action under the [APA] ... the standard set forth in Rule 56(c) does not apply because of the

12   limited role of a court in reviewing the administrative record."  *Sierra Club v. Mainella*, 459 F.

13   Supp. 2d 76, 89 (D.D.C. 2006).  Rather, "[u]nder the APA, it is the role of the agency to resolve

14   factual issues to arrive at a decision that is supported by the administrative record, whereas 'the

15   function of the district court is to determine whether or not as a matter of law the evidence in the

16   administrative record permitted the agency to make the decision it did.'"  *Id.* at 90 (quoting

17   *Occidental Eng'g Co. v. INS,* 753 F.2d 766, 769 (9th Cir.1985)).  In this context, summary

18   judgment becomes the "mechanism for deciding, as a matter of law, whether the agency action is

19   supported by the administrative record and otherwise consistent with the APA standard of

20   review." *Id.* at 90.  Pursuant to the APA, a reviewing Court shall "hold unlawful and set aside

21   agency actions, findings, and conclusions found to be ... arbitrary, capricious, an abuse of

22   discretion or otherwise not in accordance with law," or which have been taken "without

23   observance of procedure required by law." 5 U.S.C. § 706(2).

24   //

25   //

26   //

27   _____
     [3] Plaintiff and Defendant Intervenors also submitted requests for judicial notice.  (ECF Nos. 66 & 88.)  The Court
     takes judicial notice of the exhibits attached therein to the extent they are true and accurate copies of what they
28   purport to be.

                                           3

# STATUTORY AND REGULATORY FRAMEWORK

## I.      The Indian Reorganization Act of 1934

Congress enacted the Indian Reorganization Act ("IRA") in 1934.  "The overriding purpose of that particular Act was to establish machinery whereby Indian tribes would be able to assume a greater degree of self-government, both politically and economically."  *Morton v. Mancari*, 417 U.S. 535, 542 (1974).  "[T]he Act reflected a new policy of the Federal Government and aimed to put a halt to the loss of tribal lands through allotment.  It gave the Secretary of the Interior power to create new reservations, and tribes were encouraged to revitalize their self-government through the adoption of constitutions and bylaws and through the creation of chartered corporations, with power to conduct the business and economic affairs of the tribe."  *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 151 (1973).

Of particular relevance here, section 5 of the IRA authorizes the Secretary of the Interior to acquire in her discretion "any interest in lands … for the purpose of providing land for Indians."  25 U.S.C. § 465.  Section 5 further provides that any such lands "shall be taken in the name of the United States in trust for the Indian tribe or individual Indian," and "shall be exempt from State and local taxation."  *Id.*  The Secretary has also promulgated regulations governing the implementation of section 5.  *See e.g.* 25 C.F.R. § 151.3(a)(3) (providing that trust acquisition may occur "[w]hen the Secretary determines that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing").

The IRA also defines "Indians" in several ways, including as "all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction," and further defines "tribe" to mean "any Indian tribe, organized band, pueblo, or the Indians residing on one reservation."  25 U.S.C. § 479.  In 2009, in *Carcieri v. Salazar*, 555 U.S. 379, 382, the U.S. Supreme Court clarified that, "for purposes of § 479, the phrase 'now under Federal jurisdiction' refers to a tribe that was under federal jurisdiction at the time of the statute's enactment. As a result, § 479 limits the Secretary's authority to taking land into trust for the purpose of providing land to members of a tribe that was under federal jurisdiction when the IRA was enacted in June 1934."

## II.       The Indian Gaming Regulatory Act

In 1988 Congress enacted the Indian Gaming Regulatory Act ("IGRA") to regulate gaming operations owned by Indian tribes.  The IGRA's purpose includes: "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments."  25 U.S.C. 2702(1).

Section 20 of the IGRA generally prohibits tribal gaming on lands acquired by the Secretary in trust after October 17, 1988, unless the acquisition falls within one of the Act's exemptions or exceptions.  25 U.S.C. § 2719.  For example, lands acquired after October 17, 1988, may still be eligible if they are part of: "(i) a settlement of a land claim, (ii) the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment process, or (iii) the restoration of lands for an Indian tribe that is restored to Federal recognition."  25 U.S.C. § 2719(b)(1)(B).  Another exception involves a determination by the Secretary that "a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community."  § 2719(b)(1)(A).

The specific exception relied upon by the Department in the instant case is contained in section 2719(b)(1)(B)(iii): "the restoration of lands for an Indian tribe that is restored to Federal recognition" (hereinafter the "restored lands" exception).

In May, 2008, the Bureau of Indian Affairs ("BIA") published regulations implementing IGRA section 20, codified at 25 C.F.R. § 292 (the "Part 292 regulations").  The Part 292 regulations became effective in August, 2008.  73 Fed. Reg. 35,579.  Of particular relevance to this action are sections 292.7, 292.10, and 292.26(b).

Sections 292.7 ("What must be demonstrated to meet the 'restored lands' exception"?) and 292.10 ("How does a tribe qualify as having been restored to Federal recognition?") provide criteria by which the restored lands exception can be met.

In the instant case, however, the ROD relies upon section 292.26(b), the "grandfathering" provision, to meet the restored lands exception.  The grandfathering provision provides that the Part 292 regulations shall not apply to agency actions when, prior to enactment of those regulations, the Department or the National Indian Gaming Commission ("NIGC") had already

5

1    issued a written opinion regarding the restored lands exception and the property at issue.  25

2    C.F.R. § 292.26(b).  Here, the Department relies upon an Indian Lands Determination issued in

3    2006, which found the Plymouth Parcels eligible for gaming.  Thus, the Plymouth Parcels fall

4    outside application of the Part 292 regulations as set out in the ROD where the Department

5    determined that the restored lands exception is met.

6                                  **BACKGROUND**[4]

7            According to Defendant Intervenors, the Ione Band of Miwok Indians traces its ancestry

8    to Miwok and Nisenan people, who historically have resided on lands that today make up

9    Amador County.  (AR3528–301.)  In the early part of the 20th Century Congress established a

10   land purchase program, which enabled the BIA to purchase land throughout California with the

11   aim of alleviating Indian landlessness and homelessness.  (AR499–502; 644–45.)  As further

12   explained in the *Ethnohistorical Overview of the Ione Band of Miwok Indians* (2005), prepared

13   for the Ione Band (hereinafter the "*Ethnohistorical Overview*"), the BIA appointed special agent

14   C.E. Kelsey in 1905–06 to investigate the conditions of dispossessed California tribal members,

15   including in Amador County.  (AR3543.)  His investigation included taking a census of the

16   number of surviving Indian people residing at specific localities, including "Buena Vista

17   [Richey],"[5]  "Ione," "Jackson Valley", and the "Jackson Reservation".  (AR3543–44; *see also*

18   "Census of Non-Reservation California Indians, 1905 – 1906" by C.E. Kelsey, AR3774.)  In

19   1915, BIA special agent John Terrell revisited many of the Indian communities in California,

20   using Kelsey's census as a guide.  (AR3544.)  According to Terrell's "Census of Ione and vicinity

21   Indians," which included divisions for people living "At Jackson belonging to the Ione Band" and

22   "At Richey belonging to the Ione band," there were 101 "Ione and vicinity" Indians.  (AR3544–

23   45; ECF No. 65 at 14.)

24           As further explained in the *Ethnohistorical Overview*, Terrell "located the Ione village,

25

26   [4] Here, the Court notes many of the relevant events and communications between the Ione Band and the Federal
     Government that are identified in the ROD and in the parties' moving papers.  Specific items are addressed more
27   fully in the "Analysis" section of this Order.

28   [5] The parties indicate that, in the early 20th century, the "Buena Vista" location or "Buena Vista" Indians were
     sometimes referred to as the location or Indians "at Richey".

                                          6

which consisted of three homes and a sweat house, at about three and one-half to four miles out of Ione." (AR3547.)  "Terrell emphasized the importance of securing land for the Ione Band, and initiated negotiations for the purchase of forty acres, which included the Indian residences on the property … The purchase was approved, and attempts to finalize it were made between 1916 and 1930, but the transaction was never completed because the government was unable to obtain clear title to the land." (AR3547.)  *See also* "Authority" form, May 18, 1916, for the "PURCHASE OF LANDS FOR LANDLESS INDIANS IN CALIFORNIA" and allotting $2000 for "the purchase of 40 acres of land in Amador County, California (described by metes and bounds) from the Ione Coal & Iron Company, for the use of 101 homeless California Indians, designated as the Ione Band, at not to exceed $50 per acre." (AR160.)  *See* Letter from the Acting Assistant Commissioner of Indian Affairs to the Secretary of the Interior, "enclos[ing] herewith a partially executed deed, abstract of title in two volumes, and plat of survey in connection with the desired purchase of 40 acres in Amador County, at the price of $2,000 from the Ione Coal & Iron Company, for the use of 101 homeless California Indians, designated as the Ione Band.  [¶]  The tract in question is the ancient village site of these Indians and contains some rich valley land." (AR4634–35.)  It appears that efforts to acquire the aforementioned 40 acre parcel, called the "Arroyo Seco Ranch," were ultimately abandoned around 1941.[6]  (AR3549; 506; 3972; ECF No. 65 at 16.)

Apart from this 40 acre parcel, Plaintiff draws attention to a tribal history prepared by Ione Band member Glen Villa Sr., in 1996.  Villa wrote: "Buena Vista Rancheria, a 70 acre parcel of land 4 miles south of Ione, was purchased for the Ione Band.  Some of the people identified in the 1915 census already lived at this site which was an old Indian village called Upusuni." (AR3972.)  *See also Buena Vista Rancheria Miwok Indian Tribe Background Materials*, explaining: "The Buena Vista Rancheria was established as trust land for the Tribe's benefit by the Secretary of the Interior under the Authority of the Act of 1914 in 1928." (AR900; ECF No. 65 at 16.)

---

[6] It appears that throughout the early twentieth century, and continuing until the Plymouth Parcels were substituted, the main parcel sought on behalf of the Ione Band was part of the "Arroyo Seco Ranch".  The Court hereinafter refers to this parcel either as the "40 acre parcel" or the "Arroyo Seco parcel".

According to Plaintiff, there is no record of subsequent communication between the Ione-area Indians and the federal government until the 1970s.  By the early 1970s, some members of the Ione Band had renewed their interest in securing BIA housing assistance and to secure control over the aforementioned 40 acre parcel.  (ECF No. 65 at 18.)  Accordingly, in 1972 the individuals filed an action in Amador County Superior Court to quiet title to the parcel.  *See* Letter from the Acting Area Director to the Commissioner of Indian Affairs, dated July 20, 1972, stating: "[t]he California Rural Indian Land Project, a project of California Indian Legal Services, has filed an action in the Superior Court of the State of California for the County of Amador to quiet title on a 40-acre parcel for the benefit of members of the Ione Band of Indians.  A copy of the complaint is enclosed." (AR531.)  In 1972 the court awarded title to the parcel to Plaintiffs, which included individuals and "other members of the Ione Band of Indians."  (AR535–36, *Villa v. Moffatt*, No. 8160, California Superior Court, Amador County.)

On October 18, 1972, Commissioner of Indian Affairs Louis Bruce sent a letter to the Ione Band, stating in relevant part: "[The BIA] has been informed that the Indians continue to desire that the land ultimately be taken by the United States and held in trust status … Federal recognition was evidently extended to the Ione Band of Indians at the time that the Ione land purchase was contemplated … I therefore, hereby agree to accept by relinquishment of title or gift the following described parcel of land to be held in trust for the Ione Band of Miwok Indians: [40 acre parcel described]."  (AR533–34.)

As Plaintiff points out, other members within the BIA questioned the conclusiveness of the Bruce determination.  For example, the Assistant Secretary of the Interior wrote to the BIA Sacramento Area Director in 1973, stating "the former contemplated purchase of land for [the Ione Band] by the United States may indicate that they are a recognizable group entitled to benefits of the Indian Reorganization Act.  We have no correspondence, however, from the group requesting recognition or a desire to establish a reservation.  If the Band desires and merits Federal recognition, action should be taken to assist them to perfect an organization under the provisions of the Indian Reorganization Act." (AR537.)  In January, 1975, the Department's Office of the Solicitor wrote to the Sacramento Area Director stating: "The Solicitor's Office is

8

1    presently considering our proposal that the Ione Indians be extended Federal recognition."

2    (AR560.)  In January, 1976, the Director of the BIA's Office of Indian Services requested

3    additional information regarding the historical existence of the Band, and whether it met the

4    necessary criteria for recognition.  (AR574.)  In April, 1976, a BIA Tribal Operations Officer

5    wrote to California Indian Legal Services, explaining that it needed help in verifying "that the

6    recent quiet title action instituted by named Ione Indians 'and others' was in fact a representative

7    action, and that title to the subject tract is being held by the parties and on behalf of the Ione

8    Band."  (AR580.)

9      In 1978, the Department promulgated regulations outlining procedures whereby groups of

10    Indians could attain federal recognition as Indian tribes (hereinafter referred to as the "Part 83

11    regulations").  25 C.F.R. §§ 83.1–13.  At that time, the BIA also issued a list of federally-

12    recognized Indian tribes, and a list of groups whose petitions for recognition were on file at the

13    BIA.  The Ione Band appeared on the latter list.  (ECF No. 65 at 21; AR597.)

14      Defendants and Defendant Intervenors assert – as is stated in the ROD – that at some

15    point in the 1970s, the federal government began consistently taking the position that the Ione

16    Band was not a federally-recognized tribe, and therefore a de facto termination occurred.  For

17    example, a 1990 letter from Hazel Elbert, Deputy to Harold Burris, Sr. explained the position that

18    the Bruce recognition was not in fact a recognition and that the Band was not federally

19    recognized.  (AR20808–12.)  In litigation involving members of the Ione Band in the 1990s (the

20    *Burris* litigation, discussed *supra*), the government initially argued that in order for the Ione Band

21    to be federally recognized, it had to follow the procedures outlined in the Part 83 regulations.  The

22    Interior Board of Indian Appeals, in 1992 in *Ione Band of Miwok Indians v. Sacramento Area*

23    *Director*, decided that the Ione Band had not yet been recognized and that to become recognized

24    it would need to follow the acknowledgement procedures stated in the Part 83 regulations.

25    (AR812.)  A 1992 letter from Assistant Secretary-Indian Affairs Brown also took the position that

26    to achieve federal recognition the Ione Band would have to follow the procedures stated in the

27    Part 83 regulations.  (AR4779.)  Further, as stated by Plaintiff, in an undated briefing paper,

28    apparently issued by the Department to the "President of the United States," the Department

1    reiterated that: "It is the Department's position that this group has never attained Federal tribal

2    status and is not, therefore, eligible for restoration … It is our position that the Ione Band should

3    continue to seek to establish Federal status through the BIA's acknowledgement process."

4    (AR794–95.)

5            In 1994, the federal government reversed course.  In a letter dated March 22, 1994,

6    Assistant Secretary-Indian Affairs Deer stated she was reaffirming the portion of the 1972 Bruce

7    letter which stated that "[f]ederal recognition was evidently extended to the Ione Band of Indians

8    at the time the Ione land purchase was contemplated."  The Deer letter further stated: "As

9    Assistant Secretary of Indian Affairs I hereby agree to accept the land designated in the Bruce

10   letter to be held in trust as territory of the Tribe."  The Deer letter further stated that the Band

11   would henceforth be included on the list of Indian Entities recognized and eligible to receive

12   services from the BIA.  (AR4312.)  The Ione Band was placed on the Federal Register's list of

13   recognized tribes in 1995 and has been on that list since.  (AR4826; ECF No. 82 at 15.)

14           In a July, 1994 follow-up letter to her March, 1994 letter, Deer clarified: "In my [previous

15   letter], while I agreed in principle to accept that parcel of land referred to in the Bruce letter and

16   which the Federal court in 1972 ruled belonged to various named members of the band, this does

17   not mean that the Bureau will presently begin a process of taking this land into Federal trust."

18   (AR1126.)  That follow-up letter further explained that "The title to this land [i.e. the 40 acre

19   Arroyo Seco parcel] is not clear and its ownership is currently the subject of litigation.  This

20   litigation must be resolved before the land could be considered for possible trust status.  As an

21   alternative, it may be more expedient if land elsewhere could be taken intro trust for the band."

22   (AR1126.)

23           According to the *Ethnohistorical Overview*, in January, 1996, the Ione Band met in

24   Plymouth to establish a joint Interim Council, and an enrollment committee was formed.  The

25   enrollment committee established the following criteria for enrollment in the Ione Band of Miwok

26   Indians: 1) an individual must be a lineal descendant of the 1915 "Census of Ione and Vicinity

27   Indians by J.J. Terrell; or must be a lineal descendent of the 1972 judgment of *Villa vs. Moffat*; 2)

28   an individual must possess Miwok blood; and 3) an individual must have had consistent

10

1    interaction with the Tribe through cultural contacts with residents of the 40 acre tract that was the

2    subject of the 1972 judgment.  The BIA compiled a list of individuals who met these

3    requirements, which was posted in the Amador Dispatch newspaper in May, 1996.  (AR3550–51.)

4        In September, 2004, the Ione Band submitted a request to the Department for an Indian

5    Lands Determination (hereinafter "ILD") regarding the Plymouth Parcels.  (AR1401–13.)  In

6    November, 2005, with the ILD request pending, the Ione Band submitted its application to the

7    Department to have the Plymouth Parcels taken into trust for gaming purposes.  (AR2751–3482.)

8    In September, 2006, Associate Solicitor, Division of Indian Affairs, Carl Artman issued a

9    determination (hereinafter referred to as the "2006 ILD") that the Plymouth Parcels met the

10   restored lands exception; the 2006 ILD references the Bruce and Deer letters, among other

11   instances of interaction between the federal government and the Ione Band.  (AR5550–54.)

12       Following issuance of the 2006 ILD, Amador County and the State of California appealed

13   that determination to this Court.  This Court dismissed that action as untimely on the basis that

14   the trust application had not yet been approved.  *See Cnty. of Amador, Cal. v. U.S. Dep.'t of*

15   *Interior*, 2007 WL 4390499, at *4 (E.D. Cal. Dec. 13, 2007).

16       In January, 2009, Solicitor David Bernhardt circulated a withdrawal memorandum and

17   draft legal opinion to various members of the DOI, including the NIGC.  The memorandum stated

18   in relevant part:  "We are now in the process of reviewing the preliminary draft Final

19   Environmental Impact Statement for the Plymouth Parcel.  As a result, I determined to review the

20   Associate Solicitor's 2006 Indian lands opinion and have concluded that it was wrong.  I have

21   withdrawn and am reversing that opinion.  It no longer represents the legal position of the Office

22   of the Solicitor.  The opinion of the Solicitor's Office is that the Band is not a restored tribe within

23   the meaning of the IGRA."  (AR7112.)

24       However, in a memorandum issued in July, 2011, Solicitor Hilary Tompkins stated, with

25   regard to the Bernhardt position: "The Draft Opinion was never issued and the Withdrawal

26   Memorandum was not acted upon on behalf of the Department by any individual with delegated

27   authority to make decisions under the IGRA."  (AR8823.)  The Tompkins memorandum further

28   stated: "For these reasons, I hereby rescind the Withdrawal Memorandum and decline to issue the

1   Draft Opinion.  I also hereby reinstate the Restored Tribe Opinion regarding the Ione Band's

2   eligibility to conduct gaming on the land in question."  (AR8824.)

3        On February 24, 2009, the U.S. Supreme Court decided *Carcieri v. Salazar*, 555 U.S. 379,

4   holding that section 19 of the IRA "limits the Secretary's authority to take land into trust for the

5   purpose of providing land to members of a tribe that was under federal jurisdiction when the IRA

6   was enacted in June 1934."  *Id.* at 382.  Amador County sent comments to the Department

7   thereafter, arguing that the Secretary lacked authority to take land into trust for the Ione Band, and

8   the Ione Bond sent responsive comments and submitted evidence that the Ione Band had been

9   under federal jurisdiction in 1934.  (AR7757–97; 8000–210; 8872–9191.)  In May, 2012, the

10  ROD issued, concluding among things that the Ione Band was under federal jurisdiction within

11  the meaning of the IRA and *Carcieri*.

12                          **ANALYSIS**

13  **I.       Statute of limitations arguments**

14       The parties dispute whether the six-year statute of limitations in 28 U.S.C. § 2401 bars

15  Plaintiff from contesting various Departmental determinations that are referenced in the ROD.

16  Under section 2401, "every civil action commenced against the United States shall be barred

17  unless the complaint is filed within six years after the right of action first accrues."  *See Sierra*

18  *Club v. Penfold*, 857 F.2d 1307, 1315 (9th Cir. 1988) (section 2401 applies "to actions brought

19  under the APA which challenge a regulation on the basis of a procedural irregularity").

20       Specifically, the Court construes the parties' moving papers to dispute whether the

21  Plaintiff can challenge: 1) the validity of the grandfathering provision contained in 25 C.F.R. §

22  292.26(b); and 2) the validity of the 1994 Deer determination and the 1972 Bruce determination

23  insofar as they extend federal recognition to the Ione Band.

24       With respect to section 292.26(b), Plaintiff makes arguments that touch upon the facial

25  validity of the grandfathering provision, though Plaintiff expressly challenges the application of

26  this provision to the Ione Band's case.  (Pl. Reply, ECF No. 85 at 28.)  The statute of limitations

27  argument raised by Defendants and Defendant Intervenors is essentially that the Part 292

28  regulations were promulgated in May, 2008, and Plaintiff's motion for summary judgment was

                          12

1    filed more than six years later.  Defendant Intervenors state that the complaint – which was filed

2    in 2012 – does not raise the issue.  However, paragraph 25, footnote 2 of the complaint states: "

3    … the ROD's conclusion that the 2006 Artman determination is "grandfathered," and is not

4    subject to the regulations adopted in 2008 (*see* 25 C.F.R., Part 292), is arbitrary, capricious, and

5    contrary to law."  The Complaint also makes numerous arguments regarding the ROD's

6    determination that the Plymouth parcels qualified as restored lands for a restored Indian tribe

7    under the IGRA; section 292.26(b) functions in the ROD to permit the Secretary to make the

8    determination that the restored lands exception is met.  Accordingly, Plaintiff questioned the

9    validity of section 292.26(b) within six-years of the promulgation of the Part 292 regulations, and

10   so the six-year statute of limitations does not bar Plaintiff's arguments.

11          With respect to the 1972 Bruce determination and the 1994 Deer determination, to be

12   clear, this action is not brought against those determinations; it is brought against the conclusions

13   reached in the ROD.  A tenet of Plaintiff's argument is that the ROD's conclusions are arbitrary

14   and capricious because are they based upon decades of inconsistency regarding whether the Ione

15   Band was federally recognized.  Even if challenges to the Bruce and Deer determinations, per se,

16   were precluded on statute of limitations grounds, the other arguments raised by the parties would

17   require the Court to examine the reasoning behind the Bruce and Deer determinations.

18          The Court finds *Wind River Min. Corp. v. United States*, 946 F.2d 710 (9th Cir. 1991) to

19   be on point.  *Wind River* held as follows:

20              If a person wishes to challenge a mere procedural violation in the
                adoption of a regulation or other agency action, the challenge must
21              be brought within six years of the decision.  Similarly, if the person
                wishes to be bring a policy-based facial challenge to the
22              government's decision, that too must be brought within six years of
                the decision … If, however, a challenger contests the substance of
23              an agency decision as exceeding constitutional or statutory
                authority, the challenger may do so later than six years following
24              the decision by filing a complaint for review of the adverse
                application of the decision to the particular challenger.  Such
25              challenges, by their nature, will often require a more "interested"
                person than generally will be found in the public at large."
26
     *Wind River,* 946 F.2d at 715.
27
            As a reference point, in *Shiny Rock Min. Corp. v. United States*, 825 F.2d 216, 218 (9th
28

13

1    Cir. 1987), the procedural issue was whether the so-called "notation rule" had been complied with

2    by the Bureau of Land Management in rejecting plaintiff's claim for a mineral patent; the

3    notational rule required that the BLM make an initial determination regarding whether its records

4    reflected that the land had been devoted to a particular use. *See also Shiny Rock*, 906 F.2d 1362,

5    1364–65 (related proceeding); *Penfold*, 857 F.2d at 1315 (the statute of limitations in section

6    2401 "should apply to actions brought under the APA which challenge a regulation on the basis of

7    procedural irregularity").

8           Plaintiff's arguments are in part procedural and in part substantive.  For example, Plaintiff

9    argues that the Deer determination, and the Bruce determination upon which it relies, are wrong

10   because they are based on a misunderstanding of the history of the Ione Band in Amador County.

11   Plaintiff argues that the Ione Band has improperly received federal recognition because it lacks

12   distinct status as a tribe apart from the Buena Vista and Jackson Rancheria tribes.  These are not

13   "purely procedural" arguments.  (ECF No. 87 at 7.)

14          There is precedent for applying the *Wind River* analysis within the context of federal

15   recognition of an Indian tribe.  In *Artichoke Joe's California Grand Casino v. Norton*, 278 F.

16   Supp. 2d 1174 (E.D. Cal. 2003), plaintiffs challenged the Department's decision to grant federal

17   recognition to the Lytton Rancheria of California as an Indian tribe, even though the challenge

18   was brought more than six years after the recognition occurred.  Applying *Wind River,* the district

19   court held that plaintiffs' challenge was not time-barred, while stating, in relevant part:

20   "Plaintiffs' claim concerning recognition of Lytton as a tribe is a substantive challenge to the

21   Secretary's recognition decision. Further, when the Secretary made the decision to ... grant Lytton

22   federal recognition in 1991, plaintiffs could have had no idea that Lytton's tribal status would

23   affect them [by leading to tribal gaming nearby]."  *Artichoke Joe's*, 278 F. Supp. 2d at 1183.

24          In *N. Cnty. Cmty. Alliance, Inc. v. Salazar*, 573 F.3d 738, 743 (9th Cir. 2009), plaintiff

25   claimed that the NIGC acted ultra vires in approving the Nooksacks' [a federally recognized

26   Indian tribe] proposed ordinance in 1993 without first making an Indian lands determination for

27

28

14

1   locations where gaming would be permitted under the ordinance.[7]   The *Alliance* court found that

2   "'[n]o one was likely to have discovered' that the NIGC's approval was 'beyond the agency's

3   authority until someone actually took an interest in' it. *Wind River,* 946 F.2d at 715. The Alliance

4   'took an interest' in 2006 when construction of the Casino began near some of its members'

5   properties. The Alliance 'could have had no idea' in 1993 that the NIGC's approval of the

6   Nooksacks' Ordinance 'would affect them' in 2006 by leading to construction of a casino thirty-

7   three miles from the Nooksack reservation.   *See Artichoke Joe's,* 278 F. Supp. 2d at 1183."

8   Accordingly, the *Alliance* court concluded that the six-year statute of limitations in section 2401

9   did not bar plaintiff's claim.   *Alliance,* 573 F.3d at 741.

10        Defendant Intervenors argue that, at the latest, the 1995 Federal Register listing of the

11   Ione Band provided sufficient notice for Plaintiff to sue.   *See e.g.  Camp v. U.S. BLM*, 183 F.3d

12   1141, 1145 (9th Cir. 1999) ("[P]ublication in the Federal Register is legally sufficient notice to all

13   interested or affected persons regardless of actual knowledge or hardship resulting from

14   ignorance"); *Williams v. Mukasey*, 531 F.3d 1040, 1042 (9th Cir. 2008).  Plaintiff knew the Deer

15   determination had been made in 1994, because the issue arose in the course of the *Burris*

16   litigation, and thus knew thereafter that the Ione Band had appeared on the Federal Register of

17   recognized tribes.   *See Wind River*, 946 F.2d at 715 (noting that its holding would apply where

18   "no one was likely to have discovered that the [agency's action] was beyond the agency's

19   authority until someone actually took an interest in that particular piece of property….");

20   *Artichoke Jo*e's, 278 F. Supp. 2d at 1183 (noting that when the Department granted the Lytton

21   tribe federal recognition, "plaintiffs could have had no idea that Lytton's tribal statute would

22   affect them" by leading to tribal gaming nearby).

23        However, as late as 2009, after many years of listings of the Ione Band within the Federal

24   Register, Solicitor Bernhardt took the position that the Ione Band was not federally recognized

25   and therefore that trust acquisition was improper.  With respect to the 1972 Bruce determination,

26

---

27   [7] "The IGRA requires Indian tribes to receive NIGC's approval of a gaming ordinance before engaging in 'class II' or
'class III' gaming. 25 U.S.C. § 2710(b), (d). Class II gaming includes bingo and card games except for 'banking' card

28   games like baccarat, chemin de fer, and blackjack. *Id.* § 2703(7). Class III gaming includes banking card games and
slot machines. *Id.* § 2703(8)." *Alliance,* 573 F.3d at 741.

15

1   shortly thereafter it was the federal government's position that the Bruce determination was

2   wrong.  The Court's primary consideration with respect to the instant statute of limitations

3   argument is that Plaintiff now challenges the ROD's conclusions based upon, what appears to be,

4   a pattern of inconsistency that has continued up to a point close-in-time with the ROD's issuance.

5   Plaintiff does state its arguments within the vein of *Wind River*: that the Department has exceeded

6   its constitutional or statutory authority by reaching the decisions stated in the ROD, resulting in

7   an adverse application of those decisions to Plaintiff.  *Wind River,* 946 F.2d at 715.  This is the

8   first action proceeding to the summary judgment phase, in which the issue is the validity of the

9   government's acquisition of the Plymouth Parcels and their eligibility for gaming.  Plaintiff's

10  previous action in this Court making the aforementioned challenge, was dismissed on the basis

11  that the trust application had not yet been approved.[8]  *Cnty. of Amador, Cal. v. U.S. Dep't of*

12  *Interior*, 2007 WL 4390499, at *4 (E.D. Cal. Dec. 13, 2007).  In this case, Plaintiff challenges the

13  substance of the ROD's conclusions in part due to the ROD's reliance upon the Bruce and Deer

14  determinations.  Therefore, Plaintiff's challenge to the Bruce and Deer determinations is not

15  precluded by the six-year statute of limitations in 28 U.S.C. § 2401.[9]

16  **II.   The Department's two-part inquiry for "under federal jurisdiction," 25 U.S.C. §**

17       **479**

18       The IRA defines Indian to include "all persons of Indian descent who are members of any

19  recognized Indian tribe now under Federal jurisdiction," and further defines "tribe" to mean "any

20  Indian tribe, organized band, pueblo, or the Indians residing on one reservation."  25 U.S.C. §

21  479.  Further, "§ 479 limits the Secretary's authority to taking land into trust for the purpose of

22

---

23  [8] Defendant Intervenors attach a Petition for Writ of Mandate (2004), brought by Amador County against the City of
    Plymouth in Amador County Superior Court, seeking to invalidate a government-to-government agreement entered

24  into between the Tribe and the City.  Amador County argued in that petition that "the Tribe is a recognized Native
    American tribe not subject to state court jurisdiction."  (Pl. RJN, ECF No. 88-1 at 5:5–7.)  Defendant Intervenors

25  argue in the instant matter that the Ione Band's federally recognized status thus was applied as far back as that
    litigation; it is not clear the extent to which the Bruce and Deer determinations or the Ione Band's federally

26  recognized status was at issue in that case.

27  [9] As a practical matter, it is somewhat unworkable to excise challenges to the Bruce and Deer determinations from
    the Court's analysis.  For example, Plaintiff, in pointing out the inconsistency of federal recognition of the Ione Band,

28  may raise the fact that Solicitor Bernhardt sought to reverse the Deer determination in 2009, which requires some
    analysis of the strength of the Deer determination in the first instance.

1   providing land to members of a tribe that was under federal jurisdiction when the IRA was

2   enacted in June 1934." *Carcieri v. Salazar*, 555 U.S. at 382.

3          As explained in the ROD, the Department has considered section 479 ambiguous

4   regarding the meaning of "under Federal jurisdiction," and so has constructed a two-part inquiry

5   for determining whether a group was under federal jurisdiction.

6              The first part examines whether there is a sufficient showing in the
               tribe's history, at or before 1934, that it was under federal
7              jurisdiction, *i.e.*, whether the United States had … taken an action
               or series of actions – through a course of dealings or other relevant
8              acts for or on behalf of the tribe or in some instances tribal
               members – that are sufficient to establish or that generally reflect
9              Federal obligations, duties, responsibility for or authority over the
               tribe.
10
11             …

12             [T]he second part ascertains whether the tribe's jurisdictional status
               remained intact in 1934 … In general [] the longer the period of
13             time prior to 1934 in which the tribe's jurisdictional status is
               shown, and the smaller the gap between the date of the last
14             evidence of being under Federal jurisdiction and 1934, the greater
               likelihood that the tribe retained its jurisdictional status in 1934.

15   (AR10105–06.)

16          The Court agrees that the statutory term "under Federal jurisdiction" is ambiguous, and

17   that the Department's two-party inquiry is reasonable.  Thus, the Court affords the Department

18   deference for its promulgation of the two-part inquiry.[10]  *See United States v. Mead Corp.*, 533

19   U.S. 218, 219 (2001): "It can be apparent from the agency's generally conferred authority and

20   other statutory circumstances that Congress would expect the agency to be able to speak with the

21   force of law when addressing ambiguity in the statute or fills in a space in the enacted law, even

22   one about which Congress did not have intent as to a particular result. When circumstances

23   implying such an expectation exist, a reviewing court must accept the agency's position if

24   Congress has not previously spoken to the point at issue and the agency's interpretation is

25   reasonable."  *See Confederated Tribes of the Grand Ronde Comm.'n of Ore. v. Sally Jewell, et al.*,

26   2014 WL 7012707 at *9–11 (D.D.C. Dec. 12, 2014) (applying *Chevron* deference to the

27

28   [10] The Court takes Plaintiffs' arguments regarding the Department's two-part inquiry to be primarily directed at application of that inquiry to the Ione Band's case.

17

1   Department's promulgation of the two-part inquiry).

2       **III.     The two-part inquiry applied to the Ione Band**

3           In the ROD, the Secretary's application of the two-part inquiry consists essentially of

4   identifying many of the aforementioned items stated in the "Factual Background" section of this

5   Order.

6           With respect to step one – whether the Ione Band was under federal jurisdiction in 1934 or

7   before – the Secretary's justification includes: the Band's being a successor in interest to Treaty J

8   in the mid-1800s; agent Kelsey's efforts to document members of the Band in the early 1900s;

9   agent Terrell's efforts to acquire a 40-acre parcel for the Band; failed – but consistent – attempts

10  to complete the acquisition of land for the Ione Band continuing into the 1930s; and a petition by

11  the Ione Band again in 1941 to complete the acquisition.  (AR10108–09.)

12          With respect to step two – whether the Band's jurisdictional status remained intact in 1934

13  – the Secretary's justification includes: beginning in the 1970s, efforts by the California Indian

14  Legal Services to complete a trust acquisition for the Band; the 1972 Bruce determination; the

15  2006 ILD; and the fact that, in 2011, the U.S. District Court for the District of Columbia

16  previously recognized the Ione Band's "long-standing and continuing governmental relationship

17  with the United States," *Muwekma Ohlone Tribe v. Salazar*, 813 F. Supp. 2d 170, 198 (2011).

18  (AR10109–10.)

19          Plaintiff makes a number of arguments that, notwithstanding the ROD's analysis, the Ione

20  Band is not eligible to have lands taken into trust under the IRA because they do not qualify as a

21  "recognized Indian tribe now under Federal jurisdiction, " § 479.  These arguments are stated

22  below.

23      A.  Section 16 and 18 elections

24          The IRA provides authority for the Secretary to take land into trust for tribes and

25  individual Indians, 25 U.S.C. § 465, and further defines a tribe to be: "any Indian tribe, organized

26  band, pueblo, or the Indians residing on one reservation," 25 U.S.C. § 479.  Plaintiff contends that

27  the Ione Band was not a distinct tribe in 1934, as evidenced by the fact that no special elections

28  were held after enactment of the IRA, either to organize as a tribe (section 16) or to opt out of the

1    IRA (section 18).

2        Section 16 of the IRA provides that a tribe "may adopt an appropriate constitution and

3 bylaws" which shall become effective when "ratified by a majority vote of the adult members of

4 the tribe." 25 U.S.C. § 476(a). In Amador County, the Jackson Rancheria and Buena Vista

5 Rancheria voted to organize under section 16, but the Ione Band did not hold such an election.

6 (AR20777.) Defendant Intervenors argue – and the wording of section 16 lends support to this

7 interpretation – that these elections were permissive rather than mandatory. Without more, the

8 absence of such a vote by the Ione Band is not persuasive that the Ione Band was not a tribe at the

9 time of the IRA's enactment.[11]

10        In contrast, under section 18 of the IRA, the Act "shall not apply to any reservation

11 wherein a majority of the adult Indians, voting at a special election duly called by the Secretary of

12 the Interior, shall vote against its application. It shall be the duty of the Secretary of the Interior,

13 within one year after June 18, 1934, to call such an election, which election shall be held by secret

14 ballot upon thirty days' notice." 25 U.S.C. § 478. The parties agree that the Ione Band did not

15 vote, under section 18 of the IRA, in these mandatory elections called by the Secretary.

16 However, the text of section 18 states that those elections pertain to "any reservation" wherein a

17 majority of the adult Indian voted to opt out. It is a reasonable conclusion that the Ione Band did

18 not have a reservation home base on or around 1934, thus this would explain the fact – this is

19 Defendants and Defendant Intervenors' position – that the Ione Band was not subject to section

20 18 elections.

21        Plaintiff points to an August 15, 1934 letter from O.H. Lipps, then Superintendent of the

22 Sacramento Indian Agency, to the Commissioner of Indian Affairs, listing the various Indian

23 communities under the jurisdiction of the Sacramento Agency (which then included Amador

24 County). The stated purpose of that letter was to respond to a request for information from the

25

26 [11] *See Ten Years of Tribal Government under I.R.A.* (1947), Theordore H. Haas, Chief Counsel, U.S. Indian Service, stating a distinction between the mandatory opt-out section 18 elections and the permissive section 16 elections.

27 (AR20764–65.) *But See Stand Up for California! v. U.S. Dep't of the Interior*, 919 F. Supp. 2d 51, 58 & n.10 (D.D.C. 2013) (stating section 16 elections were "required"); 25 U.S.C. § 476 (c) (the Secretary must hold an election

28 if there is a tribal request for one).

1    Commissioner about Indian communities within the Sacramento Agency's jurisdiction, for the

2    purpose of facilitating the Secretarial elections described in 25 U.S.C. § 478.  Lipps stated that as

3    of the time of writing, there were only two groups "under this jurisdiction who have organized

4    tribal or group councils – the Tule River and Fort Bidwell Indians.  (AR20755.)  The Lipps letter

5    also enclosed a list of the "various rancherias under this Agency," which included the Buena

6    Vista and Jackson Rancherias, but not the Ione Band.  (AR20755–56.)

7          Defendants acknowledge that in certain instances section 18 elections were held for

8    landless tribes.  (*See* ECF No. 84-1, n. 15; *Shawano County, Wisc. v. Acting Midwest Reg'l Dir*,

9    53 IBIA 62, 72–73 (2011).)  However, in the Lipps letter itself, it appears "rancherias" was used

10   to refer specifically to "tracts of land".  *See* Lipps letter, AR20755–58 (enclosing a "list of the

11   various rancherias under this Agency, giving name of each, county in which located, size of tract,

12   and population…. These [unintelligible number] tracts of land … were purchased several years

13   ago in order that the Indians might have a place to live undisturbed … Many of the tracts remain

14   unoccupied."  Further, approximately eight months earlier, Superintendent Lipps had written to

15   the Commissioner of Indian Affairs "in reference to the proposed Indian colony for the homeless

16   Indians near Ione in Amador County, this jurisdiction."  (AR20752.)  It is a reasonable conclusion

17   that the Ione Band had no "tract of land," or at least none considered to be a rancheria under the

18   jurisdiction of the Sacramento Agency.  Without more, the Court lacks a basis to find that if

19   section 18 elections were not held with respect to a group of Indians, then that group cannot be a

20   distinct tribe under federal jurisdiction in 1934.

21          B.  <u>The Ione Band, Buena Vista Rancheria, and Jackson Rancheria</u>

22          Plaintiff argues: "historically, the members of what is now the 'Ione Band of Miwok

23   Indians' were actually part of the modern-day Buena Vista Rancheria and/or Jackson Valley

24   Rancheria tribes, rather than a separate and distinct tribal entity in its own right." [12]  (ECF No. 65

25   at 40.)

26          For example, with respect to the 1915 Terrell Census, Plaintiff points out that it is entitled

---

[12] It is not clear to the Court if the appropriate description is the "Jackson Valley" or "Jackson" tribe.  The Federal Register, 1995, lists the "Jackson Rancheria of MeWuk Indians of California".  (AR4826.)  The 1905–06 Kelsey census identifies "Jackson Valley" and "Jackson Reservation".  (AR3776.)

a "Census of Ione and vicinity Indians," and lists Charlie Maximo as the "recently elected Chief of the band," but also lists ten Indians "[a]t Jackson belonging to the Ione Band" and another 29 Indians "At Richey belonging to the Ione Band." (AR3490.) According to Plaintiff, among this latter group "At Richey" are listed John Oliver, Casus Oliver, and Lucy and Joseph Oliver, from whom the Buena Vista Rancheria claim descent. (AR919; 878; 4093–94; 3966.) Plaintiff points out that much of the correspondence that Agent Terrell had with Indians regarding the attempted Arroyo Seco land purchase is with the Olivers. (AR132; 180; 186.) *See also* "Ethnohistoric *Notes* (1982), Glen Villa and Dwight Dutschke, Amador Tribal Council, stating: "Because of their power dating back to aboriginal times, the Maximos were accepted in the Ione area as new leaders. Chief Maximo and his brothers called themselves "Christian Indians" and stated that they had received their names in the missions … Political rivalry occurred between the Maximos and the Olivers that divided the factions in the Ione area. Separate villages were created, the Olivers living in Buena Vista and the Maximos living in the Jackson Valley, both near Ione. Both communities have survived. The Oliver village became the Buena Vista Rancheria, which was terminated in 1961. The Maximo village became the Ione Band of Miwok Indians, who are currently seeking federal recognition." (AR3966.) *See also* February, 1916 letter in response to Lena Oliver, stating in part: "[I]t now appears the pending purchase of 40 acres of land to include the present village location of the Ione Indians will be soon be consummated … It appears from the census of the Ione Indians compiled by me last [unintelligible] through the kind assistance of Charley Maximo and some few other Indians of the band that your name does not appear, unless you are the wife of either John or Casus Oliver, then reported as living up at Jackson, but belong properly to the Ione Band. [¶] This census indicates 101 Indians, of which 62 then resided at Ione and near there, 13 at Jackson and 29 at Richey. If you are not the wife of either John or Casus Oliver, but really belong to the Ione band of Indians, [sic] am sure the omission of your name has been an unintentional oversight." (AR137–38.)

Plaintiff also points out that in more recent correspondence – such as during the pendency of the *Burris* litigation in the 1990s – members of the Department referred to the Ione Band interchangeably with the Buena Vista Rancheria. *See e.g.* correspondence from Ada Deer,

1    October 19, 1993, regarding "Publication of the Secretary's list of Federally Recognized Tribes,"

2    and stating the "proper name of the Tribe" is the "Buena Vista Rancheria/Ione Band of Miwok

3    Indians" (AR843); correspondence from Ada Deer, October 24, 1993, regarding an "Internal

4    Investigation and a Formal Hearing of the BIA Attempts of Termination of the Buena Vista

5    Rancheria/Ione Band of Miwok Indians." (AR847).

6         Plaintiff points to the Glen Villa, Sr. Tribal History, which stated: "Buena Vista

7    Rancheria, a 70 acre parcel of land 4 miles south of Ione, was purchased for the Ione Band.  Some

8    of the people identified on the 1915 census already lived at this site which was an old Indian

9    village called Upusuni." (AR3972.)  The Villa history further stated that it was common for the

10   population of Miwok tribes to be "divided between several settlements consisting of a few

11   households more or less connected by blood, but there was also a site that was regarded as the

12   principal one inhabited." (AR3974.)  An analysis of the Terrell Census, also submitted by the

13   Ione Band, shows that "Chief" Charlie Maximo was buried at the Buena Vista Rancheria.

14   (AR4082.)

15        Plaintiff also points to a letter within the record, apparently written at some point between

16   1916 and 1920, from Agent Terrell to Commissioner of Indian Affairs Cato Sells, which refers to

17   the "Ione and Richey Band of Indians," and which also contains hand-written notes stating that

18   the Ione Band and Buena Vista Tribes were "one tribe" and "Buena Vista is other name."

19   (AR864–66.)  The administrative record index shows the letter was submitted by Gerald Grazer,

20   an attorney for the Ione Band in the mid-1990s.  (ECF No. 85 at 33.)

21        Plaintiff also points to a letter from Harold Burris' lawyer to the Secretary of the Interior

22   in 1994, summarizing the history of the Ione Band, and stating that: "Although the factions had

23   never acted as a tribe, in 1970 they agreed to call themselves by this name and, in fact, elected

24   Harold, Sr. the Chairman of the Ione Band of Indians for the purpose of leading the quiet title

25   litigation and, later, executing ground leases with members of who occupied or desired to erect

26   homes on either side of centerline fence." (AR1100–01)

27        In sum, Plaintiff argues that as of 1934, the Secretary treated the Indians on the two land

28   bases that were under federal supervision – the Jackson Rancheria and the Buena Vista Rancheria

1    – as the tribes in Amador County that were under federal jurisdiction at that time.  Plaintiff argues

2    that because the remaining Indians were not a distinct tribal entity from those that were organized

3    under the IRA, they were not a separate tribe that was under federal jurisdiction.

4         The Court understands Defendant and Defendant Intervenors' position to be that the 40

5    acre parcel on Arroyo Seco Ranch was contemplated for purchase on behalf of peoples led by

6    Charlie Maximo.  These people were also part of the early Terrell census of Indians living in

7    "Ione and Vicinity".  That group, their lineage, and others in the vicinity continued such efforts

8    through the early 1930s, and reinvigorated those efforts briefly in 1941; then those efforts ceased,

9    beginning again in the 1970s.  (AR3972–73.)  The 1972 Bruce and 1994 Ada Deer determination,

10   now being used in efforts to acquire the Plymouth Parcels, referred to the same lineage of Indians

11   that had sought in the early 1900s and the 1970s to complete acquisition of the 40 acre Arroyo

12   Seco parcel.[13]  (AR3550.)

13        More specifically, Defendant Intervenors explain that the Ione Band had a historical

14   method of leadership ascension based on genealogical descent and location, but outside pressure

15   caused changes in traditional village organization.  (AR3974.)  Thus, in 1915, Charlie Maximo

16   was chosen by election, rather than by lineal descent or location, to be the Ione Band's leader and

17   spokesman.  Charlie Maximo served in this position until his death in 1943.

18        Defendant Intervenors point out that Agent Terrell wrote to the Commissioner of Indian

19   Affairs in 1915 explaining that a high purchase price for the property to be acquired was

20   warranted because it was an opportunity to buy property where the Ione Band's "Indian Village"

21   was located, "around which cluster so many sacred memories to this remnant band."  (AR69.)  A

22   Departmental "Authority" form in 1916 granted funds for the "PURCHASE OF LAND FOR

23   LANDLESS INDIANS IN CALIFORNIA" and states 40 acres in Amador County is to be

24   purchased "for the use of 101 homeless California Indians, designated as the Ione Band".

25   (AR160.)  A governmental transmittal of a partially executed deed, abstract of title, and survey

26

27   [13] The parties do not address current tribal membership, insofar as Defendant Intervenors purport to represent the
     Ione Band that accurately traces its lineage to the Ione Band indigenous to Amador County.  *See* the Court's
28   discussion in Case No. 1748, regarding the pro hac vice application of Mark Kallenbach.  The parties also do not
     address whether the Ione Band would in fact meet the requirements under the Part 83 regulations.

1    plat indicated a 40-acre parcel "to be purchased for the use of 101 homeless California Indians,

2    designated as the Ione Band." (AR153–54.)  Other documents list the Ione Band alongside both

3    Buena Vista and Jackson.  *See* Lipps – Micheals Survey of Landless Nonreservation Indians of

4    California, 1919–1920, stating: "The Ione group consists of 5 families – 19 people; – Buena

5    Vista, 2 families – 5 people; Jackson Valley, 7 families 27 people." (AR8129.)  *See* data

6    compiled by L.A. Berrington for the Department, in June, 1927, stating "Amador County has an

7    Indian population of approximately 260, as shown by the following detailed bands: … Ione [46

8    members] … Jackson [53 members] … Buena Vista [20 members] …." (AR8139.)

9           Defendant Intervenors also argue that, as of 1934, lands had been designated as the Buena

10   Vista and Jackson Rancherias.  *See* O.H. Lipps Letter, August 1934, identifying the Buena Vista

11   and Jackson Valley Rancherias among the list of Rancherias under jurisdiction of the Sacramento

12   Indian Agency. (AR20755.)  However, in 1941, attempts were still being made to acquire land on

13   behalf of "the Indians living near Ione." (AR506–07.)

14          With respect to the aforementioned letter from Harold Burris Sr.'s lawyer, stating that the

15   Ione Band had "never organized as a tribe," it appears the context for this letter was a leadership

16   dispute during the 1990s among factions of the Ione Band, represented respectively by Harold

17   Burris, Sr. and Nicholas Villa, Jr.  Defendant Intervenors explain that the instant letter from

18   Burris' lawyer was a response to the March, 1994 Ada Deer letter determining the Ione Band

19   were federally recognized, and addressed to Mr. Villa as "Chief, Ione Band of Miwok."  The

20   letter from Burris' lawyer was concerned with establishing Mr. Burris as the tribal leader, and

21   thus the lawyer proceeded to ask Assistant Secretary Deer to either to rescind the recognition

22   decision sent to his client's rival or to separately recognize both factions as tribes.  *See* Letter

23   from Ada Deer, July 27, 1994, stating that previous correspondence to tribal letters had "been

24   misconstrued to suggest that the Department has virtually anointed either Mr. Villa or Mr. Burris

25   as the single leader of the Ione Band … The Department is cognizant that the Ione Band is deeply

26   divided among political factions." (AR1129.)  Further, in an earlier declaration by Harold Burris

27   submitted during the *Burris* litigation, he explained he was born in 1924 and, except for the years

28   1942–45, lived his entire life on the aforementioned 40 acre parcel.  That declaration further

24

1   stated that "[d]uring my growing up years in Ione, I recall talk among my elders, including our

2   leader at that time, Captain Charlie, about getting title to the land where I was born and have lived

3   my life." (AR20904–06.)

4         It is clearly beyond the scope of this Court's authority and expertise to conduct an

5   independent investigation into the genealogy and political history supporting recognition of the

6   Ione Band as a distinct tribe, and then to substitute that analysis for the BIA's.  Rather, the

7   Court's role is to ensure that the BIA made no "clear error of judgment" that would render its

8   action arbitrary and capricious.  *The Lands Council v. McNair,* 537 F.3d 981, 993 (9th Cir. 2008)

9   (citing *Marsh v. Or. Natural Res. Counc.,* 490 U.S. 360, 378 (1989)).  The Court's review

10   includes, among other inquiries, reviewing "the evidence the [Department] has provided to

11   support its conclusions, along with other materials in the record, to ensure that the [Department]

12   has not, for instance, 'relied on factors which Congress has not intended it to consider, entirely

13   failed to consider an important aspect of the problem, offered an explanation for its decision that

14   runs counter to the evidence before the agency, or [an explanation that] is so implausible that it

15   could not be ascribed to a difference in view or the product of agency expertise.'"  *Id.* (citing

16   *Motor Vehicle Mfrs. Assn., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

17         The Court views Plaintiffs' moving papers to identify ambiguity regarding the political

18   and genealogical support for the Ione Band's status as a distinct tribe.  To recite again some of the

19   portions of the record: a 1916 Office of Indians Affairs' "Authority" form referred to the purchase

20   of 40 acres for "101 homeless California Indians, designated as the Ione Band." (AR160.)  The

21   1919-1920 Lipps – Micheals Survey found: "The Ione group consists of 5 families – 19 people; –

22   Buena Vista, 2 families – 5 people; Jackson Valley, 7 families 27 people." (AR8129.)  The 1927

23   L.A. Berrington data summary stated: "Amador County has an Indian population of

24   approximately 260, as shown by the following detailed bands: … Ione [46 members] … Jackson

25   [53 members] … Buena Vista [20 members] …." (AR8139.)  So it would appear that "Ione" or

26   "Ione Band", as those terms were being used to refer to a distinct group of people, had some

27   fluidity in the early 20th century.  Furthermore, as Defendants and Defendant Intervenors would

28   acknowledge, it appears there was genealogical and political overlap throughout the 20th century

1    between different groups of Indians who, currently, now identify as the Buena Vista, Jackson

2    Valley, or Ione groups.

3            However, the Court's role is to ensure the Department was not arbitrary and capricious in

4    determining that the Ione Band is a unique tribe apart from the Buena Vista and Jackson Valley

5    tribes.  As the above referenced portions of the record reflect, the Department gave adequate

6    consideration given to this determination, including the possibility of genealogical and political

7    overlap between groups.  The Court does not find the Department was arbitrary or capricious, or

8    otherwise made a clear error in judgment, in so recognizing the Ione Band as a distinct Indian

9    tribe.

10           C.  Land acquisition as evidence of federal recognition

11           Plaintiff argues that land purchase efforts by the federal government do not, standing

12   alone, establish that the Ione Band was under federal jurisdiction in 1934.  Plaintiff also argues

13   that the failure to acquire land on behalf of the Ione Band demonstrates a lack of federal

14   jurisdiction.

15           With respect to the first argument, Plaintiff refers to Hazel E. Elbert's, Deputy to the

16   Assistant Secretary, explanation to Senator Cranston in 1990: "The California land purchase

17   program was aimed at buying acreage for miscellaneous, landless Indians, whether or not they

18   then existed as part of a tribal entity or had previously been federally recognized.  The purchase

19   of lands for these Indians did not, in and of itself, prove or establish the existence of a

20   government-to-government relationship between an Indian tribe and the United States."

21   (AR645.)  As another example, the 2006 ILD stated: "The actions of the Department in

22   furtherance of its efforts to acquire land for the Indians at Ione are not conclusive as to the Band's

23   recognized tribal status.  Throughout California in the early part of the Twentieth Century, the

24   Department attempted to purchase land wherever it could for landless California Indians without

25   regard to the possible tribal affiliation of the members of the group."  (AR5072.)  However, the

26   record indicates that many considerations went into the Department's current position that the

27   Ione Band was under federal jurisdiction in June 1934.  While the trust acquisition attempts have

28

1   perhaps the most obvious role in reaching that position, the Department also considered the

2   genealogical and political history of the Ione Band.

3         With respect to the second argument, Plaintiff argues that federal courts have historically

4   recognized the concept of federal jurisdiction as inseparable from ownership of the land.  *See*

5   *Yankton Sioux Tribe v. Podhradsky*, 606 F.3d 994, 1007 (8th Cir. 2010) ("Section 1151(a)[14] thus

6   separates the concept of jurisdiction from the concept of ownership"); 1-15 *Cohen's Handbook of*

7   *Federal Indian Law* § 15.07 (2012) ("Taking land into trust shields the land from involuntary

8   loss, and, if the land is located outside an existing Indian reservation, establishes it as an Indian

9   country with all the jurisdictional consequences attaching to that status.") (ECF No. 65 at 46.)

10   *See Yankton Sioux*, 606 F.3d at 1011 (holding that land taken into trust by the federal government

11   under section 5 of the IRA "is effectively removed from state jurisdiction").  Plaintiff argues that

12   the Ione Band was not the subject of any pre-1934 congressional appropriation, because the

13   appropriations under which the Arroyo Seco land was to be purchased were statutes providing for

14   the purchase of land for "landless" California Indians, rather than for the Ione Band as such.

15   Plaintiff argues, with reference to the legislative history of the IRA, that then Commissioner of

16   Indian Affairs Collier proposed the inclusion of the phrase "now under federal jurisdiction" in

17   section 19, with the aim of leaving existing reservation Indians unaffected while limiting the

18   ability of non-reservation Indians to bring themselves within the IRA.[15]  Plaintiff also points out

19   that the State of California and the County of Amador have, at all relevant times, exercised

20   jurisdiction over the 40 acre Arroyo Seco parcel.

21         Regardless, Plaintiff does not identify any legal authority stating that a tribe under federal

22   

23   [14] *See* 25 U.S.C. § 1151: "Except as otherwise provided in sections 1154 and 1156 of this title, the term 'Indian
country', as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction

24   of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running
through the reservation, (b) all dependent Indian communities within the borders of the United States whether within

25   the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all
Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the

26   same."

27   [15] *See e.g.* Hearings on S.2755 and S.3645: *A Bill to Grant to Indians Living Under Federal Tutelage the Freedom To
Organize for Purposes of Local Self-Government and Economic Enterprise*, Before the S. Comm. on Indian Affairs,

28   73d Cong., 2d Sess., pt. 2, p. 263 (1934); ECF No. 85 at 47–50 (citing relevant portions).

jurisdictional requires that a trust acquisition have been completed or that federal ownership of land in some other manner is required.  Plaintiff's briefing cites, for example, *TOMAC, Taxpayers of Michigan Against Casinos v. Norton*, 433 F.3d 852, 855–56 (D.C. Cir. 2006), for its discussion that:

> In 1935, the Pokagon Band petitioned for reorganization under the newly minted IRA, which terminated the federal government's allotment policy and restored to Indians the management of their assets. While tribal governments located in Michigan's upper peninsula were granted federal services under the IRA, those in its lower peninsula, such as the Pokagon Band, were denied services and benefits due to an administrative decision predicated on the 'misguided assumption that residence on trust lands held in common for the Band was required for reorganization and the fact that appropriations to purchase such lands had run out.' H.R. Rep. No. 103-620, at 5; *see also* S. Rep. No.. 103-266, at 3-4. According to the Senate committee report leading to the passage of the Restoration Act authored nearly 60 years later, the Pokagon Band 'was unfairly terminated as a result of both faulty and inconsistent administrative decisions contrary to the intent of the Congress, federal Indian law and the trust responsibility of the United States.' S. Rep. No. 103-266, at 6.

But as the *TOMAC* decision makes clear, it was a "misguided assumption" to infer that "residence on trust lands held in common for the Band was required for reorganization."  *Id.* at 856.  The statute, 25 U.S.C. § 479, does not contain a requirement that a "recognized Indian tribe now under Federal jurisdiction" also have "land" under federal jurisdiction.  Without more, there is no support for Plaintiff's argument that failures in land acquisition attempts by the Government require a finding that the Ione Band was not "under federal jurisdiction" in 1934.

D.   The *Burris* litigation

The *Burris* litigation involved competing factions of the Ione Band and derives from the aforementioned state court quiet title action in the early 1970s, *Villa v. Moffatt*, No. 8160, California Superior Court, Amador County.  *See* Order Granting Fed. Def. Mot. for Sum. Judg., *Ione Band of Miwok Indians, et al. v. Harold Burris, et al.* No. Civ. S-90-993-LKK (E.D. Cal. April 22, 1992), AR7763–88.  In that case, the Amador County Superior Court entered judgment in favor of plaintiffs – individuals who identified as members of the Ione Band – and declared them the owners in fee simple of the 40 acre Arroyo Seco parcel.  Subsequently, in 1988, "Harold E. Burris, Esther Burris, Callie Allen, Carol Boring, Pamela Burris, Harold Burris, Jr. and

28

1   Jeanette Allen [who would be individual defendants in the *Burris* litigation now being discussed]

2   … along with Frank Pinion and Frank Villa" filed a complaint, in Amador County Superior

3   Court, for declaratory relief and partition of the 40 acre parcel.  (AR7764–65.)

4        Yet again, on August 1, 1990, "some of the defendants in the state court quiet title action"

5   filed the complaint initiating the *Burris* litigation in this Court, against the federal government

6   and other individual defendants, seeking declaratory relief "as a federally-recognized Indian tribe

7   and an order quieting title to the 40-acre parcel of land in the name of the Ione Band of Miwok

8   Indians, be held in trust by the federal government."[16]

9        In litigating that action, the government initially took the position that the Ione Band had

10  never been recognized as a tribe within the meaning of the IRA; that the 1972 letter from

11  Commissioner Bruce was not determinative of whether the Ione Band should receive tribal status;

12  and that the only way for the Ione Band to gain federal recognition was to proceed through the

13  Part 83 federal acknowledgment regulations adopted by the Secretary in 1978.

14       For example, the government asserted in a status report: "The government denies that the

15  Ione Band of Miwok Indians has ever been a federally-recognized tribe."  (Pl. RJN, ECF No. 66,

16  Ex. 5 at 4.)  The Burris faction of the group stated, in a report: "Defendants deny that the Ione

17  Band of Miwok Indians has ever been a federally-recognized tribe."  (ECF No. 66, Ex. 6 at 3.)

18       In its motion for summary judgment in that litigation, the Government stated: "In 1972,

19  the head of BIA Commissioner Louis Bruce, was not entirely convinced that the Ione Band was

20  federally recognized."  (AR697.)  The Government further stated: "[t]he essence of plaintiffs'

21  argument is that the Ione Band was a federally-recognized tribe as of 1972 and was subsequently

22  'unrecognized.'  The government submits that plaintiffs at least in 1977 [sic]  that the United

23  States did not recognize the Ione Band and certainly no later than 1979 when notice of the same

24  was published in the Federal Register.  To the extent that plaintiffs viewed this decision as a

25  change from recognition status to nonrecognition status, which change the government disputes,

26  plaintiffs were bound to bring suit no later than 1985 pursuant to the statute of limitations set

27

28  ───────────────
    [16] The specific individuals constituting the opposing parties in the federal action and in the state court actions, is
    contained in the district court's order at AR7764–65.

29

1    forth at 28 U.S.C. § 2401(a)."[17]  (AR703.)

2         The district court explained that during the *Burris* litigation, it afforded plaintiffs the

3    opportunity to determine whether there were mechanisms other than the Part 83 regulations, by

4    which plaintiffs could be "recognized" by the federal government.  Finding plaintiffs' argument

5    unavailing, the district court held:

6              Plaintiffs' argument appears to be that these non-regulatory
               mechanisms for tribal recognition demonstrate that "the Secretary
7              may acknowledge tribal entities outside the regulatory process,"
               [citation], and that the court, therefore, should accept jurisdiction
8              over plaintiffs' claims compelling such recognition.  I cannot agree.
               Because plaintiffs cannot demonstrate that they are entitled to
9              federal recognition by virtue of any of the above mechanisms, and
               because they have failed to exhaust administrative remedies by
10             applying for recognition through the BIA's acknowledgement
               process, the United States' motion for summary judgment on these
11             claims must be GRANTED.

12   (AR7779.)

13        In the instant matter, Plaintiff now seeks to estop Defendants and Defendant Intervenors –

14   via judicial estoppel, collateral estoppel, and res judicata – from arguing contrary positions from

15   those they took in the *Burris* litigation.  (ECF No. 65 at 36.)

16        Collateral estoppel, or issue preclusion, provides that "when an issue of ultimate fact has

17   once been determined by a valid and final judgment, that issue cannot again be litigated between

18   the same parties in any future lawsuit."  *U.S. v. Bhatia*, 545 F.3d 757, 759 (9th Cir. 2008).  Res

19   judicata applies when "the earlier suit ... (1) involved the same 'claim' or cause of action as the

20   later suit, (2) reached a final judgment on the merits, and (3) involved identical parties or privies."

21   *Sidhu v. Flecto Co.*, 279 F.3d 896, 900 (9th Cir. 2002).  Judicial estoppel functions to "prevent a

22   party from changing its position over the course of judicial proceedings when such positional

23   _____

24   [17] Plaintiff also points to the federal government's submission in that litigation of a February, 1991 declaration from
     Dr, Michael Lawson, an historian in the BIA's Branch of Acknowledgement and Research.  Lawson stated:

25   "According to BAR records, the United States has never extended federal recognition to the Ione Band of Miwok
     Indians as an Indian tribe."  (AR20824.)  However, Lawson prepared a later report, dated February 6, 1992, in which

26   he discusses the recent discovery of 115 documents "which [he] had not previously seen," concerning the efforts to
     acquire the 40 acre parcel between 1915–1935 for the Ione Band.  (AR784.)  The later report further stated, regarding

27   the Bruce letter: "Bureau personnel who were then on staff and have considerable knowledge regarding comparable
     cases related to us that they considered the Ione situation to be an administrative anomaly. [¶] Distinct because

28   handled by Real Estate Services rather than Tribal Relations.  Unlike other cases during that era where recognition
     was actualized – no evaluation of history and ancestry."  (AR784.)

1    changes have an adverse impact on the judicial process … Judicial estoppel is intended to protect

2    against a litigant playing fast and loose with the courts … Judicial estoppel is most commonly

3    applied to bar a party from making a factual assertion in a legal proceeding which directly

4    contradicts an earlier assertion made in the same proceeding or a prior one." *Russell v. Rolfs*, 893

5    F.2d 1033, 1037 (9th Cir. 1990).

6        As an initial matter, Plaintiff's point must be acknowledged that at the beginning of the

7    *Burris* litigation, the federal government took exactly the opposite position as it does now.

8    Defendant Intervenors point out that the district court's holding regarding federal recognition was

9    made in the course of upholding the government's claim of sovereign immunity; they argue that

10   the court's order did not concern whether Ione Band faced limitations on how it could become

11   recognized.  (ECF No. 82 at 48.)  That is not an entirely accurate summary of the district's ruling.

12   As is evident from the portion cited, *supra*, the district court accepted the position that plaintiffs

13   had not demonstrated they were entitled to federal recognition by those alternative "non-

14   regulatory mechanisms for tribal recognition" that the parties had proposed.

15       Defendants respond that the *Burris* litigation concluded in 1996.  Prior to that point, the

16   government identified its previous position as erroneous, and took its current position that there

17   were alternative methods by which a tribe could receive federal recognition, outside of the Part 83

18   process.  The 1994 Ada Deer determination reflects this correction.  The Ione Band was also

19   included on the Secretary's list of federally recognized tribes in 1995.  The Government explains

20   it presented the Department's corrected position concerning the Band's status to the district court,

21   in 1995 at the district court's request.  (AR1133.)  The remaining portion of the litigation then

22   concerned whether there was an authorized governmental spokesperson for the Ione Band with

23   standing to present litigation.  (ECF No. 84-1 at 52–53.)

24       The Court notes three points.  First, the inconsistent positions taken by the federal

25   government in the *Burris* litigation is not an anomaly, insofar as it reflects a pattern of

26   inconsistency by the federal government in its dealings with the Ione Band for the last several

27   decades.  That inconsistency includes the 1972 Bruce determination; the de facto period of

28   termination of the Ione Band's recognition and continuing into the *Burris* litigation; the 1994

1    Deer determination; the 2009 draft opinion circulated by Solicitor Bernhardt; and the 2011

2    clarification by Solicitor Tompkins, all of which reversed previous positions on the recognition

3    status of the Ione Band.  Point being, the ROD acknowledges this long pattern of inconsistency

4    and concludes that the Ione Band is federally recognized; the *Burris* litigation does not by itself

5    establish such egregious inconsistency.

6           Second, for the purposes of res judicata and collateral estoppel, it appears that the

7    Government's ultimate position in the *Burris* litigation was that in fact the Ione Band was

8    federally recognized; apparently the *Burris* court did not preclude the federal government or the

9    Ione Band from taking this new position based on either res judicata or collateral estoppel.

10   Further, the relevant portion of the district court's order, cited above, concerned the government's

11   claim that it had not waived its sovereign immunity from suit.  To the extent the district court

12   disavowed alternative means – outside of the Part 83 process – by which plaintiffs could seek

13   federal recognition, the district court considered those specific means proposed by the parties,

14   including: Congressional recognition and/or via treaty, the government's resolution of tribal

15   acknowledgment petitions, the "wholesale listing of Alaska native entities" in the 1988 Federal

16   Register, and recognition arising out of government settlement of litigation in the 1950s and

17   1960s.  (AR7778.)  But the means by which the Ione Band is recognized in this case – namely,

18   "administrative restoration" via the Bruce or Deer letters – did not appear to be within that court's

19   consideration.  Of primary importance before this Court are the 1994 Deer determination and the

20   ROD, which were not at issue in the *Burris* litigation.  Thus, Plaintiff does not establish there is

21   an identity of issues or identity of causes of action, so as to invoke collateral estoppel or res

22   judicata.

23          Third, given that the Department changed its position prior to the conclusion of the *Burris*

24   lawsuit – and that position is in fact what Defendants put forth in this matter – there is no

25   apparent "playing fast and loose" with this Court.[18]  Defendants and Defendant Intervenors argue

26   tenably that it is factually accurate to consider those members of the present day Ione Band as

27   _____

28   [18] The Court notes that Plaintiff has itself argued that the Ione Band had achieved federally recognized status and that
     such status had not been terminated, although this inconsistency is not as pronounced as the exact opposite positions
     the government takes in the *Burris* litigation relative to the instant matter.  (AR4212–16; 4851.)

1  members of a distinct Indian group, with genealogical and political ties to land in Amador

2  County, and were in fact under federal jurisdiction in 1934.  Equitable concerns do not favor

3  precluding what appears to be a factually correct argument, in a summary judgment lawsuit

4  involving trust acquisition of gaming-eligible property.  Therefore, for those reasons, the Court

5  declines to apply judicial estoppel.

6       E.   The 1972 Bruce and 1994 Deer determinations

7       Plaintiff argues that the administrative record demonstrates that both the Bruce letter and

8  the Deer letter departed from well-established agency procedures and ignored the criteria relevant

9  to their determinations.

10      Plaintiff points out that in the case of Louis Bruce, he had his determination processed

11  through Real Estate Services rather than Tribal Services.  However, Plaintiff does not elaborate

12  on this distinction; the Court does not find adequate grounds to overturn the ROD's conclusions

13  based on this observation.

14      Plaintiff also argues Commissioner Bruce failed to consider the Cohen criteria, which

15  according to Plaintiff were applied by the BIA to requests for tribal recognition from the time the

16  IRA was enacted until the Part 83 regulations were adopted in 1978.  (*See* AR678.)  Defendants

17  clarify that, according to former Associate Solicitor for Indian Affairs Cohen, various factors

18  were considered singly or jointly in making tribal status determinations, including "treaty

19  relations with the United States;" whether "the group has been treated as having collective rights

20  in tribal lands or funds, even though not expressly designated a tribe;" and whether "the group has

21  exercised political authority over its members, through a tribal council or other governmental

22  forms."  (ECF No. 86 at 12, n. 16, quoting F. Cohen, *Handbook of Fed. Indian Law* at 271

23  (1941)).  It appears that, considering application of these criteria now, such as the election of

24  Charlie Maximo as tribal leader and the attempted purchase of the Arroyo Seco parcel, some of

25  these criteria would be met.

26      Defendants also respond that the so-called Cohen criteria were not uniformly applied, as

27  demonstrated by the Department's rationale in promulgating the Part 83 procedures: "Heretofore,

28  the limited number of such requests [for formal acknowledgment] permitted an acknowledgment

1    of the group's status on a case-by-case basis of the Secretary. The recent increase in the number

2    of such requests before the Department necessitates the development of procedures to enable the

3    Department to take a uniform approach in their evaluation." (ECF No. 86 at 13, n. 17, quoting 43

4    Fed. Reg. 39,361 (Sept. 5, 1978)). This appears to be a reasonable position. Therefore, for the

5    foregoing reasons, the Court does not find the Department was arbitrary and capricious in relying

6    in part upon the 1972 Bruce determination in the ROD.

7         Plaintiff argues that in the case of Ada Deer, due to political pressure she ignored the Part

8    83 process for a tribe's attainment of federal recognition. Plaintiff argues that her failure to

9    comply with these regulations, standing alone, was an abuse of discretion, because "[a]n agency

10   is bound by its regulations so long as they remain operative ...." *Romeiro De Silva v. Smith*, 773

11   F.2d 1021, 1025 (9th Cir. 1985).[19]

12        As stated above, in 1978 at the time the Department promulgated the Part 83 regulations,

13   the BIA also issued: 1) a list of federally-recognized Indian tribes; and 2) a list of groups whose

14   petitions for recognition were on file at the BIA. The Ione Band appeared on the latter list. (ECF

15   No. 65 at 21; AR597.) It appears – this is Defendant's position in this litigation – that in the

16   1990s Assistant Secretary Deer made the determination that it was error not to include the Ione

17   Band on the initial list of federally recognized tribes. The Deer determination was essentially a

18   re-affirmation of the Bruce determination, which in turn was based upon much of the

19   aforementioned political and land-acquisition history of the Ione Band in the early 20th century.

20   It is reasonable that a legitimate route for Ione Band recognition after 1978 was for them to

21   proceed through some Part 83 mechanism. However, the main issue here is whether the

22   Department may assert it mistakenly failed to extend federal recognition to a tribe (the period

23   following the Bruce letter), subsequently implement regulations for determining federal

24   recognition (the Part 83 regulations), and then be barred from correcting that mistake except by

25   proceeding through such regulations. Plaintiff does not identify any controlling precedent

26   holding that the Secretary must be barred in all cases from making a correction as to federal tribal

27

28   _____

[19] Plaintiff also points to a document in the record stating the March, 1994 Deer determination was "hand delivered to the Assistant Secretary – Indian Affairs for signature, without program review and surname." (AR1057.)

34

1    recognition in this way.

2           Even if the Deer determination were invalid, the instant action challenges the ROD, which

3    is based on multiple determinations by the Department throughout the history of the Ione Band's

4    relationship with the federal government.  Even to accept Plaintiff's position that the Deer

5    determination, specifically, is unsubstantiated, this does not automate a finding that the ROD's

6    extension of federal recognition to the Ione Band was arbitrary, capricious, unlawful, or an abuse

7    of discretion.

8           For the foregoing reasons, the Court finds the ROD's determination that the Ione Band

9    was a "recognized Indian tribe now under Federal jurisdiction," 25 U.S.C. § 479, was not

10   arbitrary, capricious, unlawful, or an abuse of discretion.

11   **IV.    The section 292.26(b) grandfathering provision**

12          Section 20 of the IGRA, 25 U.S.C. § 2719, prohibits gaming on land acquired in trust

13   after October 17, 1988, but provides several exceptions to this prohibition.  The exception relied

14   upon by the Department for the Plymouth parcels is section 2917(b)(1)(B)(iii): "the restoration of

15   lands for an Indian tribe that is restored to Federal recognition," i.e. the "restored lands"

16   exception.[20]

17          In 2008, the Department of the Interior promulgated the Part 292 regulations, including

18   sections 292.7 and 292.10, which provide criteria by which the restored lands exception may be

19   met.  Section 292.7 provides that the exception may be met if: a) at one time the tribe was

20   federally recognized; b) thereafter the tribe lost its government-to-government relationship; c)

21   thereafter the tribe was restored to federal recognition by one of the means specified in section

22   292.10; and d) the newly acquired lands meet certain criteria (specified in section 292.11).

23          Section 292.10 then provides that section 292.7 subsection (c) may be met if at least one

24   of the following is demonstrated: congressional affirmation of the government's relationship with

25   the tribal government; recognition through the Part 83 procedures; or a federal court

26   determination or court-approved settlement in which the federal government is a party.

27

28   [20] The Court stresses again that its use of the shorthand "restored lands" throughout this Order is meant to refer to the full provision, "[t]he restoration of lands for an Indian tribe that is restored to Federal recognition," and not just the "restoration of lands" part of that provision.

1    Plaintiff argues that the Ione Band does not fit within any of the provisions listed in

2 section 292.10.  The argument would be, therefore, that the Ione Band cannot show it was

3 restored to federal recognition for the purposes of section 292.7, which means it does not meet the

4 criteria for the restored lands exception stated in 25 U.S.C. 2719(b)(1)(B)(iii).

5    In this case, the Department relies upon the "grandfathering" provision contained in 25

6 section 292.26(b), and thus takes the position that the restored lands exception may be met

7 notwithstanding the criteria set forth elsewhere in the Part 292 regulations, such as section

8 292.10.

9    Section 292.26(b), the grandfathering provision, provides, in relevant part:

10
> These regulations [i.e. the Part 292 regulations] apply to final
11 > agency action taken after the effective date of these regulations
> except that these regulations shall not apply to applicable agency
> actions when, before the effective date of these regulations, the
12 > Department or the National Indian Gaming Commission (NIGC)
> issued a written opinion regarding the applicability of 25 U.S.C. §
13 > 2719 for land to be used for a particular gaming establishment,
> provided that the Department or the NIGC retains full discretion to
14 > qualify, withdraw or modify such opinions.

15 25 C.F.R. § 292.26(b).

16    In applying section 292.26(b) to the Plymouth Parcels the ROD states:

17
> In 2004, prior to submitting its fee-to-trust application, the Band
18 > requested a legal opinion from the Department as to whether the
> Plymouth Parcels would be eligible for gaming under IGRA's
> Restored Lands exception at 25 U.S.C. § 2719(b)(1)(B)(iii).   In
19 > 2006, the Department determined that the Band is a "restored tribe"
> and that the Plymouth Parcels would qualify as restored lands under
20 > IGRA if they were acquired in trust for the benefit of the Band.

21
> The Department's 2006 determination constitutes a written opinion
> regarding the applicability of 25 U.S.C. § 2719 to be used for a
22 > particular gaming establishment under the Part 292 grandfathering
> provision.   Therefore, the particular criteria in the Part 292
23 > regulations governing Restored Lands determinations do not apply
> to this particular trust application.  I have relied upon, and adopted,
24 > the conclusions in the 2006 opinion pursuant to 25 C.F.R. §
> 292.26(b).  The Plymouth Parcels thus constitute "[restored] lands
25 > for an Indian tribe that is restored to Federal recognition" within the
> meaning of IGRA.
26
27    In summary, the 2006 ILD is that "written opinion", issued prior to the Part 292

28 regulations, which established that the Plymouth Parcels would qualify as restored lands.

36

1    Plaintiff argues that section 292.10 represents the Department's "reasonable

2  interpretation" of Congress's intent in enacting the restored lands exception, while section

3  292.26(b) merely serves to evade Congress's purpose.  *See e.g. United States Dept. of the Treas.*

4  *IRS Office of Chief Counsel Wash., D.C. v. Fed. Lab. Rel. Auth.,* 739 F.3d 13, 21 (D.C. Cir. Jan.

5  3, 2014) (holding that an agency acts arbitrarily and capriciously when it "set[s] forth two

6  inconsistent interpretations of the very same statutory term").  Plaintiff directs the Court to

7  portions of the section 292 rulemaking in which the Department rejected proposals that section

8  292.10 include tribes that were "restored" to agency action outside the Part 83 regulations.  The

9  Department's final rulemaking, describing section 292.10, stated:

10    We believe Congress intended restored tribes to be those tribes
      restored to Federal recognition by Congress or through the part 83
11    regulations.  We do not believe that Congress intended restored
      tribes to include tribes that arguably may have been
12    administratively restored prior to the part 83 regulations.

13    In 1988, Congress clearly understood the part 83 process because it
      created an exception for tribes acknowledged through the part 83
14    process. The part 83 regulations were adopted in 1978.  These
      regulations govern the determination of which groups of Indian
15    descendants were entitled to be acknowledged as continuing to exist
      as Indian tribes. The regulations were adopted because prior to their
16    adoption the Department had made ad hoc determinations of tribal
      status and it needed to have a uniform process for making such
17    determinations in the future. We believe that in 1988 Congress did
      not intend to include within the restored tribe exception these pre-
18    1979 ad hoc determinations.

19  73 Fed. Reg. 29354, 29363 (May 20, 2008).

20    The clear point to draw from this explanation is that if section 292.10 is invoked, then the

21  Department and the Ione Band must conform to its express requirements, i.e. one of the three

22  enumerated ways of showing Federal recognition of the tribe.  Those enumerated ways include

23  proceeding through the Part 83 procedures, but do not include "administrative" restoration such

24  as the Deer determination.

25    However, the same May, 2008 rulemaking also explained the motivation for section

26  292.26(b) as follows:

27    During the course of implementing IGRA section 20, the
      Department and the NIGC have issued a number of legal opinions
28    to address the ambiguities left by Congress and provide legal advice

37

1
2
3
4
5
6
7
8
9
10

> for agency decisionmakers, or in some cases, for the interested parties facing an unresolved legal issue. These legal opinions typically have been issued by the Department's Office of the Solicitor or the NIGC's Office of General Counsel. In some cases, the Department or the NIGC subsequently relied on the legal opinion to take some final agency action. In those cases, section 292.26(a) makes clear that these regulations will have no retroactive effect to alter any final agency decision made prior to the effective date of these regulations. In other cases, however, the Department or the NIGC may have issued a legal opinion without any subsequent final agency action. It is expected that in those cases, the tribe and perhaps other parties may have relied on the legal opinion to make investments into the subject property or taken some other actions that were based on their understanding that the land was eligible for gaming … In this way, the Federal Government may be able to follow through with its prior legal opinions and take final agency actions consistent with those opinions, even if these regulations now have created a conflict.

73 Fed. Reg. 29354, 29372.

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Here, the restored lands exception, 25 U.S.C. § 2719(b)(1)(B)(iii), is not further explained in that statute and it is ambiguous.  The Part 292 regulations, e.g. section 292.7 and 292.10, appear to propose reasonable criteria by which the restored lands exception can be met.  The grandfathering regulation, section 292.26(b), also reasonably safeguards against conflict with agency actions in which attempts to seek gaming eligibility were underway.  There is some inconsistency between the Department's position in the final rule that administrative restoration of tribes – at least prior to promulgation of the Part 83 regulations – be foreclosed as a route to being a "restored tribe"; and the Department's position that administrative restoration is permitted in the Ione Band's case.  Nonetheless, the Department did in fact promulgate the grandfathering provision, its justification is reasonable, and its application to the Ione Band also does not appear arbitrary or capricious.  Accordingly, the Court affords deference to the Department in its decision to promulgate the grandfathering provision as part of the Part 292 regulations.  *See Mead Corp.*, 533 U.S. at 219 ("It can be apparent from the agency's generally conferred authority and other statutory circumstances that Congress would expect the agency to be able to speak with the force of law when addressing ambiguity in the statute or fills in a space in the enacted law, even one about which Congress did not have intent as to a particular result. When circumstances implying such an expectation exist, a reviewing court must accept the agency's position if

38

1   Congress has not previously spoken to the point at issue and the agency's interpretation is

2   reasonable.")

3   **V.      Section 292.26(b) applied to the Ione Band**

4       A.  The 2006 ILD

5           The Department's reliance on the 2006 ILD as the written opinion for the purposes of the

6   grandfathering provision is consistent with the aforementioned May, 2008 rulemaking, which

7   expressed the concern that a tribe "may have relied on the legal opinion to make investments into

8   the subject property or taken some other actions that were based on their understanding that the

9   land was eligible for gaming."  73 Fed. Reg. 29354, 29372.

10          According to Defendant Intervenors, the Ione Band began preparation of the instant fee to

11  trust application around 2003.  *See* AR1382 (indicating that by April, 2003, the Tribe had

12  identified land and begun planning its project); AR1404 (stating a development agreement was

13  entered into in April, 2003); AR2808 (apparently showing land options purchased in March,

14  2003); AR5094 (stating that in September, 2004, the Ione Band submitted a request to the NIGC

15  for an opinion on the eligibility of the Plymouth Parcels for gaming).  The 2006 ILD confirmed

16  that "the lands that are the subject of the fee-to-trust application would qualify as 'Indian lands'

17  within the meaning of the [IGRA] on which the Band could conduct gaming if the lands were

18  acquired in trust by the Department of Interior."  (AR5071.)  The 2006 ILD was expressly

19  premised on the Plymouth Parcels being able to meet the restored lands exception, 25 U.S. §

20  2719(b)(1)(B)(iii).  (AR5072.)

21          By May 20, 2008, when the final section 292 regulations were published, the Ione Band

22  had been working on its instant fee to trust regulations for over 5 years.  It is thus reasonable to

23  infer that the Ione Band had relied on the aforementioned communications with the Department –

24  including the 1994 Deer affirmation, and the 2006 ILD which stated the Plymouth Parcels would

25  qualify for gaming under the IGRA – in taking action to have such parcels qualify for gaming.

26          The Court also notes the 2006 ILD's statement that: "the Department is still in the process

27  of developing regulations to govern the conduct of gaming on lands acquired after October 17,

28  1988.  Those regulations will refine what lands will be considered restored lands for purposes of

1    IGRA ….”  The regulations referred to in the statement would be the Part 292 regulations.  The

2    2006 ILD was issued in September, 2006.  In October, 2006, the BIA published its proposed rule

3    containing the section 292 requirements, including essentially the same section 292.10

4    requirements as are stated in the final section 292.10.  *See* 71 Fed. Reg. 58769, 58774.  *See also*

5    Letter from the Ione Band to the Office of Indian Gaming Management, April 26, 2006,

6    responding to draft Part 292 regulations which apparently had been circulated to tribal leaders on

7    March 15, 2006.  (AR4857.)  The 2006 ILD was issued closely in time with the Department's

8    contemplation of the current Part 292 regulations, and it appears that the 2006 ILD was issued

9    notwithstanding the Department's awareness of the proposed changes.

10       Plaintiff argues that because the 2006 ILD was purportedly withdrawn in 2009 by

11   Solicitor Bernhardt, it was improperly relied upon in the ROD.  Defendants respond, however,

12   that neither the withdrawal memorandum nor the draft opinion circulated by Bernhardt, were

13   adopted by the Secretary of the Interior, and that the NIGC did not concur in the draft opinion.

14   (AR8817–25; 7754–56.)  The July 26, 2011 Memorandum from Solicitor Tompkins to the

15   Assistant Secretary, which considered the effect of Bernhardt's withdrawal and draft opinion,

16   stated among other things: “The grandfather provisions in the Part 292 regulations were intended

17   for situations such as the Band's – to avoid upsetting settled expectations of tribes based on

18   previous legal opinions and land determinations for purposes of the IGRA … For these reasons,

19   the Withdrawal Memorandum is rescinded and the Draft Opinion is of no legal effect.  As a

20   result, the Restored Tribe Opinion is reinstated.”  (AR8824.)

21       Plaintiff also directs the Court to a January 2009 Memorandum of Understanding

22   (“MOU”), governing the NIGC and the Department's collaboration regarding giving legal

23   opinions on lands eligible for gaming.  Per that MOU, the “[Department] and the NIGC agree that

24   whether a tribe meets one of the exceptions in 25 U.S.C. § 2719 … is a decision made by the

25   Secretary when he or she decides to take land into trust or restricted fee for gaming.”  Further, per

26   the MOU, the Solicitor is required to concur in any opinion that provides legal advice relating to

27   the restored land exception in 25 U.S.C. § 2719.  (AR7088–89.)  As stated above, Solicitor

28   Tompkins, in her July 26, 2011 memorandum, expressed the opinion that the 2009 Bernhardt

40

1    withdrawal memorandum and draft opinion were not effective, and that the "Restored Tribe

2    Opinion," i.e. the 2006 ILD, was reinstated.  Plaintiff argues, however, that from the time of the

3    Bernhardt withdrawal in 2009, until the issuance of the Tompkins memorandum in 2011, there

4    was no operative ILD with regard to the Ione Band.  The point appears to be that during this

5    interim period, the Department continued to evaluate the viability of the Plymouth Parcels for

6    trust acquisition as if the Ione Band were a restored tribe.  This evaluation would have relied upon

7    the section 292.26(b) grandfathering provision, which in turn would have to rely upon a prior

8    "written opinion" regarding the restored lands exception.  But no such written opinion could be

9    relied upon because the ILD had been withdrawn but not yet reinstated.

10          Regardless, when the ROD was issued in May, 2012, the Solicitor had agreed to reinstate

11    the 2006 ILD.  Therefore, both the Assistant Secretary and the Solicitor had agreed upon the

12    validity of the 2006 ILD at that time.  It is not apparent that evaluation of the instant trust

13    application had to be stopped, in the interim between Bernhardt's and Tompkins' memoranda,

14    such that failure to do so would now serve to invalidate the ROD.

15          B.  The "*NRDC* factors"

16          Plaintiff also argues that the Secretary erred in adopting section 292.26(b) in the ROD,

17    without considering the factors set forth in *Natural Resource Defense Council, Inc. v. Thomas*,

18    838 F.2d 1224, 1244 (9th Cir. 1988) (citing *Sierra Club v. E.P.A.* 719 F.2d 436, 467 (D.C. Cir.

19    1983); *Retail, Wholesale & Department Store Union v. NLRB*, 466 F.2d 380, 390 (D.C. Cir.

20    1972)).  The NRDC factors include: "[1] whether the new rule represents an abrupt departure

21    from well established practice or merely attempts to fill a void in an unsettled area of law, [2] the

22    extent to which the party against whom the new rule is applied relied on the formed rule, [3] the

23    degree of the burden which a retroactive order imposes on a party, and [4] the statutory interest in

24    applying a new rule despite the reliance of a party on the old standard."  *NRDC*, 838 F.2d at 1244.

25          Those factors are not relevant to this case, because the grandfathering provision – which

26    Plaintiff argues is invalid facially and as applied – *protects* against the retroactive application of

27    the part 292 regulations.  The operative part of section 292.26(b) is that the Part 292 regulations

28    "shall not apply to applicable agency actions when, before the effective date of these regulations,

41

1   the Department [] issued a written opinion" regarding the restored lands exception. Hence, the

2   Department determined that the section 292.10 requirements need not be met because there has

3   been at least one written opinion regarding the restored lands exception, the 2006 ILD.

4   (AR10101.)  In contrast, the concern in *NRDC* was the mandatory retroactivity of Clear Air Act

5   restrictions on certain stacks designed to disperse pollutants. The Environmental Protection

6   Agency *refused* to provide any grandfathering for certain plants that had justified their use of the

7   stacks prior to implementation of the restriction, thus making its restriction on those plants

8   retroactive.[21]  In contrast, here the grandfathering provision is applied to protect against concerns

9   regarding retroactivity. Section 292.26(b) calls for a consideration of "the inequity of enforcing a

10  new rule against persons that justifiably made investment decisions in reliance on a past rule or

11  practice." *NRDC*, 838 F.2d at 1244.  Accordingly, the Court does not find the Secretary was

12  arbitrary or capricious in applying the grandfathering provision to the Ione Band's case without

13  expressly considering the *NRDC* factors.

14      C.  Other applications of section 292.26(b)

15          The Court notes one other instance in which the NIGC has determined Indian lands to be

16  eligible for gaming pursuant to the restored lands exception, after first applying the section

17  292.26(b) grandfathering provision. In 2003, the Karuk Tribe of California requested that the

18  NIGC issue an opinion on whether the designated trust property would be eligible for gaming

19  under the restored lands provision. (*See* Def. Int. RJN, ECF No. 82, Ex. 5.)  In a 2004 opinion,

20  the NIGC found that the submitted materials did not demonstrate the Karuk was a restored tribe,

21  but the Karuk tribe subsequently provided additional information in 2007. The NIGC did not

22  complete analysis of the 2007 information prior to the Department's publication of the section

23  292 regulations in 2008.  Therefore, in its analysis in 2012, the NIGC considered the new 2007

24  information in tandem with its prior 2004 opinion.  The 2012 NIGC analysis concluded that

25

26  _____

[21] *See NRDC*, 838 F.2d at 1244 ("EPA has refused to provide any grandfathering for plants that prior to the Final
Rule conducted demonstrations to justify above-formula stacks … Retroactivity is involved here simply because
27  enforcement of the demonstration requirement might impinge unfairly on source owners that made investments or
other commitments in reasonable reliance on prior understandings … Clearly the issue entails a balancing of the
28  interest in prompt and complete fulfillment of statutory goals against the inequity of enforcing a new rule against
persons that justifiably made investment decisions in reliance on a past rule or practice.")

1   section 292.26(b) applied to the Karuk Tribe's application, and concluded that "the 2004 Opinion

2   is a written opinion regarding the applicability of 25 U.S.C. § 2719 for land to be used for a

3   particular gaming establishment."  (ECF No. 82, Ex. 5 at 5.)  The NIGC conducted its analysis of

4   gaming eligibility pursuant to "the IGRA and the case law developed prior to [the Department's]

5   promulgation of the Part 292 regulations," notwithstanding that its analysis was occurring after

6   the Part 292 regulations had been implemented.  (ECF No. 82, Ex. 5 at 9.)

7        The NIGC determined that the Karuk tribe had shown a history of government

8   recognition, a period of non-recognition, and reinstatement of recognition.  With respect to the

9   latter, the NIGC discussed that "[i]n 1978, Interior undertook a comprehensive review of the

10   Tribe's situation and concluded that its earlier internal determination that the Tribe and its

11   members should not receive services because the Tribe or its sub-communities were not Federal

12   [sic] recognized 'was not entirely accurate.'  In 1979, Interior re-established a government-to-

13   government relationship with the Tribe, and the Karuk Tribe was added to the list of federally

14   recognized tribes."  (ECF No. 82, Ex. 5 at 9.)  The NIGC found the Karuk trust lands gaming

15   eligible, with concurrence by the Department's Office of the Solicitor.  (ECF No. 82, Ex. 5 at 14.)

16   In the instant case, this is essentially the analysis conducted in the 2006 ILD and restated in the

17   ROD relative to the Ione Band.

18        For the foregoing reasons, the Court does not find the Department's application of section

19   292.26(b) to the Ione Band's case was arbitrary, capricious, unlawful, or an abuse of discretion.

20        **VI.   <u>Termination and restoration</u>**

21        The 2006 ILD explains that, "[t]o be a restored tribe, the Band must establish that it was

22   once recognized by the Federal government, that Federal government subsequently did not

23   recognize it and that, ultimately, the Federal government restored its recognition of the Band."

24   (AR5072.)  *See e.g. Grand Traverse Band of Ottawa & Chippewa Indians v. Office of U.S. Atty.*

25   *for W. Div. of Michigan*, 369 F.3d 960 (6th Cir. 2004).

26        The ROD, with reference to the 2006 ILD, discusses the Band's land acquisition attempts

27   and the Bruce determination that the Ione Band was federally recognized, the contrary position

28   taken by the Department thereafter which it now calls "termination," and the subsequent Deer

1    restoration – thus the ROD finds the Ione Band to be a "restored tribe".[22]  (AR10101.)

2          With regards to this "restored tribe" finding, Plaintiff argues that, even if federal

3    recognition had been extended to the Ione Band via the Bruce Determination (or before), such

4    recognition was never terminated and then restored.  Plaintiff points to the dissimilarities between

5    this case and those cited by Defendants: *Tomac*, 433 F.3d 852; *Grand Traverse,* 369 F.3d 960;

6    and *Sault Ste. Marie Tribe of Lake Superior Chippewa Indians v. United States*, 78 F. Supp. 2d

7    699 (W.D. Mich. 1999).  Plaintiff argues: "[A]ll the tribes in these cases were treaty tribes; all

8    were entitled, pursuant to those treaties, to receive compensation from the government in

9    exchange for ceding their claims to certain lands; all but one of the tribes had actual reservations

10   (and the fact that it did not precluded it from reorganizing under the IRA), and all were deprived

11   of these existing benefits and their land by the administrative actions of the Department. In this

12   case, by contrast, the Ione Band received the same exact benefits at all points—which is none.

13   Thus, the Michigan tribes addressed by *Grand Traverse*, *TOMAC* and *Sault Ste. Marie* can be

14   said to have experienced a 'termination' of their prior position that could be restored. The Ione

15   Band experienced no such thing."  (ECF No. 85 at 60.)

16         Plaintiff points out that in *Sault St. Marie* and *TOMAC*, the tribes were deemed to have

17   been restored pursuant to formal acts of Congress, while the tribe at issue in *Grand Traverse* was

18   re-recognized through the Part 83 regulations.  Plaintiff also points to the May, 2008 Part 292

19   final rule, which stated:  "We believe Congress intended restored tribes to be those tribes restored

20   to Federal recognition by Congress or through the part 83 regulations. We do not believe that

21   Congress intended restored tribes to include tribes that arguably may have been administratively

22   restored prior to the part 83 regulations."  73 Fed. Reg. 29354, 29363.  (ECF No. 85 at 61.)

23         With respect to termination, Defendant Intervenors' response is that termination of treaty

24   benefits is not equivalent to termination of recognition, the latter of which is at issue here.  (ECF

25   No. 82 at 29–30.)  The record demonstrates that at some point in the 1970s until the 1994 Deer

26   ─────────────────
[22] The ROD also discusses the historical significance of the Plymouth Parcels to the Ione Band, the Band's modern
27   connection to the Plymouth Parcels, and the closeness in time between restoration of the tribe and attempts to acquire
the Parcels, thus establishing them as the "restoration of lands".  The "ROD thus records the Department's
28   determination that the Plymouth County Parcels are eligible for gaming under the 'restored lands' exception in IGRA
Section 20, 25 U.S.C. § 2719(b)(1)(B)(iii)."  (AR10102.)

1    determination, the Department consistently took the position that the Ione Band was not a

2    federally recognized tribe, hence meeting the termination element.  *See TOMAC*, 433 F.3d at

3    855–856 (stating that a tribe may be administratively terminated).

4         With respect to restoration of recognition, strictly speaking, this case involves

5    administrative restoration *after* promulgation of the part 83 regulations.  Moreover, the section

6    292.26(b) grandfathering provision provides that the Part 292 regulations "shall not apply to

7    applicable agency actions when, before the effective date of these regulations" a written opinion

8    regarding the restored lands provision had issued.  While proceeding through the Part 83

9    regulations for restoration of recognition is required if section 292.10 is invoked, the

10   Department's position is that the Part 83 process is not necessarily invoked when the

11   grandfathering provision applies.  The Court has found the grandfathering provision was validly

12   applied.

13        Plaintiff does not produce authority for the proposition that an administrative restoration,

14   such as the Deer determination, is per se prohibited from serving to meet the "restored tribe" part

15   of the restored lands provision.  *See Grand Traverse*, 369 F.3d at 969 ("The result of this

16   administrative acknowledgment was a restoration of federal recognition, a necessary component

17   of which includes the resumption of the government's political relationship with the Band … On

18   the facts of this case, a tribe like the Band, which was administratively 'acknowledged,' also is a

19   'restored' tribe.)  It appears that in other cases, the Department has found a tribe to be restored in

20   a manner similar to here.  *See e.g.* ECF No. 82, Ex. 3 at 21 (2008 NIGC determination that the

21   Poarch Band, because the Department had re-recognized the Band in June, 1984, was a restored

22   tribe; the NIGC further interpreted *Grand Traverse* to mean "reinstatement of recognition [may

23   be] achieved through Congressional action, the administrative federal acknowledgement process,

24   or administrative recognition").  The general elements – recognition, followed by termination,

25   followed by recognition again – which had been identified by the Department prior to the Part

26   292 regulations, are present in this case.  The ROD demonstrates consideration was given to the

27   applicable statutory and regulatory framework, and to the Ione Band's relationship with the

28   federal government throughout the 20th century, in reaching the determination that the restored

1   lands provision is met.

2        For the foregoing reasons, the Court does not find the Department's conclusion – that the

3   acquisition constitutes the "restoration of lands for an Indian tribe that is restored to Federal

4   recognition," 25 U.S.C. § 2719(b)(1)(B)(iii) – was arbitrary, capricious, unlawful, or an abuse of

5   discretion.

6                                   **CONCLUSION**

7        For the foregoing reasons, Plaintiff's Motion for Summary Judgment (ECF No. 65) is

8   DENIED; Defendants' Motion for Summary Judgment (ECF No. 84) is GRANTED; and

9   Defendant Intervenors' Motion for Summary Judgment (ECF No. 82) is GRANTED.

10

11  Dated:  September 29, 2015

12

13

14                                         Troy L. Nunley
                                           United States District Judge
15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                              46